UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARLES H. CHRISTENSEN, D.O.,

        Plaintiff,

v.

MCLAREN MEDICAL GROUP, a
subsidiary of MCLAREN HEALTH
CARE CORPORATION,

        Defendant.

Case No. 24-cv-12642
Hon. Thomas L. Ludington

---

| Charles H. Christensen, D.O. | Terrence J. Miglio (P30541) |
| *In pro per* | Barbara E. Buchanan (P55084) |
| | BUTZEL LONG P.C. |
| | Attorneys for Defendant |
| | 201 W. Big Beaver, Suite 1200 |
| | Troy, MI  48084 |
| | (248) 258-1616 |
| | miglio@butzel.com |
| | buchanan@butzel.com |

---

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant McLaren Medical Group ("McLaren" or "Defendant") by its
attorneys, **Butzel Long**, **P.C.** moves this Court for an Order dismissing Plaintiff's
Complaint in its entirety with prejudice, pursuant to Fed. R. Civ. P. 56. Even
assuming all facts in a light most favorable to Plaintiff, no reasonable jury would

conclude that Plaintiff is entitled to recovery on his claims.

Defendant relies upon the facts and legal argument set forth in the accompanying brief in support of this Motion.

Defense counsel sought the concurrence from Plaintiff on February 21, 2026, and concurrence was denied.

WHEREFORE, Defendant moves this Court for an Order dismissing Plaintiff's Complaint in its entirety with prejudice pursuant to Fed. R. Civ. P. 56 and awarding them the costs and fees they incurred in defending this matter.

Respectfully submitted,

**BUTZEL LONG, a professional corporation**

By: */s/ Terrence J. Miglio*
Terrence J. Miglio (P30541)
Barbara E. Buchanan (P55084)
Attorneys for Defendants
201 W. Big Beaver, Suite 1200
Troy, MI 48084
(248) 258-1616
miglio@butzel.com
buchanan@butzel.com

Dated: March 2, 2026

000161884\0003\200851393

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARLES H. CHRISTENSEN, D.O.,

        Plaintiff,

v.

MCLAREN MEDICAL GROUP, a
subsidiary of MCLAREN HEALTH
CARE CORPORATION,

        Defendant.

Case No. 24-cv-12642
Hon. Thomas L. Ludington

---

| Charles H. Christensen, D.O. | Terrence J. Miglio (P30541) |
|---|---|
| *In pro per* | Barbara E. Buchanan (P55084) |
| | BUTZEL LONG P.C. |
| | Attorneys for Defendant |
| | 201 W. Big Beaver, Suite 1200 |
| | Troy, MI  48084 |
| | (248) 258-1616 |
| | miglio@butzel.com |
| | buchanan@butzel.com |

---

**DEFENDANT'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................................................................... iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS .......................................................................... 1

    **Plaintiff Joined McLaren as Part of a Hospital Acquisition.** ......................... 1

    **Plaintiff Demanded that McLaren Provide Him a Personal Scribe.** ............. 2

    **Plaintiff Refused to Complete the Accommodation Request Paperwork** ....................................................................................... 3

    **Plaintiff's Troubled Employment History: McLaren Received Numerous Complaints about Plaintiff from His Staff.** ............. 5

    **McLaren's Chief Medical Officer Met with Plaintiff to Address His Behavior.** ...................................................................... 6

    **McLaren Attempted to Negotiate Plaintiff's Next Contract.** ......................... 7

    **McLaren Discovered Gun Paraphernalia in Plaintiff's Office.** ..................... 8

    **Plaintiff Admitted the Gun Paraphernalia And Other Items Found In His Suite Belonged to Him.** ......................................................... 10

ARGUMENT ......................................................................................... 11

    **Plaintiff Refused to Provide Documentation Confirming His Disability and Need for Accommodation.** ................................................ 11

    **The ADA Did Not Require McLaren to Give Plaintiff a Personal Scribe** ................................................................................ 13

    **McLaren Had No Duty to Continue Providing a Personal Scribe** ............... 15

    **Plaintiff Cannot Prove a Prima Facie Case of Disability Discrimination.** .......................................................................... 15

    **McLaren Did Not Retaliate Against Plaintiff.** ............................................ 16

    **Plaintiff Cannot Prove Pretext** ................................................................. 17

**Plaintiff Did Not Work in a Hostile and Offensive Work Environment.** ..................................................................................21

**McLaren Did Not Put Plaintiff in a False Light** ............................23

**Plaintiff's Intentional Infliction of Emotional Distress Claim Is Frivolous.** ..............................................................................24

**CONCLUSION** .....................................................................................25

000161884\0003\200851393

# INDEX OF AUTHORITIES

## Cases

*Bhama v. Mercy Mem. Hosp. Corp.*, 416 Fed. Appx. 542 (6th Cir. 2011) ..............19

*Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834 (6th Cir. 2018)............... 12, 13

*Cardenas-Meade v. Pfizer, Inc.,* 510 Fed. Appx. 367 (6th Cir. 2013) ....................18

*Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409 (6th Cir. 2020) ...................................13

*Gardner v. Wayne County,* 520 F. Supp. 2d 858 (2007) .........................................25

*Green v. Rocket Mortg. LLC,* 769 F. Supp. 3d 668 (E.D. Mich. 2025)...................12

*Hrdlicka v. GM* LLC, 63 F.4th 555 (6th Cir. 2023)...................................................11

*Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010) ........................................24

*Kennedy v. Superior Printing Co.*, 215 F.3d 650 (6th Cir. 2021) ............................12

*Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886 (6th Cir. 2006). ...................................................................................................................................16

*Kuhn v. Washtenaw County*, 709 F.3d 612 (6th Cir. 2013).......................................17

*Monak v. Ford Motor Co.*, 95 F. App'x 758 (6th Cir. 2004) ...................................22

*Peden v. City of Detroit*, 470 Mich. 195 (Mich. 2004)............................................15

*Pemberton v. Bell's Brewery, Inc.,* 150 F.4th 751 (6th Cir. 2025)............................18

*Puetz v. Spectrum Health Hosps. & Kevin Splaine*, 324 Mich. App. 51 (2018).....23

*Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 531 (6th Cir. 2020)....17

*Rosenthal v. Faygo Bevs., Inc.*, 701 Fed. Appx. 472 (6th Cir. 2017)......................18

*Sanford v. Quicken Loans*, 2015 US. Dist. Lexis 19068 *13-*15, (E.D. Mich. Feb. 18, 2025) ...................................................................................................................14

*Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824 (E.D. Mich. 2017). 18

*Smith v. Ameritech*, 129 F.3d 857 (6th Cir. 1997)...................................................15

000161884\0003\200851393

*Smith v. Honda of Am. Mfg.,* 101 Fed. Appx. 20 (6th Cir. 2004) ............................ 14

*Tchankpa v. Ascena Retail Grp., Inc.,* 951 F.3d 805 (6th Cir. 2020) ...................... 12

*Thomas v. Owen Elec. Coop., Inc.,* 121 Fed. Appx. 598 (2005) ............................ 19

*Trepka v. Bd. of Educ.,* 28 Fed. Appx. 455 (6th Cir. 2002) .................................... 21

*Waltherr-Willard v. Mariemont City Sch.,* 601 F. App'x 385 (6th Cir. 2015) ........ 21

*Williams v. AT&T Mobility Servs. LLC,* 847 F.3d 384 (6th Cir. 2017) ................... 16

iv

## **INTRODUCTION**

Plaintiff, Dr. Charles Christensen, is a pediatrician who worked for Defendant McLaren Medical Group ("McLaren"). McLaren terminated Plaintiff's employment after it discovered gun paraphernalia and disturbing and violent political propaganda in his clinic office. Plaintiff is suing McLaren, claiming that it terminated his employment because of an alleged learning disability and refused to provide him a personal scribe as a reasonable accommodation. Plaintiff is also claiming that McLaren retaliated against him, created a hostile work environment, invaded his privacy and intentionally inflicted emotional distress upon him. As described in detail below, Plaintiff's claims fail as a matter of law.

## **STATEMENT OF FACTS**

## I.  **Plaintiff Joined McLaren as Part of a Hospital Acquisition.**

In 2018, McLaren Health System ("McLaren") acquired Huron Medical Center ("HMC"). At the time, Plaintiff worked for HMC at a pediatric clinic in Bad Axe, Michigan and performed inpatient services at Huron Memorial Hospital ("HMH"). (Ex. 1, 2015 Agreement). As a result of the acquisition, Plaintiff became employed by McLaren and eventually signed a two-year employment agreement on July 21, 2021. (Ex. 2, 2021 Agreement). In Section 1.05 of the agreement, Plaintiff agreed that he would "abide by all applicable rules, regulations and policies of [McLaren]." (*Id.*) Among other policies, McLaren maintained  a "Workplace

Threats and Violence Policy.  (Ex. 26, Workplace Threats and Violence Policy).

## II.     Plaintiff Demanded that McLaren Provide Him a Personal Scribe.

Plaintiff claims he has dyslexia and dysgraphia, learning disabilities that he asserts impact his ability to read and write. (Ex. 3, Plaintiff's Dep., p. 33-34). When Plaintiff worked for HMC, he had a medical assistant who, in addition to performing medical assistant duties, assisted Plaintiff by putting patient information into the electronic medical record ("EMR") and writing prescriptions and orders. (*Id.*, p. 77). This medical assistant/personal scribe worked with Plaintiff after McLaren acquired HMC, but eventually resigned. (*Id.*, 95, 99-100).

Plaintiff demanded McLaren replace his personal scribe and include his entitlement to a scribe in his next employment agreement. (Ex. 4, 1/1/24 Proposed Contract). In fact, Plaintiff can perform all the functions a scribe would perform, but his opinion is that his energy "would be better served thinking about the mental work of what would be best for the patient." (Ex. 3, p. 80, 83). Plaintiff claims that it "takes forever" to enter information into McLaren's EMR, as " . . . I have to proofread, which even takes more time[.] (Ex. 3, p. 88) However, Plaintiff admits that he has to confirm the accuracy of entries made by a scribe. (*Id.*, p. 91).  Indeed, Plaintiff agreed that it is his responsibility as the physician to confirm everything a scribe enters into the electronic medical record. (*Id.*, p. 94).

Despite asserting that it "takes forever" to enter information into McLaren's

000161884\0003\200851393

system, Plaintiff testified he had not even tried to enter <u>anything</u> into an EMR since 2016, before he worked for McLaren. (*Id.*, p. 109-110). Thus, Plaintiff admitted he had <u>no idea</u> if it would be difficult for him to enter information in McLaren's EMR. (*Id.*).   Importantly, Plaintiff had no scribe in medical school or residency and no scribe when he saw patients and made chart entries while rounding at the hospital. (Ex. 3, p. 86, 212). Plaintiff also did not use a scribe from 2012, when he started practicing at HMC, through 2016 when HMC hired a medical assistant to assist him. (Complaint ¶18). He does not have a scribe now in private practice. (Ex. 3, p. 107).

While McLaren did not hire a scribe for Plaintiff, Tara Smalley, the clinic's Operations Supervisor, helped Plaintiff with his EMR charting. (Ex. 3, p. 336-337). Additionally, McLaren provided Plaintiff with a dictation service called Scribe America.  Plaintiff testified that he used an iPad to dictate into the Scribe America software and received back the information that was typed into the EMR. (Ex. 3, p. 205-206). Plaintiff said he did not like using Scribe America, after <u>trying it for only two weeks</u>. (Ex. 3, p. 205-206, Ex. 5, Email 9/6/22).

## III.   Plaintiff Refused to Submit Accommodation Request Paperwork Completed by a Provider.

Under McLaren's Reasonable Accommodation policy employees may be required to provide documentation from their provider in support of their request for accommodation.  (Ex. 6, Reasonable Accommodation Policy). Consistent with that policy, McLaren sent Plaintiff a form for his provider to complete. (Ex. 7,

3

Accommodation Request Form).

Plaintiff refused to submit information from his provider, however, telling McLaren that his doctor was "gone." (Ex. 8, Email, 1/9/23-1/10/23). When asked for his provider's contact information, Plaintiff responded: "This is A Lifelong disability Documented with Assessments that happened when I was in K-1st Grade." (Ex. 7). Instead of having a provider complete the form as required, **Plaintiff** completed the section of the form directed to his provider and told McLaren, "I have extensive File that documents my LD. If you Like you Can @ Anytime Review it." (*Id.*). The most recent clinical assessment of Plaintiff's learning disability in this file is from 1976, when Plaintiff was in the first grade. (Ex. 9, Report of Examination).

Human Resources asked Plaintiff on two occasions to provide a completed form to no avail. (Ex. 7; Ex. 3, p. 329) Additionally, Dr. Bradley Ropp, McLaren's Chief Medical Officer, told Plaintiff that he needed to submit a completed accommodation request form. (Ex. 10, Ropp Deposition, p. 21-22). Despite these repeated instructions, Plaintiff refused, claiming that he did not want to provide information from his doctor because he did not want people to know that he had a disability. (Ex. 3, p. 318). Plaintiff also unbelievably claims that, despite having been seen by clinical professionals in the past regarding his alleged disability and being a pediatrician, he did not know what kind of doctor could complete the information on the form. (*Id.*, p. 320). **Plaintiff admits that he never provided**

4

**McLaren with any medical documentation supporting his accommodation request.**  (Ex. 3, p. 317).

## IV.  Plaintiff's Troubled Employment History: McLaren Received Numerous Complaints about Plaintiff from His Staff.

In early 2023, Plaintiff's staff complained to McLaren that Plaintiff was frequently late to the office, causing patients to leave because they did not want to wait. (Ex. 11, Email 3/2/23). Staff also complained that Plaintiff would leave the office without telling them. McLaren learned that Plaintiff's refusal to work his required schedule was frustrating the staff, some of whom quit because they were tired of having to apologize to patients for Plaintiff's behavior. (*Id.*).

On November 6, 2022, there was a staff meeting at the pediatric clinic. In addition to Plaintiff and the clinic staff, Jeff Whiting, Operations Manager, and Tara Smalley attended the meeting. Plaintiff claims that the meeting turned into a discussion about him asking staff to write his prescriptions and orders. (Ex. 3, p. 115-116). Plaintiff alleges that Whiting started speaking loudly at the meeting and asked him "what makes you so special" that you need a scribe. (*Id.*). Whiting denies saying this. Plaintiff responded by saying that he has dyslexia. (*Id.,* p. 135).  Plaintiff admits that he got angry and loud with Whiting (*Id.*, p. 124).

Whiting and Smalley reported to their manager, Ken Rates, Director of Operations, what happened at the meeting. (Ex. 12, Email, 11/14/22). Rates investigated the incident by interviewing the staff who were present. The staff

reported issues such as:

- He has "an attitude . . . of this is what you're going to do to make me happy";

- He refuses to "send in prescriptions or orders and forces the staff to do it";

- He has said to them "if he doesn't want them in this office that they will be gone"; and

- The staff "never knows how Dr. Christensen is going to behave."

(Ex. 13, Investigation Notes).  The staff also described Plaintiff's behavior at the meeting:

- He "began yelling and . . . it became uncomfortable . . . this is an ongoing issue and not unique to this incident";

- He was "very agitated . . . was getting louder and not letting anyone speak . . . he wasn't listening to staff and not hearing their concerns.

- Dr. Christensen's behavior [w]as super angry . . . the meeting was very tense and turned into a yelling match.

(*Id.*).

## V. McLaren's Chief Medical Officer Met with Plaintiff to Address Plaintiff's Inappropriate Behavior.

Assistant Chief Medical Officer, Dr. David Pinnelli, and Human Resources Consultant, Sherri Bryant, met with Plaintiff to discuss what happened at the meeting.  At that meeting Plaintiff refused to acknowledge his inappropriate behavior and dismissed the staff's concerns because they "didn't mesh with [his] experiences." (Ex. 3, p. 150).

Bryant subsequently followed up with Rates and Smalley to find out how

things were going in Plaintiff's office.   They reported that Plaintiff had little

interaction with the staff and behaved like a recluse. (Ex. 14, Email, 12/13/22). They

also reported that "all staff are looking for other positions." (*Id.*). Indeed, within

several days, three staff members had resigned.  (Ex. 15, Email, 12/16/22).

In January 2023, Dr. Ropp, Whiting and Rates called Plaintiff to a meeting at

McLaren's Flint office to discuss his conduct and clinic operations. (Ex. 10, Ropp

Dep., p. 19-20).[1] When Plaintiff arrived at the meeting, he launched into a diatribe,

reading a prepared statement of grievances.   (Ex. 3, p. 167; Ex. 16, Prepared

Statement for Physician Discussion). Dr. Ropp let Plaintiff read his statement for a

few minutes, then stopped him so they could discuss why Dr. Ropp had called the

meeting. When Dr. Ropp tried to explain that staff was leaving because of Plaintiff's

behavior, Plaintiff refused to listen and denied that staff were leaving because of

him. (Ex. 3, p. 168-169).

## VI.   McLaren Attempted Without Success to Negotiate A New Contract with Plaintiff.

In June 2023, McLaren and Plaintiff began negotiating Plaintiff's next

contract. (Ex. 17, Email, 5/18-6/12/23). On August 10, 2023, McLaren sent Plaintiff

a new contract to sign, but he returned it with extensive changes, a letter explaining

---

[1] When Plaintiff learned of the meeting, he called Dr. Ropp's secretary, demanding an itinerary and wanted to know why he had to come to Flint.  (Ex. 3, p. 165).

his objections, and a notification that, going forward, McLaren should negotiate with his attorney. (Ex. 18, Email, 8/2-9/5/23). In January 2024, Plaintiff sent McLaren another contract proposal. (Ex. 4). In response, among other demands, Plaintiff wanted a promise that he be provided with "a <u>Real</u> person scribe." (*Id.*). <u>However, Plaintiff still had not provided McLaren with documentation from a provider substantiating his need for a scribe</u>. (Ex. 3, p. 317).

## VII.  McLaren Discovers Weapon Paraphernalia And Other Inappropriate Items  in Plaintiff's Office.

On August 29, 2024, McLaren was moving Plaintiff's pediatric clinic to a different suite in the medical office building where it was located.  Rates and his boss, Sr. Director of Operations, Sheila Windy, were on site to make sure the old suite had been completely cleaned out. (Ex. 19, Windy Dep., p. 37). When they went into Plaintiff's old office, they discovered:

- **Shell casings and live ammunition** (*Id.*, p. 39);

- **A gun stock, magazines for a semi-automatic rifle, and a user manual for a gun scope** (*Id.*, p. 40; Ex. 20, Rates Dep., p. 30; Ex. 21, Photographs); and

- **Disturbing artwork** taped to the wall, including **a picture showing bombing targets in Moscow**. (Ex. 21).

Windy testified that she found the items to be "very disturbing," so she contacted Dr. Ropp, who, in turn, contacted Vice President of Human Resources, Carla Henry. (Ex. 19, p. 43-44). Henry told Windy to bring the items they discovered

to Human Resources. (*Id.*, p. 43-44). Henry also told Windy to go to Plaintiff's new office the next day to see if there were any similar items there. (*Id.*, p. 47-48). When Rates and Windy went to Plaintiff's new office, they found:

- **More shell casings, gun magazines (parts, not literature)**; and

- **"[I]tems that were very unique sitting in a chair that were wrapped in bubble wrap with wires sticking out of them."** (Ex. 19, p. 50; Ex. 20, p. 47; Ex. 22, Photographs).

Windy contacted Henry to tell her what additional items they had found, and Henry contacted her boss and McLaren's Chief Operating Officer. (Ex. 23, Henry Dep., p. 68). McLaren's head of security, Jeff Young, Huron County Sheriff's Deputy, Hunter Talaski, and a Michigan State Trooper responded to the medical office building to investigate what Windy and Rates had found. (Ex. 24, Incident Report). Deputy Talaski and the State Trooper went into Plaintiff's office. Upon observing the suspicious item that was bubble wrapped with wires protruding, they made a decision to call in the Michigan State Police Bomb Squad. They also evacuated the building and went back outside and instructed people to move away from the building. (Ex. 24; Ex. 19, p. 52).

A Michigan State Trooper from the bomb squad arrived at the scene and went to Plaintiff's office to inspect the suspicious device. (Ex. 24). He eventually concluded that the device was a battery for an electric bike. (*Id.*; Ex. 19, p. 52-54). By that time, Plaintiff had arrived at the scene. After the police finished

investigating, Young told Plaintiff that he was not allowed back in the building and that McLaren was placing him on administrative leave. (Ex. 19, p. 55-56). Later, the Huron County Sheriff expressed concerns about Plaintiff to McLaren, saying that, "[Plaintiff's] overall manner while this was going on and material that was found just made him [the Sheriff] worried." (Ex. 10, Ropp Dep., p. 41-42).

## VIII. Plaintiff Admitted the Weapon Paraphernalia And Other Items In His Office Belonged to Him And Should Not Have Been Kept In His Office.

On September 3, 2024, Henry and Ropp met with Plaintiff and asked him to explain why he had the weapon paraphernalia and disturbing images in his office. (Ex. 25, Henry Notes of 9/3 Meeting).  Plaintiff did not deny that any of what they found belonged to him; he simply gave excuses about why it was there.  Plaintiff explained that he belongs to a gun club near the Hospital and that he had three magazines for semi-automatic weapons in his office because he was going to either give them to his friend or sell them. (Ex. 3, p. 221-225). Plaintiff also admitted that he had a gunstock in his office that he had forgotten about and that there were shell casings on the ground and in his desk drawer. (*Id.*, p. 223-224). He further acknowledged that there was one live .22 round, which he claims fell out of his pocket, and an instruction manual for a rifle scope. (*Id.*, p. 226). Ropp and Henry described Plaintiff as dismissive of their concerns about what was found in his office. (Ex.  10, p. 48; Ex. 23, p. 80).  At his deposition, Plaintiff admitted that it was wrong to keep those items in his office. (Ex. 3, p. 327).

10

Ropp and Henry told Plaintiff that McLaren was continuing his suspension. Subsequently, Ropp and Henry met with Dr. Binesh Patel, McLaren Medical Group's CEO. (Ex. 23, p. 84). They reviewed the pictures of what Windy and Rates found in Plaintiff's office and what happened when they met with Plaintiff. (*Id.*, p. 84-85). Dr. Patel concluded that Plaintiff should be terminated for cause. (*Id.*, p. 87-88). Dr. Ropp called Plaintiff to tell him he was terminated due to a violation of the Workplace Threats and Violence Policy. (Ex. 26, Workplace Threats and Violence Policy). Dr. Ropp followed up with a letter of termination. (Ex. 27, 9/18/24 Letter).

Plaintiff admitted at his deposition that in addition to the weapon paraphernalia he kept in his office, he frequently stored weapons such as a .22 long rifle in the trunk of his car that was parked on hospital property. (Ex. 3, p. 160-161).

## ARGUMENT

### I.   Plaintiff Refused to Provide Documentation Supporting His Alleged Disability and Need for Accommodation.

To prove his claim that McLaren failed to accommodate his alleged disability, Plaintiff must show that he requested a reasonable accommodation. *Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018).[2] An employee requesting a reasonable accommodation must provide "documentation confirming the employee's disability

---

[2] Claims under the PWDCRA and under the ADA are "generally analyzed identically." *Hrdlicka v. GM* LLC, 63 F.4th 555, 566 (6th Cir. 2023).

and need for accommodation." *Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d 805, 812-813 (6th Cir. 2020). That documentation should "explain how the disability impairs their ability to perform essential job functions, or at least show that the suggested accommodation relates to their disability." *Id.* at 814. An "employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement." *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2021). "If this were not the case, every employee could claim a disability warranting special accommodation yet deny the employer the opportunity to confirm whether a need for the accommodation exists." *Id.* Furthermore, an employee cannot rely on outdated medical information to support an accommodation request. See, *Green v. Rocket Mortg. LLC,* 769 F. Supp. 3d 668 (E.D. Mich. 2025) (summary judgment in employer's favor where employee refused to provide updated medical information supporting her accommodation request to work from home.); *Kennedy,* supra (two-year old doctor's note stating employee had a problem was insufficient to support employee's accommodation request).

**An employee's failure to provide requested medical documentation supporting an accommodation precludes a failure to accommodate claim.** *Green v. Rocket Mortg. LLC*, supra. Indeed, if an employee voluntarily abandons the interactive process by failing to provide adequate information, an employer is

12

not liable for failure to accommodate. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018).

Here, Plaintiff repeatedly refused to provide McLaren with current clinical documentation supporting his accommodation request. Plaintiff offered McLaren a decades-old document about an examination done when Plaintiff was in first grade, but provided no information about his current impairment, how his impairment affected his ability to perform his job, or why he needed a personal scribe because of his impairment.   (Ex. 9).   Plaintiff tried to get McLaren to accept an accommodation form where <u>he</u> completed the information that should be completed by his provider.  (Ex. 7)  Yet Plaintiff testified that a medical doctor like himself was not qualified to complete the form because his alleged disability was neurodevelopmental.  (Ex. 3, p. 320-321).  For these reasons alone, as a matter of law, McLaren is entitled to summary judgment on Counts I and III of Plaintiff's Complaint alleging that it failed to accommodate Plaintiff's alleged disability.

## II.    The ADA Does Not Require McLaren to Give Plaintiff a Personal Scribe.

The ADA "does not obligate employers to make on-the-spot accommodations of the employee's choosing." *Brumley v. UPS,* supra.  The employee requesting an accommodation has the burden of proving that the accommodation he is requesting is <u>reasonable</u>. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020). Furthermore, even if an employee does propose a <u>reasonable</u> accommodation, the

000161884\0003\200851393

employer is not obligated to provide that employee with the accommodation they prefer; the employer is legally entitled to select which reasonable accommodation to employ. *Smith v. Honda of Am. Mfg.,* 101 Fed. Appx. 20, 25 (6th Cir. 2004).

In this case, the only accommodation Plaintiff ever requested was a personal scribe. As a matter of law, a personal assistant, like a scribe, is not a reasonable accommodation. See *Sanford v. Quicken Loans*, 2015 US. Dist. Lexis 19068 *13-*15) (E.D. Mich. Feb. 18, 2025).[3] Furthermore, even though Plaintiff never properly requested an accommodation, McLaren did provide him with assistance to complete the job tasks he claims he found difficult. Specifically, as discussed supra, Tara Smalley helped Plaintiff with his charting (Ex. 3, p. 336-337); and Plaintiff could use Scribe America. Plaintiff said he did not <u>like</u> using Scribe America, but admits that he only tried <u>it for two weeks</u>. (Ex. 3, p. 205-206, Ex. 5, Email 9/6/22). Plaintiff acknowledges that McLaren tried to resolve the technical issues he was having with Scribe America, but ultimately, he did not like Scribe America because it could not help him do other things, like write orders or help him with other functions in his outpatient clinic. (*Id.*, p. 205-206, 305-306).

Even if Plaintiff had fulfilled his duty to provide McLaren with medical documentation supporting his request for a scribe, his claim would still fail. As a

---

[3] Unpublished cases are attached as Exhibit 29.

14

matter of law, a personal scribe is not a reasonable accommodation. Moreover, McLaren provided Plaintiff with reasonable alternatives to a personal scribe, but Plaintiff refused to try to make them work. For these reasons, his failure to accommodate claim in Counts I and III of his complaint fail.

## III.    McLaren Had No Duty to Continue Providing a Personal Scribe.

Plaintiff incorrectly argues that because he had a personal scribe for a time, McLaren was legally required to continue providing him a personal scribe. The ADA is not intended to turn an employer's good deed into future liability, since that "would deter employers from providing greater accommodations than are required by law." *Smith v. Ameritech*, 129 F.3d 857, 868 (6th Cir. 1997). Thus, merely because McLaren permitted Plaintiff to continue using a scribe after it acquired HMC, it was not obligated to continue to do so. Plaintiff was never legally entitled to a scribe and was not entitled to one when he worked at McLaren. See e.g., *Peden v. City of Detroit*, 470 Mich. 195 n18 (Mich. 2004). Consequently, Counts I and III of Plaintiff's Complaint should be dismissed.

## IV.    Plaintiff Cannot Prove a *Prima Facie* Case of Disability Discrimination.

Counts I and III of Plaintiff's complaint also allege that McLaren discriminated against Plaintiff because of his alleged disability. The fifth element of a *prima facie* case of disability discrimination requires Plaintiff to prove that he was replaced or his position remained open after his termination, or that McLaren

treated him differently than a similarly situated, non-disabled employee.[4] *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017); *Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886, 915 (6th Cir. 2006). Plaintiff cannot prove the fifth element of a *prima facie* case.

First, Plaintiff has no evidence that McLaren replaced him or that his position remained open. In fact, there is no dispute that McLaren did not hire another pediatrician to replace Plaintiff.  In fact, McLaren closed the pediatric clinic shortly after Plaintiff's termination. (Ex. 20, p. 56-57). Second, Plaintiff admits having no evidence that McLaren treated him differently than a similarly situated, non-disabled employee. (Ex. 3, p. 338).  Accordingly, Plaintiff cannot establish a *prima facie* case of disability discrimination, as a matter of law. *Williams,* supra; *Kesler*, supra.  Thus, Counts I and III of his complaint should be dismissed.

## V.    McLaren Did Not Retaliate Against Plaintiff.

Counts V and VI of Plaintiff's Complaint allege that McLaren terminated Plaintiff's employment because he complained about disability discrimination. To establish a *prima facie* case of retaliation, Plaintiff must show there was a causal connection between his alleged complaints and his termination. *Robinson v. MGM*

---

[4] For purposes of this motion only, Defendant will assume that Plaintiff can establish the first four elements of his *prima facie* case: he has a disability, is otherwise qualified to perform his job, suffered an adverse employment decision, and that McLaren was aware of his disability.

16

*Grand Detroit, LLC*, 821 F. App'x 522, 531 (6th Cir. 2020). Indeed, Plaintiff must prove by a preponderance of evidence that "but for" his complaints, McLaren would not have terminated his employment. *Id.* Plaintiff cannot make that showing, because the only evidence he has to establish a causal connection is that McLaren terminated his employment <u>after</u> he complained about discrimination.

According to Plaintiff, he had been complaining about discrimination for years.  However, despite these alleged complaints,  McLaren continued to engage in contract negotiations with him and repeatedly tried to get him to provide clinical documentation to support his accommodation request. That is not conduct suggesting in any way that McLaren intended to terminate his employment.

It was only after McLaren discovered gun paraphernalia and violent political propaganda in Plaintiff's office that it decided to terminate Plaintiff's employment. An "intervening legitimate reason to take an adverse employment action dispels an inference of retaliation based on temporal proximity." *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013). No reasonable juror could conclude that McLaren terminated Plaintiff because he requested an accommodation or complained about discrimination. Counts V and VI of the complaint should be dismissed.

## VI.   Plaintiff Cannot Prove Pretext.

Courts evaluate ADA claims of discrimination and retaliation under the *McDonnell-Douglas* burden shifting analysis. *Pemberton v. Bell's Brewery, Inc.,*

150 F.4th 751, 767 (6th Cir. 2025).  Under that analysis, even if Plaintiff could meet his burden of establishing a *prima facie* case of discrimination or retaliation, McLaren can avoid liability by articulating a legitimate, non-discriminatory reason for terminating his employment. *Id.* at 768. McLaren "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if [McLaren's] evidence raises a genuine issue of fact." *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824, 835 (E.D. Mich. 2017).

McLaren has articulated a legitimate non-discriminatory, non-retaliatory reason for terminating Plaintiff: his violation of McLaren's Workplace Threats and Violence policy. (Ex. 27, Termination Letter). Courts have found that violation of a company policy is a legitimate, non-discriminatory reason for termination. See e.g., *Cardenas-Meade v. Pfizer, Inc.,* 510 Fed. Appx. 367, 373 (6th Cir. 2013).  Because McLaren articulated a legitimate, non-discriminatory reason for Plaintiff's termination, his claims can survive summary judgment only if he can prove that McLaren's reason was a pretext for disability discrimination and/or retaliation. To do so, Plaintiff must demonstrate that the offered justifications had no basis in fact, did not actually motivate its decisions, or were insufficient to motivate its actions. *Rosenthal v. Faygo Bevs., Inc*., 701 Fed. Appx. 472, 477 (6th Cir. 2017).

Plaintiff cannot prove pretext by questioning the soundness of McLaren's judgment or by substituting his judgment for McLaren's judgment. *Thomas v. Owen*

*Elec. Coop., Inc.*, 121 Fed. Appx. 598, 602 (2005). He must have evidence that could cause a reasonable jury to conclude that the reasons McLaren gave for terminating his employment were merely a pretext for discriminating against him because of his alleged disability and/or retaliating against him because he complained about discrimination. *Id.* Plaintiff cannot meet his burden.

Plaintiff cannot prove pretext by showing that McLaren's legitimate non-discriminatory reason for his termination had no basis in fact. He admitted that the gun paraphernalia and disturbing political images that McLaren found in his office belonged to him. (Ex. 3, p. 221-224, 226).

Similarly, Plaintiff has no evidence that McLaren's legitimate, non-discriminatory reason did not motivate its actions. "For a did not actually motivate theory of pretext, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal." *Bhama v. Mercy Mem. Hosp. Corp*., 416 Fed. Appx. 542, 551 (6th Cir. 2011), citations omitted. But, the plaintiff argues that "the sheer weight of circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext or cover-up." *Id.*

Here, Plaintiff has no  circumstantial evidence that McLaren's explanation for his termination was a "pretext or cover-up." *Id.* Plaintiff cannot show that McLaren failed to terminate another physician who kept gun paraphernalia, live ammunition

19

and disturbing political propaganda in his office. (Ex. 3, p. 338). He also cannot show that McLaren failed to follow an internal policy or breached an established procedure while investigating the incident and making the decision to terminate his employment. In fact, Plaintiff cannot refute that McLaren conducted a thorough investigation, including by contacting local law enforcement, who agreed that the items in Plaintiff's office and Plaintiff's response to questioning about those items, was concerning, and reviewed the matter with McLaren leadership prior to making its termination decision. (Ex. 10, p. 41-42). Indeed, McLaren's termination of Plaintiff's employment wholly conformed with McLaren's Corrective Action Program. (Ex. 28, MMG Corrective Action Program).

Plaintiff also cannot prove that his violation of the Workplace Threats and Safety Policy was insufficient to justify McLaren's actions.  No reasonable jury could conclude that McLaren lacked justification for Plaintiff's termination given what McLaren discovered in Plaintiff's pediatric clinic office and Plaintiff's refusal to acknowledge that he had done anything wrong.

There is simply no evidence that McLaren terminated Plaintiff's employment because he was disabled or because he complained about discrimination. McLaren terminated Plaintiff's employment because he violated its Workplace Threats and Violence Policy by keeping gun paraphernalia and violent political propaganda in his pediatric clinic office, and no other reason. Because Plaintiff cannot meet his

burden of proving pretext with respect to his disability discrimination and retaliation claims, Counts I, III, V and VI of the complaint should be dismissed.

## VII.   Plaintiff Did Not Work in a Hostile and Offensive Work Environment.

To establish an ADA hostile work environment claim, Plaintiff must prove that he was subject to alleged harassment on the basis of his disability and that it substantially interfered with his work performance. *Trepka v. Bd. of Educ.*, 28 Fed. Appx. 455, 460–61 (6th Cir. 2002). Moreover, Plaintiff must show that, because of his disability, his work environment was "permeated with discriminatory intimidation, ridicule, and insult." *Waltherr-Willard v. Mariemont City Sch.*, 601 F. App'x 385, 388 (6th Cir. 2015). Conduct that is "merely offensive will not suffice to support a hostile work environment action." *Trepka, supra.*

For example, in *Trepka, supra*, the plaintiff claimed that her supervisor: yelled at her and questioned whether she was impaired in her ability to walk; told her to "knock the snow off her boots before entering the building while other people were entering with snow on their boots"; told her and "another allegedly 'disabled' teacher to sit on the floor with their classes while other teachers were not so asked"; and failed to respond quickly when the plaintiff pressed the panic buzzer in her classroom. *Id.* at 461. The court held that this conduct fell "well short of even presenting a genuine issue of material fact regarding whether [the plaintiff] was subjected to a hostile work environment." *Id.*

21

Similarly, in *Monak v. Ford Motor Co*., 95 F. App'x 758 (6th Cir. 2004), the plaintiff claimed a laundry list of alleged harassing and offensive conduct, including that: the plant superintendent unfairly criticized her work, played favorites, tried to put his arm around her in a non-sexual way, refused to give her a steady job, made her perform what she considered "a torture job," and made her work with someone whom he knew made her uncomfortable; a supervisor stared at her as he rode by her on his scooter, tried to intimidate her and screamed at her "to the point where she got a headache with nausea and went to the hospital"; and a worker's compensation representative pretended to play the violin while she described her back problem. *Id.* at 760–61. Even considering all of this, the court held that the conduct was not "severe or pervasive enough to alter the terms and conditions of [the plaintiff's] employment and constitute a hostile work environment." *Id.* at 767.

The conduct Plaintiff describes in this case does not even come close to being as egregious as the conduct alleged by the plaintiffs whose claims failed in *Trepka* and *Monak*. Plaintiff claims that McLaren harassed him by discussing his request for a personal scribe at the staff meeting where he yelled at Whiting and others.  It was not news to anyone in that meeting that Plaintiff had a learning disability.  Plaintiff was constantly reminding his staff of that disability by asking them to write out his orders and prescriptions, complaining about Scribe America, and telling them he

could not use the EMR.  Moreover, Plaintiff chose to announce at that meeting that he had dyslexia; there are myriad other ways he could have responded.

The bottom line is that no one at McLaren created a hostile work environment for Plaintiff because of his learning disability. The only time Plaintiff's disability was even a topic of conversation was when Plaintiff unreasonably demanded that McLaren provide him a personal assistant to perform scribe services - - a demand that Plaintiff expected McLaren to assent to without a single piece of clinical documentation to support it. McLaren did not subject Plaintiff to a hostile work environment, and Counts II and IV of his complaint should be dismissed.

## VIII.  McLaren Did Not Put Plaintiff in a False Light.

To prove his claim of false light invasion of privacy, Plaintiff must at least show that McLaren "broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to [him] characteristics, conduct, or beliefs that were false." *Puetz v. Spectrum Health Hosps. & Kevin Splaine*, 324 Mich. App. 51, 69 (2018). He must also show that McLaren "must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Id.*

Plaintiff claims McLaren issued public statements accusing him of being a threat and being guilty of committing violence in the workplace, but he has no evidence to prove that claim. (ECF No. 1, Page*ID.*19, ¶ 116). The only evidence in

23

the record regarding <u>any</u> public statement is that <u>Plaintiff's wife communicated to</u> <u>the general public that McLaren terminated Plaintiff in a Facebook post stating that</u> <u>"McLaren fired [Plaintiff] for 'threats and violence</u>.'" (Ex. 29, Facebook Post). Plaintiff's wife told their community that McLaren terminated her husband because he had an electric bike battery in his office. (*Id.*) She did not mention the gun paraphernalia and violent political propaganda found in Plaintiff's office, because Plaintiff did not tell her that McLaren found those things. (Ex. 3, p. 342).

Plaintiff has no evidence that McLaren broadcast to a large number of people that it terminated Plaintiff's employment because he was a threat or committed violence in the workplace. Thus, Count VII of the complaint should be dismissed.

## IX.   Plaintiff's Intentional Infliction of Emotional Distress Claim Is Frivolous.

Plaintiff alleges that McLaren intentionally caused him to suffer severe emotional distress by the ways in which it negotiated his contract, handled his request for accommodation and terminated his employment. To recover on this claim for intentional infliction of emotional distress, Plaintiff must allege that McLaren engaged in conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Jones v. Muskegon County*, 625 F.3d 935, 948 (6th Cir. 2010). None of Plaintiff's allegations rise to the level of even stating a claim for intentional infliction of emotional distress.

000161884\0003\200851393

Furthermore, Plaintiff is basing his intentional infliction claim on the same facts as his frivolous disability discrimination, retaliation and harassment claims. (ECF No. 1, Page*ID.*21, ¶ 127). Courts have held that where a plaintiff cannot survive summary judgment on discrimination, harassment and retaliation claims based on the same facts as an intentional infliction claim, the intentional infliction claim also fails. *Gardner v. Wayne County,* 520 F. Supp. 2d 858, 869 (2007). McLaren did not engage in any unlawful conduct, let alone "atrocious" or "utterly untolerable" conduct. Consequently, Plaintiff's infliction of emotional distress claim, Count VIII of the complaint, should be dismissed.

## CONCLUSION

WHEREFORE, Defendant requests that this Court grant its motion for summary judgment, dismissing Plaintiff's Complaint in its entirety with prejudice, and awarding Defendant the costs and fees it incurred in preparing this Motion.

Respectfully submitted,

**BUTZEL LONG, P.C.**

Dated: March 2, 2026        By:    */s/ Terrence J. Miglio*
                                           Terrence J. Miglio (P30541)
                                           Barbara E. Buchanan (P55084)
                                           Attorneys for Defendants
                                           201 W. Big Beaver, Suite 1200
                                           Troy, MI  48084
                                           (248) 258-1616
                                           miglio@butzel.com
                                           buchanan@butzel.com

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to Plaintiff.

<u>*/s/ Regan K. Dahle*</u>
Regan K. Dahle (P53975)