Exhibit 3

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                FIRM #8093

**Page 1**

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF MICHIGAN
        NORTHERN DIVISION
CHARLES H. CHRISTENSEN, D.O.,

        Plaintiff,

            Case No. 24-cv-12642
vs          Hon. Thomas L. Ludington

McLAREN MEDICAL GROUP, A
SUBSIDIARY OF McLAREN HEALTH
CARE CORPORATION,

        Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

    VIDEOTAPED DEPOSITION OF CHARLES CHRISTENSEN,
D.O., taken on Thursday, July 10, 2025, at 300 East
Huron Street, Bad Axe, Michigan, at 10:50 a.m., pursuant
to Notice.

REPORTED BY: LAURI A. SHELDON, RPR, CSR 4045

**Page 2**

```
 1              A P P E A R A N C E S
 2      TERESA J. GORMAN P61001
        TERESA J. GORMAN PLLC
 3      5700 Crooks Road, Suite 200
        Troy, Michigan 48098
 4      (248)763-6943
        terigorman@aol.com
 5      Appearing for Plaintiff.
 6      TERRENCE J. MIGLIO P30541
        BARBARA BUCHANAN P55084.
 7      BUTZEL LONG
        201 W. Big Beaver Road, Suite 1200
 8      Troy, Michigan 48084
        (248)258-1616
 9      miglio.butzel.com
        Appearing for Defendants.
10
        VIDEO TECHNICIAN: LAUREN LUZOD
11
12      ALSO PRESENT: CARLA HENRY
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

1         T A B L E   O F   C O N T E N T S
2   Witness                              Page
3   CHARLES CHRISTENSEN, D.O.
4   Examination by MR. MIGLIO ..................... 5
5

**Page 4**

1            E X H I B I T   I N D E X
2               (Exhibits attached)
3   Exhibit   Description                   Page
4   Exhibit 1 Schedules ........................... 51
    Exhibit 2 Curriculum Vitae ................... 60
5   Exhibit 3 Letter ............................. 62
    Exhibit 4 Letter ............................. 64
6   Exhibit 5 Memo ............................... 64
    Exhibit 6 Receipt for Softward ............... 66
7   Exhibit 7 Letter ............................. 66
    Exhibit 8 Letter ............................. 67
8   Exhibit 9 Memorandum ......................... 68
    Exhibit 10 Physician Employment Agreement .... 72
9   Exhibit 11 Compact ........................... 76
    Exhibit 12 Email ............................ 113
10  Exhibit 13 Emails and attachments ........... 179
    Exhibit 14 Prepared Statement for McLaren ... 184
11     Sarah Frye
    Exhibit 15 Email Chain ...................... 196
12  Exhibit 16 Email with attachment ............ 213
    Exhibit 17 Email Chain ...................... 214
13  Exhibit 18 Brave Browser History ............ 217
    Exhibit 19 Photographs ...................... 227
14  Exhibit 20 Case Report ...................... 242

1 (Pages 1 to 4)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                              FIRM #8093

```
 1    prospective employers that you were terminated for
 2    cause, correct?
 3  A  Correct.
 4  Q  And you would also tell them, if I'm understanding you
 5    correctly, you would tell them that you were terminated
 6    for cause because of threats and violence?
 7  A  I would say that the policy that they terminated me with
 8    and what I was provided with from my conversation with
 9    Dr. Ropp in HR was that I was terminated because of the
10    policies on threats and violence.
11  Q  But you wouldn't go further and explain to them why you
12    felt that was not justified; is that what you're saying?
13  A  At -- There were a couple clients at the beginning, but
14    then I noticed that they -- they didn't respond, they
15    didn't ask more questions, they didn't really want to
16    spend any more time or energy with me as soon as I said
17    what I -- what I just already mentioned.
18  Q  What is your disability?
19  A  I have a learning disability and it involves dyslexia,
20    dysgraphia.
21  Q  For the record, what's dyslexia?
22  A  Dyslexia is a learning disability involving language.
23  Q  Okay.  And how does it affect you?
24  A  It affects me by -- it -- to read.  It takes me more
25    time.  I have to sometimes reread several times if it
```

                              Page 33

```
 1    is -- depending on the information that's being
 2    provided, if it's quite dense and things -- terms that I
 3    don't necessarily see a lot, then I would have to read
 4    it again and then get the -- the meaning of it.  So that
 5    takes extra time.
 6        So what else?  In discussions, like when I'm
 7    talking to you right now, it -- it is something that has
 8    to relate to something else, so it provides . . .
 9    dialogue helps and talking helps.
10        What else?  Dysgraphia is a disability of
11    writing, but it's the one thing that since I was in
12    first grade, that was the one thing that, you know, I
13    always worked on writing and writing and writing to get
14    better at it, and I guess because I spent so much time,
15    I mean, it -- there weren't any computers, so I didn't
16    do a lot of typing.
17  Q  So your dyslexia -- Strike that.
18        So when you say "learning disability," it's
19    dyslexia and dys -- What is it?
20  A  Dysgraphia.
21  Q  Dysgraphia.  That's the learning disability.
22  A  That is it, yeah.  That is a learning disability.
23  Q  It requires you to take more time to read or perhaps
24    reread material for it to be processed.
25  A  And write.  And writing, too.
```

                              Page 34

```
 1  Q  Okay.  Now, going back to what you tell prospective
 2    employers and recruiters, do you tell them, "I was fired
 3    for a policy violation"?
 4  A  What -- They will ask why I was -- why I was terminated.
 5    I give them that I was terminated with cause.  They ask
 6    me what cause was that, and it would be the policy on
 7    threats and violence.
 8  Q  And do they ask you -- Did anyone ask you what that
 9    means?
10  A  Um . . . I don't recall.
11  Q  Okay.  So since leaving the employ of McLaren have you
12    worked?
13  A  I have a private practice.
14  Q  Okay.  And tell me what you did to start your private
15    practice.
16  A  Materials.  Computer.  Purchased some of the basic
17    office equipment.  Some of it I had from residency.  We
18    started it with telemedicine, which was easier, and then
19    went on to home visits, and we have our home next door
20    and I've converted that when we -- we're not -- We've
21    only had two to three rentals, so any time that it
22    wasn't rented, which is pretty much all the time --
23    Well, not almost all the time, but most of the time -- I
24    just used that -- that building, the front -- the front
25    living room.
```

                              Page 35

```
 1  Q  For what?
 2  A  For seeing patients.
 3  Q  Okay.  Are you enrolled in any insurances?
 4  A  Yes.
 5  Q  What insurances are you enrolled in?
 6  A  Blue Cross/Blue Shield, straight Medicaid, Molina.
 7    There are several other ones.  It's on my website.
 8  Q  Okay.
 9  A  Yeah.
10  Q  And in order to start your practice up you have to apply
11    to be eligible to receive reimbursement from those
12    companies, correct?
13  A  Yes.
14  Q  Are there any companies that you were reimbursed for or
15    that the hospital was reimbursed for when you were
16    working at McLaren that you're not covered by insurance
17    now?
18  A  Can you repeat that?
19  Q  Yeah.  It's a bad question.  Are there any insurance
20    companies for which you were reimbursed while you were
21    at McLaren that you aren't reimbursed now that you're in
22    private practice?
23  A  Oh, okay.  There would be McLaren and United Health.
24  Q  Okay.  Do you have any idea how many patients you were
25    regularly seeing when you were at McLaren when you last
```

                              Page 36

                                        9 (Pages 33 to 36)

                    Tri-County Court Reporters
                         248-608-9250

CHARLES CHRISTENSEN, D.O.
7/10/2025                                        FIRM #8093

| | |
|---|---|

1   A   I don't know what happened to it after I gave it to
2       Amber Kleekamp on the date that it was signed.
3   Q   Okay. So it says here, "Dr. Christensen requests the
4       support for documentation through a scribe for his
5       outpatient clinic to ensure thorough and timely
6       documentation." So what were you asking for?
7   A   A scribe consistent with what was a scribe previously.
8   Q   I'm asking you what you were asking for here. What does
9       that mean?
10  A   I was asking --
11  Q   "Support for documentation through a scribe for his
12      outpatient clinic."
13  A   Hm-hmm.
14  Q   What does that mean?
15  A   That means a person to receive information, help with
16      putting information into the EMR, electronic medical
17      record. It is to -- if coming out of a room
18      providing -- to write a prescription that I would ask
19      them to write for me and then I would sign, review it
20      and sign it. Orders the same way. Input data into the
21      computer or orders into the computer. If there is
22      any -- I guess when I get to the point where I would
23      review their documents in the computer, if there is
24      something that needed to be edited or changed, then I
25      would ask them to change it, you know, right away.

Page 77

1       Would be really, you know, very close loop. And they
2       would change it and I would sign it to provide the
3       verification of, you know, that I looked at it, of
4       course.
5   Q   You were in charge of the medical services that your
6       clinic provided to patients, correct?
7   A   Yes.
8   Q   So everything that went in the chart, every prescription
9       that was written --
10  A   Hm-hmm.
11  Q   -- every order that was written was your responsibility,
12      correct?
13  A   Yeah.
14  Q   Okay.
15  A   That's correct.
16  Q   Why would you need a scribe to write a simple
17      prescription for a patient?
18  A   I -- Do you recall that, you know, we were talking about
19      that I would need extra time for providing for those
20      things if we had a busy day. We would -- You know,
21      there would be times where I would ask for that
22      assistance from the scribe, because it would make timely
23      more seeing patients, you know.
24  Q   Okay.
25  A   Just from one patient to the next patient you would say,

Page 78

1       "I need an order for a chest x-ray and here's -- I need
2       a prescription for Amoxicillin or Augmentin," or
3       whatever medication they would need, and it would be
4       very quick to provide that for them if they could write
5       out everything, I would review it, sign it, and then
6       give it to the patient.
7   Q   Well, I understand it would be easier for you and --
8   A   No, no. It wouldn't be easier for me, but timely.
9   Q   What I'm asking you is why couldn't you write the
10      prescription out?
11  A   I could write the prescription, but it could take a lot
12      of -- it would take a lot more time.
13  Q   Did you -- Excuse me. Did you use a prescription pad?
14  A   For most, but not all. Some of them were sent
15      electronically.
16  Q   So what you have to write is the prescription for the
17      patient's name, the medication, the dosage, and then you
18      sign off on it, right?
19  A   Correct. That would be a prescription, yes.
20  Q   Okay. And are you saying that you needed a scribe to do
21      that?
22  A   I'm saying in an environment where I was very busy, yes,
23      I would.
24  Q   Well, your office wasn't always busy, was it?
25  A   It was initially, yes.

Page 79

1   Q   Okay. But not in 2023 and 2024, was it?
2   A   No.
3   Q   Okay.
4   A   It was quite degraded by that time, yes.
5   Q   So -- And you said you needed -- the scribe would also
6       write orders?
7   A   That's what I said, yes.
8   Q   Okay. And how much work goes into writing an order?
9   A   I -- In whose perspective? I'm sorry.
10  Q   In your perspective. You're the physician. How much
11      time would it take you to write an order?
12  A   It would take a lot of energy and it would take several
13      times proofreading, and then making sure that all of the
14      aspects of the -- of the order or prescription. It
15      would then be produced, but in the meantime I also was
16      thinking about what was that -- what's the differential
17      in looking at what can I do to provide for the patient?
18      I mean, all of that energy would be better served
19      thinking about the mental work of what would be best for
20      the patient.
21  Q   Well, once you decided to issue an order, you'd already
22      made the decision about what the order should be, right?
23      I mean, you don't have -- write an order and then change
24      it. You decide first what the patient --
25  A   Sometimes I will change it.

Page 80

20 (Pages 77 to 80)

Tri-County Court Reporters
248-608-9250

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                          FIRM #8093

| | |
|---|---|

1   Q   Hold on.  Let me finish.  Once you decide an order, it
2       just needs to be reduced to writing and put in the
3       chart, right?
4   A   Sometimes that order would be changed.  I would be,
5       like, "Well, I don't think that's a good idea," and then
6       I'd throw it away and ask the scribe to provide another
7       one.
8   Q   But why would you need to have the scribe write an
9       order?  How many -- Strike that.
10          How many sentences is an order?
11  A   It depends on the order.
12  Q   Well, what do they usually say?  Give me an example.
13  A   All of the different -- So for labs it would be all the
14      different labs and then there'd be a diagnosis attached
15      to it, signed and date, the patient's name, patient's
16      date of birth, date of -- Okay.  The date is already
17      there, but . . . but it could be an order for physical
18      therapy, occupational therapy, speech therapy.  It could
19      be instructions to go to the ISD.  It could be
20      instructions to go to the health department for
21      screening examinations, immunizations.  It could be
22      instructions how to help with constipation.  It could be
23      instructions to help with administration of a whole host
24      of different things that would be at home providing the
25      patient above and beyond any prescription, any order.

                          Page 81

1       It could be also maybe a website that I would like them
2       to utilize to help with their son or daughter with ADHD.
3       Any behavioral difficulties or problems.  Helping people
4       with -- You know, one of the reasons I got into
5       pediatrics is to provide for kids with special needs, so
6       there is a lot of kids that needed extra instruction
7       provided by the scribe being available.
8   Q   I'm not talking about that.  I'm just asking you when it
9       came time -- This is what you said, you needed a scribe
10      to write prescriptions, which we've covered.
11  A   Hm-hmm.
12  Q   You said you also needed a scribe to write orders.  I'm
13      not talking about taking history and physicals and --
14  A   No.
15  Q   -- writing down lab results.  I'm talking about the
16      order -- orders.
17  A   It's --
18  Q   And aren't the orders typically one or two sentences?
19  A   But the process of thinking about the differential and
20      then putting it down into a workable plan, it would --
21      it would break that up and make it difficult to then go
22      back to the train of thought of providing the patient
23      with the best information, best plan.
24  Q   I'm just focusing on the aspect of a scribe, which would
25      you agree with me is somebody that writes down something

                          Page 82

1       that a patient -- that a doctor tells them to write
2       down, correct?
3   A   Hm-hmm.  Definitely.
4   Q   But nothing about your disability precluded you from
5       writing prescriptions, did it?
6   A   I -- I disagree with you.  It is the ability to -- I
7       mean, yes, of course, you can write them down, but it
8       breaks up the concentration of looking at -- It takes a
9       lot of energy to do that.  It's not something -- It --
10      It takes you off of the train of thought, especially in
11      a very busy practice, or any practice, I guess.  It
12      really was that beneficial for me to have a scribe,
13      especially with the EMR that I could not use.  I mean, I
14      tried for in desperation.  CPSI is not something that
15      you -- I could --
16  Q   We're getting far afield, and I don't -- I'll ask you
17      questions about that, but I'm just saying you could
18      write a prescription, correct?
19  A   Yes, I could write a prescription.
20  Q   I understand you saying it took time away in your
21      practice was --
22  A   No, I said it took energy away.
23  Q   Energy away.  But a part of a physician's responsibility
24      is to write prescriptions, correct?
25  A   That is part of their responsibility.

                          Page 83

1   Q   And part of their responsibility is to write orders.
2   A   That is -- Yes, that's true.
3   Q   So if you told somebody what to put in a prescription
4       pad --
5   A   Hm-hmm.
6   Q   -- or in an order in the patient's chart, you would
7       still need to be able to review it to make sure it was
8       accurate, wouldn't you?
9   A   I -- They wouldn't sign it for me.  I would have to
10      review it after they finished.
11  Q   Right.  So all you're saving is writing it down as
12      opposed to writing it and signing it.  I mean, that's
13      what the scribe was doing.  It's just somebody who's
14      taking a pen or a paper or -- paper and writing what you
15      tell them to write, correct?
16  A   I already described the reasoning why it was beneficial
17      for me.
18  Q   Well, are you saying that you needed a scribe to write
19      prescriptions, orders, and enter in the computer even
20      when your practice wasn't very busy?
21  A   Entering it into the computer, yes.  Extremely so.
22  Q   Well, tell me about --
23  A   And --
24  Q   Go ahead.  I'm sorry.
25  A   And -- And writing those orders and writing -- they were

                          Page 84

                          21 (Pages 81 to 84)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                    FIRM #8093

| | |
|---|---|
| 1    much more legible because of my dysgraphia. The -- | 1      MR. MIGLIO: Let me finish. |

Page 85

1      much more legible because of my dysgraphia. The --
2      There would be less likelihood for difficulties with the
3      other person that's reading them. So yes, it was
4      much bet -- And a lot of orders would be -- if they were
5      internal to McLaren would be through the CPSI, which I
6      had great difficulty with. So there's multiple reasons
7      why a scribe was needed throughout this whole process.
8   Q  Whatever -- Whatever the scribe wrote you were
9      responsible for reviewing and making sure --
10  A  I did.
11  Q  Let me finish. Whatever the scribe wrote, whether it be
12     the prescription, an order, an entry in the computer, an
13     entry in the electronic medical record, you were
14     responsible for reviewing and ensuring it was
15     accurate --
16  A  Yes.
17  Q  -- and correct, correct?
18  A  Yeah.
19  Q  I mean, a scribe doesn't make those decisions for you.
20     You have to look at them.
21  A  Yeah, and I have to sign for it.
22  Q  Okay. And the only thing you're saying is the scribe
23     just saved you time by writing --
24  A  No.
25             MS. GORMAN: Objection.

                        Page 85

1             MR. MIGLIO: Let me finish.
2             MS. GORMAN: That mischaracterizes his
3      testimony. He's explained it half a dozen times.
4             THE WITNESS: It's much more legible because
5      of my dysgraphia, the difficulties with it going to
6      other places was facilitated, it was much more legible,
7      and I, of course, reviewed everything that they ever did
8      and then signed it.
9   BY MR. MIGLIO:
10  Q  You didn't have a scribe in medical school, did you?
11  A  No, I did not, but we didn't have a --
12  Q  You didn't have a scribe in residency, did you?
13  A  We didn't have EMR either.
14  Q  So tell me the problems you had with EMR, which stands
15     for --
16  A  Electronic --
17  Q  -- electronic medical record.
18  A  Oh, what problems I had with CPSI?
19  Q  What is CPSI --
20  A  It is --
21  Q  -- for the record.
22  A  It is the EMR, electronic medical record, for Huron
23     Medical Center and then till my last day at McLaren.
24  Q  What does it stand for?
25  A  I don't know.

                        Page 86

1   Q  Is it -- CPSR {sic}, is that the same thing as an
2      electronic medical record?
3   A  It's a CPS -- It's a software company that makes EMRs.
4   Q  And so what are you supposed to do in order to use it as
5      a physician?
6   A  It -- The difficulty was --
7   Q  No. I'm just asking you what are you supposed to use it
8      for? How are you supposed to use it?
9   A  Documenting the patient, what was with the patient, what
10     was done for the patient, what your findings were on
11     exam, the chief complaint, their review systems, and
12     then assessment and plan, and then from that would be
13     billing, but most of the time the billing -- actually,
14     the billing was taken care of by someone that reviewed
15     it, a biller.
16  Q  All right. So let's simplify this. What did you have
17     to enter as a physician in the electronic medical
18     record?
19  A  Every aspect of their -- why they came in, what
20     happened, you know, during -- why they're coming in, of
21     course, like a narrative of what was going on with
22     them. A review of systems, but also social
23     developmental, medications, allergies, vital signs. The
24     vital signs were provided by the MAs or the CENAs, and
25     then the physical exam would -- Do you want me to go

                        Page 87

1      through all of the physical exam?
2   Q  No. I'm just asking you, so in order to enter that
3      information in the EMR what would you be -- what would
4      you have to do if you didn't have a scribe?
5   A  Click and click and click, and read and reread and click
6      and click and read, type, which I never really was
7      very -- I was not -- I was extremely -- I do this. I'm
8      not a -- It takes forever. And I have to proofread,
9      which even takes more time, because it -- to me
10     everything looks normal. You know, like, when I look at
11     the spelling of the word it's like, "Oh, yeah. That's
12     kind of correct." And there was no spellcheck on CPSI,
13     either.
14            There -- The dictation aspect of it is still
15     difficult, because whatever I would dictate I still
16     would have to proofread, but it just doesn't look --
17     everything looks okay because it's kind of shattered a
18     little bit and thrown around and then I have to
19     refamiliarize, so it takes a lot of time, so.
20            And the other aspect of CPSI is that you can't
21     change it. You can't modify the templates. Myself. I
22     can't change it and modify it and develop it in time to
23     something that would be beneficial for me. It was
24     rigid. So it -- You can't, like your iPhone or your --
25     any computer program these days you can put a widget

                        Page 88

                                    22 (Pages 85 to 88)

Tri-County Court Reporters
248-608-9250

CHARLES CHRISTENSEN, D.O.
7/10/2025

FIRM #8093

Page 89

1    over here and a widget over here.  You could change the
2    template of, you know, let's say your well child exam
3    for each -- Because there's a well child exam for, let's
4    say, before two months, two months, four months, six
5    months, nine months, twelve months.  You can get the
6    picture.  There is multiple templates that would -- I
7    could -- I didn't have the ability to -- I could ask
8    someone to do it for me, but it required then lots of
9    time and lots of -- like, it never would be the same as
10   I wanted them to do.
11          So it finally got down to I need someone to
12   help me.  Because it's a medical-legal thing.  You know,
13   we're trying to put things into the chart, but it wasn't
14   to my satisfaction as a doctor and it wasn't complete.
15   So when I had a scribe I could -- I could tell them
16   things and I could have them definitely put into the
17   record.
18   Q   You could have them put in the electric medical record
19       what you were supposed to be putting in yourself, right?
20   A   No, that's -- that's --
21   Q   Isn't that correct?
22   A   That's not -- That's not fair, sir.
23   Q   Well, isn't it correct that that's what they were doing
24       because you were having problems with the electronic
25       medical record?

Page 90

1    A   I was having difficulty with it -- accommodation, and
2        then provided that accommodation and it worked.
3    Q   I'm not talking about that.  I'm just asking you what
4        the scribe that you wanted to put in the medical -- the
5        electronic medical record would be information that
6        ordinarily the physician would be entering in the
7        electronic medical record --
8    A   If that physician --
9    Q   -- correct?  I'm just asking you.
10   A   Let me clarify that then, please.  If that physician
11       didn't have dyslexia and dysgraphia, then yes.
12   Q   That's not part of my question.  We're taking way too
13       long.  Please listen --
14          MS. GORMAN:  Because you're contradicting his
15       answers.  Just let him --
16          MR. MIGLIO:  I'm just saying, if you --
17          MS. GORMAN:  -- answer the question.
18   BY MR. MIGLIO:
19   Q   Isn't it correct that the information that goes into the
20       EMR is ordinarily the responsibility of the physician to
21       put in there, correct?
22   A   If that physician didn't have dyslexia and dysgraphia I
23       would completely agree.
24   Q   But otherwise the physician is supposed to put that
25       information in.

Page 91

1    A   I'll answer the same way.
2    Q   And even with a scribe the physician is supposed to make
3        sure that the scribe put in the patient's condition,
4        circumstances, surrounding treatment, orders, and all of
5        that correctly?
6    A   The scribe would put them in correctly, and if it was
7        incorrect before I signed it, I would ask them to change
8        it.
9    Q   But you had to make sure no matter who put it in that it
10       was accurate, and in order to do that you would have had
11       to read it and reread it, right?
12   A   Yes.
13   Q   And tell him to make any changes.
14   A   Yes.
15   Q   Okay.  So you still had to do reading.  You still had to
16       do proofreading, right?
17   A   But it's -- It then -- I could narrow it down to the
18       chief things were important to -- So like, you know,
19       every word that has to be put in would be a labor and
20       more energy required, but then if, let's say, the scribe
21       put it in, I could focus on, let's say, the -- well, of
22       course the chief complaint, but then substantiating
23       things I made sure were -- Like, the pertinent negatives
24       I wouldn't have to worry about, but the pertinent
25       positives I would, and that would focus me down to a

Page 92

1    much more efficient mode, and then from that my
2    assessment and plan would be so much easier to do.  It
3    was amazing.  I love it.
4    Q   Are you saying that you didn't have to proofread every
5        word ---
6    A   The pre --
7    Q   Let me finish.
8    A   Okay.
9    Q   Are you saying you didn't have to proofread every word
10       that the scribe put into the electronic medical record
11       before you signed off?  Is that was you're saying?
12   A   No, what I'm saying is that the pertinent negatives
13       would be already in the template, so you would notice
14       those very easily.
15   Q   What does that mean, pertinent and negatives?
16   A   No wheezing.  No, like, listening to the lungs.  No
17       wheezing.  No crackles.  Air entry to the bases.  No
18       retractions.  I mean, those are all the pertinent
19       negatives that you would have in the template.  It would
20       be easy to know that those were the pertinent negatives
21       with the patient.  You would read through them, but it
22       would be much more efficient that the -- the scribe
23       would put those in and not me just fussing around with
24       words that took a lot of energy.
25   Q   When you say "pertinent" and "negatives" --

23 (Pages 89 to 92)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                            FIRM #8093

| | Page 93 | | Page 94 |
|---|---|---|---|

**Page 93**

1    A    Yes.

2    Q    -- is that just boxes that are checked, no coughing, no

3         this, that, or the other thing?

4    A    I -- I think so.  I don't -- You know, it was a while

5         that I tried, and CPSI might have changed if it was

6         boxes that you checked or if you actually typed them in.

7    Q    Well, I'm asking you what you're referring to as

8         pertinent and negatives.

9    A    Pertinent negatives.

10   Q    Okay.  Pertinent negatives, but what did -- Tell me what

11        a pertinent negative it on the template in the EMR?

12   A    A normal finding.  A finding of a normal physiologic or

13        normal history or, let's say, like allergies.  No known

14        drug allergy.  That would be a pertinent negative.

15   Q    Isn't it like a box is checked, "No known allergies"?

16   A    I don't know, sir.

17   Q    Well, I mean, isn't that something that you could check

18        the box just as easy as a scribe?

19   A    No.  I've already described to you in great detail the

20        energy required to provide that.

21        MS. GORMAN:  Hold on.  You've answered --

22        THE WITNESS:  And you keep on going back to it

23        like this is, like, a walk in the park.  It is not a

24        walk in the park, especially if you see 20 patients.  It

25        is something where you as a physician, you have the --

**Page 94**

1         it's a labor of mental ability, and that mental ability

2         is best served providing for the patient, not checking

3         boxes that require a lot when you're dyslexic or have

4         dysgraphia.

5    BY MR. MIGLIO:

6    Q    You would have to verify pertinent negatives even though

7         a scribe entered that into the record --

8    A    It's --

9    Q    -- correct?

10   A    It's easy to recognize those.

11   Q    Dr. Christensen, just let me finish my question before

12        you answer.

13   A    Hm-hmm.

14   Q    I don't want to know whether it's easy or not.  I just

15        want to know whether or not it was your responsibility

16        to confirm everything the scribe put into the electronic

17        medical record.  Is that correct or not?

18   A    I answered that earlier, and yes, it is.

19   Q    Okay.  So even if it was a pertinent negative, you would

20        have to make sure that it was accurate in terms of

21        that --

22   A    Yes.

23   Q    -- EMR.  How many scribes did you have?

24   A    Annette and Nicole Murawski.  Two.

25   Q    Okay.  And during what period of time was Annette there?

**Page 95**

1    A    2016, approximately, and then she hurt herself and fell

2         down and then accepted a job with the postal service,

3         and I'm not sure, but I think it was 2018/'19.  I'm

4         not -- I don't know, but it was -- it was -- Nicole was

5         already there, so she just took her place, so it was

6         a -- it was a very, you know, integrated, so there

7         wasn't any lapse.

8    Q    Nicole was a medical assistant, wasn't she?

9    A    Yes.

10   Q    You had other medical assistants in the office.

11   A    Yes.

12   Q    Nicole did more for you as a scribe, including job

13        duties that a medical assistant would do, correct?

14   A    She -- Her responsibilities were mainly for me, of

15        course, as a scribe, and then she did, in the meantime

16        if I was, like, in a room or something like this, she

17        would mainly be inputting the vaccines.  The -- The

18        state has MCIR, which is a state-maintained record of

19        immunizations for all the children, and of course you

20        would have to enter, you know, with the patient's name

21        and date of birth you have to put down what was given,

22        when it was given, the lot number, and there might be a

23        serial number, I'm not sure, but there's some informa --

24        a lot of information that need to be done.

25   Q    Did other medical assistants do that for you?

**Page 96**

1    A    You mean the immunization record?

2    Q    Right.

3    A    I'm sure they did, but that was one of her main

4         responsibilities.

5    Q    As a scribe or as a medical assistant?

6    A    As -- As her job description, but she helped me with a

7         scribe a lot.  I mean, she was really there all the

8         time.

9    Q    Didn't you tell McLaren that a scribe -- you needed a

10        scribe to do more than just scribing for you, that you

11        needed a scribe to perform other duties like giving

12        immunizations and providing other support duties?

13   A    No, I don't.  I -- Can you rephrase that?

14   Q    Yeah.  Didn't you tell McLaren that you needed a scribe

15        to do more than just simply dictating or writing down

16        the information you gave them?

17   A    I -- It wasn't my direction.  It was McLaren's

18        direction.

19   Q    I'm just asking you --

20   A    No.

21   Q    -- didn't you tell them that?

22   A    No.

23   Q    Okay.  All right.  Now, when was the last time you were

24        seeing patients on average 20 patients a day?

25   A    Probably before 2018.  Well -- Yeah 2017, 2016.  I'm --

24  (Pages 93 to 96)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                        FIRM #8093

**Page 97**

1    I -- I'm not -- It's an approximation, but I do remember
2    that the practice was really thriving definitely in
3    2017.
4  Q   Right.  And in 2022, 2023, and 2024 I think you said
5    earlier the number of patients you were seeing was
6    significantly reduced?  Is that correct?
7  A   It was my approximation to that, yes.
8  Q   Okay.  So you would have additional time to do the
9    things that a scribe was doing for you; am I correct in
10   that regard?
11 A   What -- What I found out with being -- having a scribe
12   available, even if it was slow, would be that ability to
13   focus on the patient and providing what they needed.
14   And yeah, it would be slow, but it would involve, I
15   think, a much better product and also my ability to
16   spend more time on the patient and what they needed and
17   providing a better service for them.
18 Q   Okay.  But wouldn't that be true for every physician if
19   they had somebody that took care of scribing for them or
20   immunizations, they'd have more time to spend with the
21   patient?
22 A   Well --
23         MS. GORMAN:  Objection.  Calls for
24   speculation.  He just --
25 BY MR. MIGLIO:

**Page 98**

1  Q   Yeah, isn't that a generalist -- general statement?
2  A   Again, so you're asking me what was the standard for a
3    regular physician.
4  Q   No, I'm just asking you, wouldn't the fact that a
5    physician was relieved of responsibilities of entering
6    information in the patient's chart, writing
7    prescriptions and orders, wouldn't that free up any
8    physician to be able to spend more time with patients,
9    in your experience?
10 A   I can only talk to my experience that I've already told
11   you about.
12 Q   Okay.
13 A   All of these comparisons, I really don't know what
14   your -- what you can compare to another physician.  I
15   can tell you it would it help with my disability and that
16   it was something crucial to my ability to help practice
17   medicine and provide good care.
18 Q   Okay.  So let's take an example.  So a patient comes in
19   to see you.
20 A   Hm-mm.
21 Q   And you have a scribe.
22 A   Hm-mm.
23 Q   Okay.  And what -- How -- What is the procedure that
24   follows where you see the patient, you give instructions
25   to the scribe so that the scribe can put this into the

**Page 99**

1    medical record and issues order and prescriptions?  Tell
2    us that procedure that you follow.
3  A   Well, the patient would be roomed, and then I would see
4    the patient, ask questions, get the history stemming
5    from the chief complaint, do an examination, and then
6    come up with a plan, assessment and plan.  And then I
7    would come out to the scribe, tell them the pertinent
8    positives about, you know, what was abnormal, the
9    assessment, the plan, and then if that required extra
10   notes, orders, prescriptions, referrals, all of those
11   things would then be -- then easily, if they could --
12   they'd write them down, and then they would provide them
13   to the patient, and that's how it usually would go.
14 Q   So what and when are you telling the scribe to write
15   things down?
16 A   As soon as I walk out of the -- the room.
17 Q   The scribe is -- And we're talking about scribe, but
18   really we're referring to an MA, right?  Correct?
19 A   Well, no.  They're a scribe.
20 Q   Well, she was an -- She was hired as an MA and that was
21   her job title, right?
22 A   Her job -- Her job was -- Her training was MA, but she
23   performed scribe duties.
24 Q   Right, but she also performed MA duties, correct?
25 A   Right.  But one of MA duties is that you provide help to

**Page 100**

1    the physician, don't they?
2  Q   Yeah.
3  A   Yeah.
4  Q   Well, that's what I'm saying.  She was an MA --
5  A   Yeah.
6  Q   -- who provided you with scribe responsibilities or
7    services?
8  A   Yeah.
9  Q   Okay.  So my question is so the MA, the scribe --
10 A   Yes.
11 Q   -- isn't in the examining room when you see a patient.
12 A   We did that with Annette.  We tried it for, I don't
13   know, maybe four months, maybe six months.  It -- The
14   rooms were too small, so to have an additional person,
15   including -- sometimes the family would be quite large.
16   There wouldn't be really any comfort in that
17   arrangement, so we came up with the arrangement of me
18   coming out of the room, discussing with the scribe, and
19   then, you know, going on from there.
20 Q   So when you were working for McLaren you didn't have the
21   MA, the person who was serving as a scribe as you say,
22   in the room with you when you saw the patient, correct?
23 A   Maybe with Annette.  I don't know if Annette was around
24   when McLaren took over, but she --
25 Q   What about --

CHARLES CHRISTENSEN, D.O.
7/10/2025

FIRM #8093

| | |
|---|---|
| 1   **A**   Yes. | 1   **Q**   And then tell me about how you'd write prescriptions for |
| 2   **Q**   Okay.  And then what would happen after the information | 2    them to take to the drug store.  Would you sign those or |
| 3    is inputted in the computer as far as your | 3    you'd have her write those out? |
| 4    responsibility to review it? | 4   **A**   You can do both.  Like, she could write them out and |
| 5   **A**   Later on I would review the information at my desk. | 5    then I would sign them. |
| 6   **Q**   When?  How far after the patient left? | 6   **Q**   What about refills?  How would those be handled? |
| 7   **A**   Without a scribe it usually would be the next day. | 7   **A**   There's a refill section on the prescription pad.  You |
| 8   **Q**   Okay.  And you'd sit at your desk and open up EMR? | 8    can note how many refills are within that, but -- Okay. |
| 9   **A**   Yes.  There was a section in the EMR where you could | 9    So if the pharmacy called for a refill, then there would |
| 10    review -- Instead of going to each chart, there would be | 10    be a piece of paper provided from the pharmacy |
| 11    like a log list of orders and then would be one for | 11    describing patient's name, what medication they've been |
| 12    notes . . . So, yes. | 12    on, and you could change it, of course, and then add |
| 13   **Q**   So you would have to review all of those sections of the | 13    refills, if needed.  So there would be a paper -- All |
| 14    EMR where the scribe, the MA -- | 14    pharmacies would -- there would be a paper provided for |
| 15   **A**   Hm-hmm. | 15    non-controlled substances, and it would be on my desk. |
| 16   **Q**   -- put in information that you told her to put in the | 16    I would fill it out and then hand it back to the nurse |
| 17    day earlier or a couple days earlier, whenever the | 17    or the MA, and then they would fax it back to the |
| 18    patient ended, right? | 18    pharmacy. |
| 19   **A**   Yes. | 19   **Q**   How many MAs did you have working when you were in the |
| 20   **Q**   Okay.  And you'd have to review every entry she made. | 20    office, personally in the office?  Two or three? |
| 21   **A**   Yes. | 21   **A**   At least two. |
| 22   **Q**   For each patient. | 22   **Q**   Okay. |
| 23   **A**   Yeah.  Yes. | 23   **A**   I mean, there may have been -- We shared a lot, because |
| 24   **Q**   And then you have to sign off on it. | 24    the nurse practitioner also had her staff and we shared |
| 25   **A**   Yes. | 25    staff and -- but at least two. |
| Page 105 | Page 106 |

| | |
|---|---|
| 1   **Q**   And did you ever have to review electronic information | 1   **Q**   Do you take notes yourself? |
| 2    received from the pharmacy? | 2   **A**   Patients that require a lengthy history, especially new |
| 3   **A**   There was -- For controlled substances there was a | 3    ones, I would use a piece of paper, try and write down |
| 4    review sheet.  I would ask them to print that out and | 4    as, you know, in just terse notes and -- and I also have |
| 5    then provide it with the request. | 5    lots more time.  I mean, I only see a couple patients a |
| 6   **Q**   Was there -- What happens when a pharm -- when a | 6    day usually, so -- At most.  Some days it's four.  You |
| 7    prescription is lost and it needs to be refilled? | 7    know, that's probably the most I've seen.  Or five.  But |
| 8   **A**   It depends what the medication is. | 8    that doesn't happen too often, and usually they're |
| 9   **Q**   Well, did that require you to go in the chart and see | 9    patients that have low acuity to them. |
| 10    what you had issued as a prescription earlier? | 10    So I -- I spend so much time with them in this |
| 11   **A**   It . . . It would be under the -- If it needed to be | 11    scenario as a private practice and I have all that time, |
| 12    referred to, then usually -- it would be in the chart, | 12    I usually -- The least amount of time is usually an |
| 13    you know, it would be stated in the plan that this | 13    hour, 50 minutes to an hour, so I can spend that extra |
| 14    patient needed this or the reason why we had an | 14    time, and it really is not -- I can work through my |
| 15    assessment, then we had the plan, the plan would include | 15    disability through that. |
| 16    that medication, but ultimately also would be you would | 16   **Q**   What I'm asking you is what records do you keep on |
| 17    get -- for refills you would get that summons from the | 17    patients who you see in your private practice? |
| 18    pharmacy of what needed to be refilled.  It would have | 18   **A**   Only on Simple Practice.  I just -- I either -- I use |
| 19    the medication, of course, how it was prescribed | 19    the built-in dictation, and even then I spend probably |
| 20    earlier, and that, you know, if you wanted to change | 20    30 percent of the time that I would with a patient even, |
| 21    anything or, you know, how many re -- how much -- the | 21    you know, like to input all that information in, and |
| 22    <mark>quantity and the refills that are needed.</mark> | 22    it's after they left, of course. |
| 23   **Q**   <mark>I assume you don't have a scribe now in your private</mark> | 23   **Q**   So but if you see a patient -- |
| 24    <mark>practice.</mark> | 24   **A**   Yeah. |
| 25   **A**   <mark>No.</mark> | 25   **Q**   -- where do the notes from the visit go? |
| Page 107 | Page 108 |

27 (Pages 105 to 108)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                        FIRM #8093

| | |
|---|---|
| 1   A   They go into Simple Practice, the EMR. | 1        point, so we still had the software, but nothing was |
| 2   Q   Simple Practice is an EMR. | 2        changing with it, so . . . And the -- I told you the |
| 3   A   Yes. | 3        advantages of the scribe before -- |
| 4   Q   And you input it yourself. | 4   BY MR. MIGLIO: |
| 5   A   I do. | 5   Q   I'm just asking you, you don't know what changes there |
| 6   Q   Okay. | 6        would be to the EMR system or platform at McLaren since |
| 7   A   But it is also a platform where I can change things, | 7        you last used it in 2016. Would that be fair to say? |
| 8        make it to a note that -- I can customize everything. I | 8   A   Yeah. |
| 9        can customize every aspect of how the information is | 9   Q   Okay. So you don't if it got easier, if you could make |
| 10       inputted. I can also spend as much time as I want or | 10        amendments, if you could change things around, or |
| 11       need to input that information in. | 11        anything like that, because you never used it since |
| 12   Q   Okay. And when was the last time you entered anything | 12        2016, correct? |
| 13        on your own in EMR while you were at McLaren? | 13   A   Correct. |
| 14   A   Hmm. Probably 2016, 2000 -- Yeah, 2016, I think. | 14   Q   Let's take a break. |
| 15   Q   So would it be fair to say from 2016 to 2024 you don't | 15        VIDEO TECHNICIAN: We are going off the |
| 16        know what other changes or revisions there were to the | 16   record. It's 2:09. |
| 17        EMR platform that would have allowed you to make changes | 17        (Off the record at 2:09 p.m.) |
| 18        to move things around -- | 18        (On the record at 2:24 p.m.) |
| 19   A   Well -- | 19        VIDEO TECHNICIAN: We are back on the record. |
| 20   Q   -- because you never used it? | 20   It's 2:24:55. |
| 21   A   What CPSI was -- I mean, we talked about CERNER, but | 21   BY MR. MIGLIO: |
| 22        CPSI -- | 22   Q   So Doctor, just to clarify, if you look at Exhibit 10, |
| 23        COURT REPORTER: Talked about what? | 23        the employment agreement, I want to make sure I |
| 24        THE WITNESS: -- was dropped. I don't -- I | 24        understand you. You said that the employment agreement |
| 25        know that they weren't improving the product at some | 25        that you have, the McLaren employment agreement, that |
| Page 109 | Page 110 |
| 1        you wrote the date on the bottom of each of these pages. | 1   Q   Okay. And you have that document at home. |
| 2   A   So let me -- Let me go in detail. So Amber Kleekamp | 2   A   I either have it at home or Teri has it or I'll have to |
| 3        brought the -- | 3        find it for you, but there was that. |
| 4   Q   I just want the know if you wrote the date on the bottom | 4   Q   Okay. And the next thing I just want to clarify, you |
| 5        of the these pages. | 5        said the last time you entered information into the |
| 6   A   Let me -- Let me answer your question, sir. So when she | 6        electronic medical record in 2016; is that right? |
| 7        told me to sign the agreement, I signed it and -- she | 7   A   That is right, and I know that soon after that they |
| 8        wanted it right away, so I signed it, and I'm almost | 8        stopped regularly updating the software products. |
| 9        posi -- I'm positive that I put a date, just like | 9        Because you have to -- |
| 10        on . . . was it 19? That I put a date on each one of my | 10   Q   I don't care about that. I just want to know, you said |
| 11        sheets of paper, just like this on 19 and also the | 11        the last time that you entered information into the |
| 12        scribe compact, and this right here wasn't there at all, | 12        electric medical record -- |
| 13        the 7/22 slash. That wasn't there when I signed it. | 13   A   Yes. |
| 14   Q   So are you saying -- This is all I'm asking you -- that | 14   Q   -- was in 2016. |
| 15        the contract that you have that you signed has the date | 15   A   Yes. |
| 16        handwritten on each of the pages? | 16   Q   And then after that time somebody else entered it for |
| 17   A   I'll have to find it. It's -- It was where I was -- I | 17        you and you would proof it? Is that what you're saying? |
| 18        found this, of course, because I had to show -- There | 18   A   Yes, that is correct. |
| 19        were people saying that -- | 19   Q   Okay. All right. |
| 20   Q   Doctor, really. And I don't want to have to lecture | 20   A   I would have to proof everything. So we've already gone |
| 21        you. I'm just asking you do you -- did you have -- did | 21        through the scripts, the orders, the referrals. |
| 22        you write the date on the bottom of each page? If you | 22        MS. GORMAN: Okay. You answered his question. |
| 23        don't recall, you can just say you don't recall and we | 23        THE WITNESS: Okay. |
| 24        can move on. | 24        MS. GORMAN: Thank you. |
| 25   A   My best recollection is yes. | 25        MR. MIGLIO: Thank you. |
| Page 111 | Page 112 |

28 (Pages 109 to 112)

CHARLES CHRISTENSEN, D.O.
7/10/2025

FIRM #8093

**Page 113**

```
 1            MS. GORMAN:  Hm-hmm.
 2        (Exhibit 12 marked for identification)
 3   BY MR. MIGLIO:
 4   Q   Let me show you what I marked as Exhibit 12 and ask you
 5       if you've ever seen this document before.
 6   A   I do you remember this from documents that were provided
 7       through discovery.
 8   Q   Okay.
 9   A   I --
10   Q   Do you know who Ken Rates is?
11   A   Yes, I do.
12   Q   How did you get along with Ken Rates?
13   A   I got along with him as well as anyone else.
14   Q   Okay.  Well, do you think he was out to get you or that
15       he treated you inappropriately or unfairly or anything
16       like that?
17   A   I remember in August of this year describing --
18       personally sitting down with him --
19            MS. GORMAN:  Last year.
20            THE WITNESS:  Or in 2022.
21            MS. GORMAN:  Oh.
22            THE WITNESS:  So in 2022 before November -- it
23       could have been August, September -- I remember sitting
24       down with him and saying:  You need to know this.  I have
25       learning disability and I really needed a scribe.  You
```

**Page 114**

```
 1       know, I understand that Tara and Jeff, you know, are
 2       concerned about, you know, getting things done timely,
 3       and I told them that I was having many problems in
 4       confidence.  I told him about my disability.  Like, I
 5       didn't want other people to know this.  It's like need
 6       to know.
 7   BY MR. MIGLIO:
 8   Q   Doctor, I didn't ask you what you told him.  I just
 9       asked you if you thought he treated you fairly or
10       unfairly or somehow was out to get you or anything like
11       that.  Kenneth Rates, that's who I'm asking about.
12   A   I only know that after -- What he's describing here was
13       something that Jeff Whiting knew about my disability --
14   Q   Doctor.
15            MS. GORMAN:  Can we have a minute?  Please,
16       listen to Mr. Miglio's question.
17            THE WITNESS:  Hm-hmm.
18            MS. GORMAN:  And just -- Your story will come
19       out.
20            THE WITNESS:  Yeah.
21            MS. GORMAN:  You'll be able to talk about
22       this, but answer what he's asking you.
23            THE WITNESS:  From every interaction with him
24       it seemed very copessetic and good.  I mean, it was a
25       good relationship.
```

**Page 115**

```
 1   BY MR. MIGLIO:
 2   Q   Okay.  So this Exhibit 12 that I gave you.
 3   A   Yes.
 4   Q   Here's Ken Rates saying that there is a team staff
 5       meeting that took place and things got a little heated
 6       and Dr. Christensen began raising his voice to some --
 7       to a level that some describe as yelling.  He was
 8       raising his voice, pointing fingers, and was described
 9       as being a bully and being uncompromising and
10       unreasonable.
11            Now, do you dispute that?
12   A   That characterization I would, yeah, I would dispute.
13   Q   Okay.  Do you remember what the meeting was?
14   A   It was -- So let me go back.  The reason why I can
15       remember it so well is that I finally got my money that
16       I had not received for four or five months, and my
17       family, who desperately needed it, and it was that same
18       right before the meeting -- We were going into the
19       meeting.  It was described to be as scheduling, you
20       know, like scheduling if someone had a chief complaint
21       of, say, sexual abuse, abuse, that they would be
22       afforded more time, and we had several difficulties with
23       staff inappropriately putting patients into the room and
24       compromising the ability to, you know, help them.  So I
25       brought that attention to Tara earlier, like maybe it
```

**Page 116**

```
 1       was a week before, maybe it's a couple days before.  I
 2       wasn't aware of that meeting after the meeting I just
 3       described to you.  We went to the front room where
 4       everybody was, you know, there after being in the room
 5       in my office or the break room where it was more
 6       private.  We started talking about the difficulties with
 7       scheduling, which that's what the meeting was supposed
 8       to be about.  Then Tara started asking, "What's the
 9       problem?  Why are you asking the staff to write
10       prescriptions or write orders?"  Well, we didn't have a
11       scribe at that time, and I had several times before made
12       it plain and clear to Ken -- Ken Rates in August or
13       September, I made that quite clear.  And Jeff even knew
14       about it, because he was there with me with my
15       negotiation of my first contract that I have a learning
16       disability and that I needed a scribe.  So I found it
17       very, like I was almost -- it was staged.  It was Tara
18       bringing up, "Why do you need these services from the
19       staff?"
20            And then Jeff soon became closer and closer to
21       me questioning me "Why -- Why do you need this?  Why do
22       you need these services?"  I said, "Jeff, we have ramps
23       for" --
24   Q   Doctor, I just asked you whether you remembered the
25       meeting.  I didn't ask for a whole version.  We'll get
```

29 (Pages 113 to 116)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                          FIRM #8093

| | |
|---|---|
| 1    refused to send in prescriptions or orders and forces | 1    having cardiomyopathy or hypertrophy.  I don't -- I |
| 2    the staff to do it."  Would you -- Is that a true | 2    don't know what this is referring to.  I don't remember |
| 3    statement, that you would -- | 3    There's not many kids in my practice -- I don't think |
| 4    A   No. | 4    there are any -- that have enlarged hearts. |
| 5    Q   -- refuse to send in prescriptions or orders and forced | 5    Q   So she says, "She reported that his notes are not |
| 6    the staff to do it? | 6    complete, and when she said something to him he laughed |
| 7    A   No. | 7    at her and said get it done."  Did that take place? |
| 8    Q   Okay.  That would be inappropriate, wouldn't it, if it | 8    A   No, I didn't laugh about it.  So what would be going on |
| 9    was true? | 9    is that as soon as we didn't have a scribe it made |
| 10   A   If it was true, yes. | 10   things extremely difficult, because Scribe America was |
| 11   Q   Yeah, it would be -- | 11   just a dictation program, and they told -- |
| 12   A   But it's not true. | 12   administration told me to ask the staff to help with an |
| 13   Q   -- malpractice, wouldn't it? | 13   extension of what was provided to me in the past to use |
| 14   A   I'm not -- I won't speculate. | 14   the staff that was there.  I tried to, but, you know, it |
| 15   Q   She describes, Deziree describes, an instance where | 15   was -- we're dealing with human beings.  We had to have |
| 16   McLaren Thumb Hospital employee Houston, who is a | 16   things done.  I would ask -- I'd been asking for a |
| 17   patient, was waiting on a referral for her son's | 17   scribe, pleading for a scribe, and it wasn't being met, |
| 18   enlarged heart.  When she saw Dr. Christensen in the | 18   and then every day we would have continued patients |
| 19   hospital she asked.  Dr. Christensen said he didn't know | 19   coming in the door, and I -- I felt like -- that I |
| 20   whether the staff are not doing their job. | 20   couldn't ask anybody to do anything.  I couldn't get |
| 21   A   I don't recall that at all. | 21   anything -- I was like all by myself and not having what |
| 22   Q   Okay.  You're not saying it didn't happen; you're just | 22   I needed. |
| 23   saying I don't recall? | 23   Q   She said she -- when she reported that your notes were |
| 24   A   First thing, who.  I would have to reference the chart | 24   not complete, when she said something to you you laughed |
| 25   if that was actually -- I don't remember any children | 25   at her and said "Get it done."  Did that take place or |
| Page 121 | Page 122 |

| | |
|---|---|
| 1    not? | 1    Q   Well, whoever interviewed her, this is what the notes |
| 2    A   No, but -- but she wasn't a scribe -- At that time she | 2    they took: "Stated they were having a meeting to discuss |
| 3    wasn't a scribe, so she wasn't doing any of those | 3    scheduling and communication.  She described |
| 4    things. | 4    Dr. Christensen's behavior as super angry and it was |
| 5    Q   So you're claiming that she -- if she said that, it | 5    like talking in circles with him.  She said the meeting |
| 6    wasn't true; is that correct? | 6    was very tense and turned into a yelling match." |
| 7    A   She -- She -- She was not a -- She was not a scribe. | 7         Now, you disagree that you got very angry, |
| 8         MS. GORMAN:  Yes or no? | 8    super angry, in the meeting. |
| 9         THE WITNESS:  There's no -- No.  Not at all. | 9    A   I got -- I was extremely disappointed that Jeff was |
| 10   BY MR. MIGLIO: | 10   calling my disability out to everybody in the room and |
| 11   Q   Okay.  "Deziree stated that multiple patients have | 11   asking just outrageous questions like, "What made you so |
| 12   shared with her that they heard he," being you, "treats | 12   special?" |
| 13   them poorly." | 13   Q   So were you super angry in the meeting? |
| 14   A   I -- I -- | 14   A   I don't know if super angry, but angry, yes. |
| 15   Q   Are you aware of that? | 15   Q   Were you yelling in the meeting? |
| 16   A   No.  That's -- That is not true. | 16   A   I was matching what Jeff Whiting was yelling at me |
| 17   Q   Okay.  Do you know Chelsea Bischer? | 17   about. |
| 18   A   Yes, I do. | 18   Q   "Chelsea stated that Dr. Christensen will only speak to |
| 19   Q   She was a medical assistant in your office? | 19   Deziree and not anyone else."  Now, you have denied |
| 20   A   She was twice, actually, which doesn't -- it's not | 20   that's the case, right? |
| 21   stated here. | 21   A   No.  And the first -- Let me tell you, Chelsea Bischer |
| 22   Q   She in, apparently, being interviewed by Mr. Rates | 22   was in my office previously.  Couple years at least |
| 23   stated, "They were having a meeting to discuss" -- | 23   before.  She answered the phone and said, "Oh, F-U-C-K," |
| 24   A   I disagree with it being by Mr. Rates.  I don't know who | 24   and then I reported her and she was taken -- she was |
| 25   the author of this was. | 25   taken out of the office for that incident. |
| Page 123 | Page 124 |

31 (Pages 121 to 124)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                          FIRM #8093

| | |
|---|---|
| 1  Q  Is that true? | 1  the office with Jeff and Tammie. Then Tara -- When Tara |
| 2  A  No. | 2  was talking to me about why -- why do you need these |
| 3  Q  You didn't take a couple of steps. | 3  services and things like this, we had already gone |
| 4  A  Okay. Tara was as far away to me as that door is over | 4  through this in August and -- and other times about why |
| 5  there. | 5  I needed scribe, so it was kind of dishing up the same |
| 6  Q  She says, "At this point Jeff, the manager, stepped in | 6  thing and I give back the same reasons and it isn't good |
| 7  between them. Tammie stated that the only way Jeff | 7  enough for them. So it was -- Of course it was |
| 8  could say anything was to get loud himself, because | 8  something very dear to me, but Jeff Whiting was with |
| 9  Dr. Christensen was loud. Tammie stated she was glad | 9  Sarah Frye the whole time when I was negotiating my |
| 10  that Jeff stepped in between them because she did not | 10  contract with that scribe statement here. I -- |
| 11  know where it would have gone. She didn't feel that | 11  Exhibit 11. He was there and he knew why that needed to |
| 12  Dr. Christensen would have been physical. However, he | 12  be there, and then Jeff stepped in after Tara started, |
| 13  felt he would have gotten even closer to Tara's face. | 13  and I would respond with, "Yeah, I course I do these |
| 14  At this point Dr. Christensen left the meeting." | 14  things. They're important." And then Jeff continued to |
| 15  Now, that doesn't sound to me like you were at | 15  get closer and closer to me. I backed up. I went past |
| 16  the other end of the room. | 16  that partition door away from him, because he's right in |
| 17  A  No, it was. Okay. So in that -- in that office area | 17  my face. |
| 18  there was a row of files, and then there's a partition | 18  Q  So you're saying Tammie's lying here when she -- if she |
| 19  between the two offices that were there when there were | 19  said this, that you got into Tara's face and that Jeff |
| 20  two separate offices. So they put -- They put it, like, | 20  had to step in between you and Tara. |
| 21  an opening between the two offices and then combined | 21  A  She -- She did -- |
| 22  them both. So I was standing like right across from | 22  Q  You're saying that's not true. |
| 23  where Stacie Dorsch usually would be sitting. Tara was | 23  A  I'm saying that he stepped in front of me. I did not |
| 24  on the other end of that office because that -- So I was | 24  advance. She was well far away of me. And he stepped |
| 25  at one end of the office, she was at the other end of | 25  in that 10- to 15-feet distance and got closer and |
| Page 133 | Page 134 |
| 1  closer, and he was literally about foot away from me | 1  they were pretty traumatized, too. Do you think they |
| 2  yelling at me. | 2  were? |
| 3  Q  But you didn't step towards Tara. | 3  MS. GORMAN: Objection. Calls for |
| 4  A  No. And I stepped back more than anything else, because | 4  speculation. |
| 5  Jeff was approaching me yelling at me. I was telling | 5  THE WITNESS: Yeah, I don't know. |
| 6  him that people need ramps if they have a wheelchair. I | 6  MS. GORMAN: He has no way of knowing. |
| 7  was trying to give him substantial hints about what we | 7  BY MR. MIGLIO: |
| 8  had talked about in my disability. I said that people | 8  Q  Did you get along with Tara Smalley? |
| 9  with disabilities need things, and then finally he goes, | 9  A  Besides that one incident? Yes. |
| 10  "What makes you so special?" I go, "Jeff, I have a | 10  Q  Wait. Besides what incident? |
| 11  learning disability. I have dyslexia." And then I | 11  A  This incident. The one on this day that we were talking |
| 12  left. I mean, I -- it was too traumatic and I left. | 12  about. November 8th, I think it was. November 8th, |
| 13  Q  Okay. So, "Tammie also says that you're cordial to her | 13  2022. |
| 14  and will always answer your {sic} questions. However, | 14  Q  So if Tara said that you got in her face or approached |
| 15  she's concerned with how he," being you, "treats staff." | 15  her, she would be lying as well? |
| 16  She mentioned he has said to them in the past if he | 16  A  She was at a far distance that -- I mean, if I went a |
| 17  doesn't want them in this office, they will be gone." | 17  foot forward or a foot backwards, I mean, I was sitting |
| 18  A  No, I never said that. | 18  by these -- I remember these metal cabinets right beside |
| 19  Q  So Tammie made that up if she said it? | 19  me. Like, I was putting my elbow on them and it was |
| 20  A  If she said it. | 20  near that partition where the two offices were |
| 21  Q  She said, "Staff are walking on egg shells with him." | 21  separated, and they were on the opposite side, which |
| 22  A  That's very common -- It seems very common, that | 22  is -- you know, it's a 20-foot, 30-foot wide room. |
| 23  statement. That cliche is there. But I was pretty | 23  Q  So you didn't walk towards her, yes or no? |
| 24  traumatized after that. | 24  A  I don't recall. No. |
| 25  Q  Well, I guess it sounds like from all these other people | 25  Q  Okay. |
| Page 135 | Page 136 |

34 (Pages 133 to 136)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                                FIRM #8093

| | |
|---|---|
| 1  Q   Correct or not? | 1     with the assistant medical director or assistant chief |
| 2  A   I provided him with what happened at the staff meeting. | 2     medical officer? |
| 3  Q   But wasn't the meeting with Dr. Pinelli to talk to you | 3  A   Yes, but -- |
| 4      about these staff members and their -- what they were | 4  Q   Wasn't that -- Did that not register as something that |
| 5      saying about you? | 5     you needed to pay attention to? |
| 6  A   I -- | 6  A   Well, we paid attention to it, but, you know, we talked |
| 7  Q   Yes or no? | 7     about the situation back and forth with my input, what |
| 8  A   I don't know if they actually said those things. | 8     he was told, and . . . but we didn't come up with, you |
| 9  Q   I didn't ask you that. | 9     know, any change in plans, no -- there was nothing |
| 10      MS. GORMAN:  That's not the question.  Come | 10     directed for me to, you know, of course, to talk to |
| 11  on.  Answer his question. | 11     staff, have good lines of communication.  I think he |
| 12      THE WITNESS:  Okay.  What is it again? | 12     said, "What are the things you need?"  I said, "You know |
| 13  BY MR. MIGLIO: | 13     what?  I've had -- I've had significant trauma from this |
| 14  Q   Let me just go back. | 14     experience and that it would be nice if Jeff apologized |
| 15  A   Okay. | 15     and that -- that we have a scribe."  That was, like, one |
| 16  Q   You said nobody ever told you about these issues, and I | 16     of the conclusions -- two conclusions from that meeting. |
| 17      just said isn't it true that after this staff meeting, | 17  Q   And you didn't walk away from that meeting with any |
| 18      the one where you dispute what these -- how it took | 18      insight into what the staff were thinking about? |
| 19      place, after this staff meeting didn't you have a | 19  A   No, no.  He provided all -- and I -- I heard about that, |
| 20      meeting with Dr. Pinelli about the staff issues that | 20      yes, but it didn't mesh with my experiences, and I -- I |
| 21      occurred at the meeting? | 21      also -- I had a terrible traumatic event just happen to |
| 22  A   Yes. | 22      me. |
| 23  Q   Okay.  And how many times have you met with Dr. Pinelli? | 23  Q   What was the traumatic event that happened to you? |
| 24  A   I -- Maybe just once. | 24  A   Jeff Whiting yelled at me and everyone knew my |
| 25  Q   Okay.  Wasn't that a significant meeting to be meeting | 25      disability.  Personal information that I would never -- |
| Page 149 | Page 150 |

| | |
|---|---|
| 1      at that point never have given to anyone besides Jeff or | 1      MS. GORMAN:  Objection.  Calls for |
| 2      Ken Rates or Sarah Frye. | 2  speculation. |
| 3  Q   You just said that you told people very first -- before | 3  BY MR. MIGLIO: |
| 4      the very first contract you told Sarah Frye and | 4  Q   Do you think that was the case? |
| 5      everybody -- | 5  A   No.  I never told them till Jeff Whiting was in my face |
| 6  A   But -- | 6     telling me, "Why are you so special" -- literally a foot |
| 7  Q   -- that you had a disability and you needed | 7     away from me -- and me finally saying, "Jeff, the reason |
| 8      accommodations. | 8     why is because I have a disability.  All right?"  And |
| 9  A   But -- | 9     that would be -- that wouldn't be information now |
| 10  Q   What was the secret about that? | 10     that it's -- It's something very personal.  I would |
| 11  A   Because it's your -- it's something very personal. | 11     never -- When I would talk to Ken Rates about it, that |
| 12  Q   How can it be personal if you're telling everybody that | 12     was just before this incident, it was a room with just |
| 13      you're applying for a job for about it? | 13     him in the break room.  I said, "Jeff" -- or "Ken". |
| 14  A   Well, I'm telling administrators.  I'm not telling the | 14     Ken.  "I have had a disability ever since I was young, |
| 15      man off the street or the coworkers that I have.  I | 15     and this is why I need this accommodation."  I was |
| 16      don't want them to feel differently about me.  I don't | 16     desperate.  I wanted administration to provide what I |
| 17      want that information to be then given to patients and | 17     needed.  And it was -- It was terrible not to have any |
| 18      feel differently about me.  I mean, this is something | 18     interaction with anybody.  It was terrible that the only |
| 19      very personal.  It is something where it is of my being | 19     interaction I had was Jeff yelling at me, wanting to |
| 20      since I was, you know, six or seven years old. | 20     know why I was so special.  It was devastating to show |
| 21  Q   Do you think that the staff in this meeting that took | 21     that to everybody because I did not want people to think |
| 22      place didn't know anything about you having a learning | 22     of me differently. |
| 23      disability and the need that you needed for a scribe and | 23  Q   You had already established yourself as somebody who |
| 24      the accommodation?  Do you think for a minute they | 24     needed to be treated differently. |
| 25      didn't know any of that at that time? | 25  A   No. |
| Page 151 | Page 152 |

38 (Pages 149 to 152)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                    FIRM #8093

---

**Page 157**

1    but now you're talking about -- you're blaming me for
2    asking staff to write a script or write an order in
3    between patients when it was really busy?"  And I'm
4    going, "Well, I need a scribe then, right?  Isn't that
5    the real reason we're having this, you know, this
6    conversation and why -- why are we doing it again?
7    We're doing it again and again and again."  I'm just --
8    The -- The answer to the question was, "Provide me with
9    a scribe.  I need a scribe.  Why are you yelling at me?
10   Why are you pinning me down and making me come up with a
11   reason when you already know the reason?"  You can shake
12   your head --
13   Q   Are you done with the answer?  Because that's not what I
14       asked you.  But we'll go on to something else.
15   A   No, I think that was the answer.
16   Q   Because we're going to be here for --
17           MS. GORMAN:  You're good.
18           MR. MIGLIO:  -- ten hours.
19           THE WITNESS:  I don't -- Sir --
20   BY MR. MIGLIO:
21   Q   You keep saying the same thing, Doctor, and I'm only
22       asking you --
23   A   You keep -- You keep on asking the same question.
24   Q   No.  I just asked you about what -- whether you were
25       told that your allegations about Jeff Whiting were never

---

**Page 158**

1    corroborated.
2    A   I --
3    Q   And that's all I asked you --
4        You have never shown me anything --
5    Q   -- and you said no.  I didn't ask you to show you
6        anything.  I just asked you a simple question.  Did
7        anybody tell you that nobody substantiated those
8        allegations that you made about Jeff Whiting?
9    A   I don't know -- I never had any --
10   Q   Okay.  So the answer is no then, right?  Simple answer.
11   A   I never received anything written or verbal about
12       anything you're talking about.
13   Q   Thank you.  Now, what did you take away from the meeting
14       with Dr. Pinelli?  That you needed to apologize to the
15       staff for anything or that you needed to build bridges?
16       Anything like that?
17   A   I talked to Jeff about -- We talked about building
18       bridges.  He wanted me to take everyone out to lunch.
19   Q   I'm asking about the meeting with Dr. Pinelli.
20   A   No.  I mean, we -- It was -- It was something that --
21           MS. GORMAN:  Listen.  It's a yes or no
22   question.  Please.
23           THE WITNESS:  Yes.
24       Do you want to take a break?
25           MR. MIGLIO:  Not yet.

---

**Page 159**

1            THE WITNESS:  Should we take a break?
2            MS. GORMAN:  Yeah.
3            THE WITNESS:  Let's take a break.
4            MS. GORMAN:  There's no question pending.
5    We'll be right back.
6            VIDEO TECHNICIAN:  Off the record.  3:23.
7            (Off the record at 3:23 p.m.)
8            (On the record at 3:57 p.m.)
9            VIDEO TECHNICIAN:  We are back on the record.
10   It's 3:57.
11   BY MR. MIGLIO:
12   Q   Doctor, do you belong to a gun club?
13   A   The Thumb -- I don't belong to it anymore just because
14       of my . . . but at the time I was a part for at least
15       six years.
16   Q   Okay.
17   A   And it was Thumb Sportsman's Club.
18   Q   All right.  And when were you a member of that?  Or I
19       should say when did you stop being a member of --
20   A   From -- The new dues were -- were -- I had to submit
21       them in May, but I wanted to save money.  And I didn't
22       have much interest in it anymore because of all that I
23       went through.  I didn't have much interest in a lot
24       things afterwards.
25   Q   So when you belonged to the gun club was this a place

---

**Page 160**

1    where you would shoot?
2    A   Yes.
3    Q   And how often would you shoot there?
4    A   Usually on average once a week, approximately.
5    Q   And do you have to sign in?
6    A   No.  It's a -- It's a combination lock and then you
7        would have access to the grounds.
8    Q   What do you get for your dues?  You get the locker?  You
9        have to schedule an appointment to shoot?  What?
10   A   No.  If it's -- If it's open, you can -- you can utilize
11       the facilities.  They had trap, skeet, pistol range, and
12       rifle range.
13   Q   And when would you go to the shooting range?
14   A   Sometimes before work.  Sometimes on the weekend with my
15       daughter.  We would go -- There was a 4-H function that
16       my daughter and I went to several times at the
17       shooting -- that same shooting range.  One of the
18       speech -- not the -- the respiratory therapists at the
19       hospital put that one on and it got me into that with my
20       daughter.
21   Q   Do they have a locker for your guns?
22   A   No, they don't have a locker for the guns.
23   Q   So you would transport guns back and forth in your
24       personal vehicle?
25   A   Yes.

---

40 (Pages 157 to 160)

Case 1:24-cv-12642-TLL-PTM   ECF No. 23-4, PageID.230   Filed 03/02/26   Page 17 of 34

**Page 161**

```
 1   Q   Okay.  Would you do that during lunch hours or what?
 2   A   Yes, sometimes would it be on lunch hour.  Sometimes
 3       before, after.  They would have an event where we go
 4       long rifle bench rest shooting, and that would be like
 5       right after work.
 6   Q   Okay.  And when you went to work would these weapons be
 7       in your car?
 8   A   A locked trunk, yes.
 9   Q   Were you aware that it was against policy to have
10       weapons on premises?
11   A   No, I -- I did not know about that.
12   Q   You didn't know that no weapons were supposed to be
13       brought on the premises of McLaren Hospital?
14   A   I definitely knew that anything outside of my car would
15       be not something that would be tolerated, no.  It was
16       always in my car.
17   Q   So was that relatively frequent that your car had
18       weapons in it when it was sitting in the parking lot?
19   A   Yes.
20   Q   Now, at any time were you told that in order to get an
21       accommodation for your disability you needed to submit a
22       form?
23   A   After I went to Dr. -- on January of 2023 when I had a
24       meeting with Dr. Ropp, after he yelled at me I was not
25       feeling so great, but even before that I said, "I
```

**Page 162**

```
 1       have -- I'm being discriminated against."  And he, you
 2       know, wanted more explanation, and I did talk about my
 3       disability.  And there was subsequent from that,
 4       finally, because I had been talking about my disability,
 5       the accommodations I needed, from that conversation
 6       with -- at the end of meeting with Dr. Ropp they said
 7       that they would send me a form.  I received the form,
 8       but it was like a medica -- it was a neutral form.  It
 9       wasn't a neurodevelopmental form.  So to explain this --
10       And after being outed, I didn't feel that I could
11       trust -- I mean, I wanted to trust McLaren, but I
12       couldn't trust McLaren, because I'd just been --
13   Q   Doctor --
14   A   -- yelled at McLaren --
15           MS. GORMAN:  Just answer the question.
16           THE WITNESS:  So I --
17   BY MR. MIGLIO:
18   Q   Doctor, I just asked you if you ever submitted a request
19       for an accommodation.
20   A   Many times I asked for accommodations.
21   Q   I'm talking about did you ever submit, fill out a form
22       requesting an accommodation?
23   A   One was given to me after Dr. Ropp's yelling at me, and
24       then I filled it out to my best ability, yes.
25   Q   Okay.  So you did submit a form.  That's the answer to
```

**Page 163**

```
 1       my question?
 2   A   It was given to me, I filled it out, and I gave it back.
 3   Q   Well, let's go back, since you raised it several times
 4       in two different answers.  What did Dr. Ropp yell at you
 5       about?
 6   A   For the staff leaving.
 7   Q   Okay.  What did he say specifically?
 8   A   I had a prepared statement, because I did not know
 9       why --
10   Q   What did he say specifically?
11   A   "Shut up and listen to me talk or I'm going to suspend
12       you."
13   Q   Okay.  Did that register for you?
14   A   Yeah.
15   Q   Was it -- Did you consider this to be a serious warning?
16   A   I considered it being abused, but I -- it was pretty
17       definitely serious at that point and I wanted to
18       preserve my job.
19   Q   And he told you to shut up while you were talking?
20   A   I had a prepared -- I didn't know why I was going to be
21       there, so I had a prepared statement that I wrote out,
22       and I was trying to say, "Let me at least talk to you
23       about what I can write down and provide to you," and he
24       told me to shut up.
25   Q   Why were you writing something down for a meeting if you
```

**Page 164**

```
 1       didn't know what the meeting was about?
 2   A   Well, I was trying to be prepared for whatever could be
 3       the meeting.  I didn't know what the meeting was about.
 4       I knew about it that day.
 5   Q   Well, wouldn't it have been easier to go to the meeting
 6       and find out what it was about instead of preparing
 7       something in advance?
 8   A   I didn't know -- I wanted to know what the -- No one
 9       would tell me what the meeting was about.
10   Q   You knew you were in trouble, didn't you?
11   A   I don't -- Meaning about being abused or about the
12       discrimination, yes.  I was duly aware of the situation
13       that I had received trauma from Jeff.  I received --
14       Everyone saw it and then they were leaving.  I don't
15       know what else that I could have done.  And then I
16       was -- I still didn't have my accommodations, even
17       though I told everybody many, many times before, and
18       then I was asked -- I was actually on call.  I was
19       rounding on patients that day that I went to see
20       Dr. Ropp, and the nurses knew about it before I did.
21       They go, "You're not going to be here this afternoon."
22       I go, "What are you talking about?"  They go, "Well,
23       there's another doctor coming to replace you."  I go,
24       "Really?"  And then I called and found out that I had a
25       meeting.
```

41 (Pages 161 to 164)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                        FIRM #8093

Page 165

1    And then I called Dr. Ropp's secretary. I go,
2    "What is the meeting about?" "You'll know when you get
3    here." I freaked out. I had a panic attack. I was
4    like, "What is going on? Why -- What is -- What is the
5    meeting about? What's the itinerary?" And they refused
6    to tell me. And why do I have to drive all the way to
7    to Flint? I've never been to Flint before.
8  Q    You've never been to Flint before?
9  A    Not the city proper. Maybe if you consider 75 Flint.
10     I'd never been to Flint before in my entire life.
11 Q    Well, you know that's where the headquarters is for
12     McLaren.
13 A    Well, yeah. Obviously. Yes.
14 Q    And did you surmise that because you were being called
15     to a meeting with Dr. Ropp's office in Flint that it
16     might have something to do with your employment?
17 A    Well, sure.
18 Q    Okay. Did you think that your employment might be in
19     jeopardy?
20 A    I -- I was -- I asked and no one told. I don't know
21     what -- what it was going to be about.
22 Q    Okay. But you didn't have any consideration that your
23     employment might be in jeopardy because you were being
24     called to talk to the chief medical officer; is that
25     correct?

Page 166

1  A    I'm telling you I don't -- At that moment I was --
2     anything could happen. I don't know what it was -- I
3     was in a panic.
4  Q    Okay. So if you were in a panic and you didn't know
5     what the meeting was like, why did you prepare a
6     statement?
7  A    I thought I -- the best preparation I could. I don't --
8     To be prepared for whatever would happen. And I wanted
9     to be organized in some fashion and I wanted to provide
10     a beginning statement about, you know, just about my
11     understanding about the situation.
12 Q    What situation?
13 A    My accommodations that were duly not provided for and
14     the fact that it was becoming very discriminatory that
15     they -- it's like they didn't want to accommodate me and
16     they -- it's like you were talking to a wall or talking
17     to -- And it would be vast times of just silence. You
18     could send an email, you could send a letter, a page of
19     thoughts to anybody, like Tara or Jeff Whiting or Sarah
20     Frye, and you would get no response or you would get,
21     "You're doing fine. Don't worry" or -- I don't know.
22     It would just -- It would be like talking and with one
23     hand clapping. So it was almost like solitary
24     confinement. And that was another explanation of what
25     happened with --

Page 167

1    MS. GORMAN: Okay.
2    THE WITNESS: -- that meeting.
3  BY MR. MIGLIO:
4  Q    Did anyone help you in preparing this statement?
5  A    No.
6  Q    And how did you pick the topic for this statement if you
7     weren't sure what the meeting was about?
8  A    It was just all of the stagnant details that weren't
9     being facilitated to that point. It was, you know,
10     scribe . . . I don't -- I don't recall everything, but
11     it was mainly accommodations for my disability.
12 Q    But what you wanted to say, not what you thought
13     Dr. Ropp wanted to say?
14 A    I didn't know what Dr. Ropp, because they refused to
15     tell me until I got there.
16 Q    Okay. And when you got there did you begin reading?
17 A    I asked. I said, "Can I start -- I'd like to start this
18     meeting with a prepared statement." I started, and then
19     I was --
20 Q    What was the response when you said, "I'd like to start
21     with a prepared statement"?
22 A    Well, I started talking about the prepared statement
23     after I said I wanted to provide one, and then I was
24     rudely . . .
25 Q    Then what happened?

Page 168

1  A    I was rudely -- I was yelled at and said, "If you
2     continue, you will be on administrative leave," so I
3     stopped.
4  Q    When did you learn that the meeting was going to take
5     place?
6  A    That day.
7  Q    Okay. And when did you prepare the statement? The same
8     day?
9  A    Well, it was -- it was -- Yes, that same day.
10 Q    Okay.
11 A    But it was -- A lot of it was already written from all
12     of the stagnant issues that had built up over time.
13 Q    And this is the same thing that you have been saying all
14     along in every meeting that you had with management,
15     right?
16 A    There possibly was some new objective points to it, but
17     some of it, or a lot of it, was actually, yeah, old
18     points.
19 Q    Okay. When was the meeting with Dr. Pinelli?
20 A    I think it was on the 6th of December.
21 Q    Are these items in the timeline that you prepared?
22 A    Yes.
23 Q    So you got to the meeting and you started reading this
24     presentation and Dr. Ropp stopped you, and then what
25     happened?

42 (Pages 165 to 168)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                          FIRM #8093

| | |
|---|---|
| 1   A   He told me about the -- what he was given for the | 1   say anything more about staff? |

1   A   He told me about the -- what he was given for the
2       reasons for people leaving.
3   Q   Okay.
4   A   I did try to correct him, but he would cut me short and
5       say, "Wait till the end of my talk or I'll put you on
6       administrative leave" or -- you know, he would provide
7       that, and I would stop.
8   Q   Okay.
9   A   And I waited and I didn't say anything.
10  Q   All right.  And what did he tell you?
11  A   A lot of what those points were in Exhibit 12.
12  Q   All right.  And what did you say in response to him?
13  A   I let him finish.  I didn't -- He wasn't -- He was very
14      aggressive that he didn't want to be interrupted,
15      obviously.
16  Q   Was the statement that you gave him, is that part of
17      your timeline?
18  A   No, I don't -- I mean . . . I did write down that I was
19      told to shut up and -- in that meeting date, but I don't
20      think it -- I don't think I have that in my timeline
21      itself, because it was abbreviated --
22  Q   So what did you take away from the meeting?  What was
23      the message that you got from the meeting with Dr. Ropp?
24  A   That I -- just not say anything more.
25  Q   And you not say anything more in the meeting or you not

Page 169

1   say anything more about staff?
2   A   I didn't have any say in what was going on with me.  He
3       told me basically shut up and don't do this anymore.
4       And you know what?  I gave up.  I totally said to myself
5       the only thing I need to do is make my family and give
6       them -- It didn't matter how I was feeling.  Just --
7       It's not my practice.  It is not my practice.  It is not
8       something that has my name on the front door.  It is not
9       me having what I need.  To shut up, do what you're told,
10      and that you just be there and you do your job.
11  Q   How many staff members had left since the staff meeting
12      where you say Jeff Whiting yelled at you and the meeting
13      with Dr. Ropp?
14  A   By -- by mid January I think pretty much everyone left.
15  Q   Right.  Do you know why they left?
16  A   I think I was abused -- abused to a degree that no one
17      would want to be there for.
18  Q   Wait.  You're saying that --
19  A   I don't -- I don't --
20  Q   -- people left because you were abused, not because you
21      were abusing them?
22  A   No.
23  Q   No, I want to know what you're saying.  You're saying --
24  A   I'm saying --
25  Q   -- people left because you were abused by McLaren?  Is

Page 170

1       that your -- what you're saying?
2   A   Yes.  Well, no.  What I'm -- What I'm trying to tell
3       you --
4           MS. GORDON:  You answered his question.
5   BY MR. MIGLIO:
6   Q   Okay.  So you didn't get that there was a -- You didn't
7       understand that there was a level of concern about the
8       staff meeting that took place, the one we talked about
9       where people said that you were yelling, and the staff
10      leaving, you weren't aware that that was a concern that
11      Dr. Ropp had about you and how you treated staff?
12  A   I didn't treat staff as it was portrayed.
13  Q   I didn't ask you whether you treated staff.  You've
14      already said you haven't, contrary to what they said.
15      My question is did you understand that that's what
16      Dr. Ropp was concerned about?
17  A   Yes.
18  Q   The fact that you had this meeting where staff were
19      saying that you yelled at them and the staff -- the fact
20      that after the meeting all the staff quit?
21  A   What I'm telling you is I don't know why the staff left.
22      They left for other -- Whatever reasons, it's between
23      them and themselves.  What I'm telling you is that what
24      I got from the meeting with Mr. Ropp was that he had
25      already decided why they left and what I did was the

Page 171

1       reason for that.  If I provided him with anything
2       besides that, he shut me off and I was not appreciated
3       at all.  There was no -- The script had already been
4       written.  Whatever I provided wasn't listened to.  It
5       was dismissed.
6   Q   So did you understand that you needed to act differently
7       with staff, whether you agreed with it or not, after
8       your meeting with Dr. Ropp?
9   A   I understood that I wasn't going to probably receive a
10      accommodation and that . . . that I -- whatever pride
11      that I had and what I -- what I tried to build up over
12      the years was not -- you know, whatever part of me that
13      was in that practice had been destroyed and was now
14      gone.
15  Q   Did you ever during the course of your employment with
16      McLaren look elsewhere for employment?
17  A   Well, I tried to find another place, yeah.
18  Q   When did you try and find another place?
19  A   Well, when HMC then transitioned to McLaren, the only
20      thing I did was I discretely talked to Scheurer and
21      maybe Harbor Beach.  Yeah, probably Harbor Beach, too.
22      And just asked, you know, if they had any positions
23      available, and they said no.
24  Q   That's the extent of you looking elsewhere?
25  A   Yeah.  At least I -- I mean, there might have been, but

Page 172

43 (Pages 169 to 172)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                    FIRM #8093

| | |
|---|---|
| 1  I don't think there is anything else besides that, but | 1  A  I saw him at a social occasion at Rachel's here in town. |
| 2  those are the ones I definitely remember. Because it | 2  Q  Okay. So who else was at the meeting with Dr. Ropp and |
| 3  had to be discreet. You know, you had to be . . . | 3  you? |
| 4  appropriate. | 4  A  Someone from HR. Human resources. |
| 5  COURT REPORTER: Had to be what? | 5  Q  Okay. Do you remember if it was Carla? |
| 6  THE WITNESS: Had to be discreet. | 6  A  It may have been. I don't recall the meeting. I just |
| 7  COURT REPORTER: You said something after | 7  know that she was there, a person from HR. |
| 8  that. | 8  Q  All right. So after the meeting you went back to your |
| 9  THE WITNESS: Okay. | 9  office? |
| 10 BY MR. MIGLIO: | 10  A  By then -- By the time I got home it was late, so I went |
| 11 Q  When you were told that you had a meeting with Dr. Ropp, | 11  home. |
| 12  didn't you tell people that, "I'm not driving down to | 12  Q  Okay. |
| 13  Flint to meet with him"? | 13  A  It was beyond hours. It was in January. Because the |
| 14 A  I didn't know -- | 14  roads were terrible. Wasn't fun. And I wasn't |
| 15 Q  Just listen to my question. | 15  definitely the same person. |
| 16 A  Yeah. | 16  Q  Why weren't you the same person? |
| 17 Q  Did you tell people, "I'm not going to Flint to meet | 17  A  I already explained. |
| 18  with Dr. Ropp"? | 18  Q  Because Dr. Ropp said, "Stop talking or I'm going to |
| 19  MS. GORMAN: Yes or no? It's just a yes or no | 19  suspend you." Is that why you weren't the same person? |
| 20  question. | 20  A  No. I already explained. |
| 21  THE WITNESS: Yes. | 21  Q  Were people rehired after the ones -- the staff quit? |
| 22 BY MR. MIGLIO: | 22  A  Yes. |
| 23 Q  Okay. Who did you tell that to? | 23  Q  Now, when did you feel -- When was the first time you |
| 24 A  I don't recall. | 24  felt that you were being harassed by McLaren? |
| 25 Q  Okay. Had you ever met with Dr. Ropp before? | 25  A  Can you define "harassed"? |
| Page 173 | Page 174 |

| | |
|---|---|
| 1  Q  Well, you claim that you were harassed and abused by | 1  A  Yep. I wrote a letter -- I came back from the Smokies |
| 2  McLaren. I'm asking you when was the first time you | 2  in the spring of '21 and just said, you know, I'll -- |
| 3  felt that you were being harassed or abused by McLaren? | 3  I'll leave if -- and just do locums or something else |
| 4  A  Well, con -- contract negotiations, they take almost a | 4  besides working here, unless we agree to my |
| 5  year. | 5  accommodation, there was a salary, and there was one |
| 6  Q  So the question was when. | 6  other topic or two, but those are the main ones. And |
| 7  A  That would be negotiated in the contract that was signed | 7  they -- I gave it to the president, Michael Johnson, |
| 8  on 7/21/22. | 8  and -- of the hospital, and then they agreed to it |
| 9  Q  <mark>So when was the first time you felt you were harassed or</mark> | 9  shortly afterward, but then it took another five months |
| 10  <mark>abused?</mark> | 10  to get it in writing. It was, like, glacially slow. |
| 11  A  <mark>Approximately a year before that contract was signed.</mark> | 11  Q  And were you given any of reasons as to why it was |
| 12  Q  <mark>And that would be what date?</mark> | 12  taking so long? |
| 13  A  <mark>7/21/2020.</mark> | 13  A  I don't know. No, that -- I was just told that it takes |
| 14  Q  <mark>Okay.</mark> | 14  time, but it had taken so much time before and so much |
| 15  A  <mark>I -- It's approximate.</mark> | 15  energy before that I was just whittled down to nothing. |
| 16  Q  <mark>And that -- the form of harassment that you said took</mark> | 16  Q  Well, I mean, you agree that a contract has to be agreed |
| 17  <mark>place then was what?</mark> | 17  by both sides, right? |
| 18  A  <mark>That we would have meetings, we'd have a meeting about</mark> | 18  A  Hm-hmm. |
| 19  <mark>the contract, we'd talk about the contract, we'd talk</mark> | 19  Q  Correct? |
| 20  <mark>about the accommodation, then I wouldn't have a response</mark> | 20  A  Yeah. |
| 21  <mark>for many, many days or weeks, and then he would send</mark> | 21  Q  And so in order for both sides to agree to an employment |
| 22  <mark>another contract without any of the things that we</mark> | 22  agreement they have to do some negotiating if they don't |
| 23  <mark>talked about.</mark> | 23  agree on what the terms are at the beginning of the |
| 24  Q  Okay. So you were trying to reach a contract that | 24  negotiation. |
| 25  eventually was signed in 2021? | 25  A  I understand. |
| Page 175 | Page 176 |

44 (Pages 173 to 176)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                         FIRM #8093

| | |
|---|---|
| 1    MS. GORMAN: Okay.  It's just a yes or no<br>2  question.<br>3    THE WITNESS: Yes.<br>4  BY MR. MIGLIO:<br>5  Q   But they told you, did they not, that they couldn't pay<br>6       you in the way you wanted to pay unless it was in a<br>7       formalized written agreement that was approved by<br>8       headquarters, correct?<br>9  A   But I had already negotiated the contract.<br>10 Q   Listen to what I'm asking you.  Didn't they tell you<br>11      the reason why they just couldn't pay you is because they<br>12      needed to have the agreement providing oncall<br>13      compensation signed and submitted to the compensation<br>14      department in order to process your payment?<br>15 A   But another way of looking at that would be that we --<br>16      we were not paid.<br>17    MS. GORMAN: Just yes or no.  It's a yes or no<br>18  question.<br>19    THE WITNESS: That's what they told me.<br>20 BY MR. MIGLIO:<br>21 Q   Okay.  So, I mean, are you saying that they purposely<br>22      did this because they knew about all of this stuff going<br>23      on in Ukraine and they just wanted to harass you?  Is<br>24      that what you're saying?  Because I want the injury to<br>25      hear that argument that you make about these people who | 1    worked with you during this period of time.<br>2  A   We had an agreement, I signed that agreement, and then<br>3       they wanted to change the agreement within the time<br>4       frame.  I -- That's what they did.  They -- And to get<br>5       me to the table to sign that agreement they withheld<br>6       money that I desperately needed.<br>7  Q   I just asked you this question, but I'm not going to ask<br>8       you again.  You knew that the payment was in process and<br>9       they needed to have something in writing in order to pay<br>10      you, didn't they?<br>11 A   They had an agreement that I signed earlier, but they<br>12      didn't want to honor that anymore and they wanted to<br>13      change that, and that's what they told me.<br>14 Q   So first of all, I want to be clear on something.<br>15      You've never been diagnosed with PTSD, have you?  Yes or<br>16      no?<br>17 A   I . . . When I talked to my therapist I -- we've talked<br>18      about those issues, yes.<br>19 Q   You've never been diagnosed with PTSD, correct?<br>20 A   I don't know what my therapist diagnosed me with or not.<br>21 Q   Okay.  Well, you threw that term around in a number of<br>22      correspondence, that the hospital was causing you to<br>23      suffer PTSD.  Now, did you talk to your therapist before<br>24      you started making those allegations?<br>25 A   I was not seeing a therapist at that time.  When I lost |
| Page 193 | Page 194 |
| 1  my job I did.<br>2  Q   Okay.<br>3  A   Because it was really bad.<br>4  Q   You didn't see a therapist until after you were<br>5       terminated.<br>6  A   Yes.<br>7  Q   Did somebody suggest that you go there?<br>8  A   I looked at my life and how the shambles that it was and<br>9       I wouldn't be able to work.  I just --<br>10 Q   Did somebody suggest that you see a therapist?<br>11 A   I talked to my -- I just talked to my wife and she said<br>12      it was a great idea.<br>13 Q   Okay.  So nobody suggested it.  It just came out of a<br>14      discussion with your wife.<br>15 A   Yeah.<br>16 Q   Okay.<br>17 A   I was pretty rock bottom.<br>18 Q   Now, what were your office hours?<br>19 A   Where?<br>20 Q   Pardon?<br>21 A   Where?<br>22 Q   When you worked at McLaren.<br>23 A   Okay.  Because I also have my private practice.  So at<br>24      McLaren it would be Monday through Thursday from<br>25      8 o'clock to 6, as I recall.  Yeah, 6. | 1  Q   Every day.<br>2  A   Monday through Thursday.<br>3        (Exhibit 15 marked for identification)<br>4  BY MR. MIGLIO:<br>5  Q   Let me show you what we've marked as Exhibit 15.<br>6  A   Hm-hmm.  Yes.<br>7  Q   Have you ever seen this before?<br>8  A   Through discovery.<br>9  Q   Okay.  So this is an email from Jeff Whiting to Sarah<br>10      Frye and others, and she says, "Ken and I spoke about<br>11      this today while he was here.  Dr. Christensen is not<br>12      showing up on time.  His schedule is 8 to 6 every day<br>13      and staff are scheduling patients accordingly.  He has<br>14      always been notoriously late, but it's impacting the<br>15      patients.  We had three patients walk out Wednesday<br>16      morning because he didn't show up until after 9 a.m.  I<br>17      spoke with him Wednesday afternoon and let him know<br>18      staff are scheduling patients at 8 a.m.  I informed him<br>19      there was a patient Thursday morning at 8 a.m.  Tara<br>20      also spoke with him on Wednesday and had relayed the<br>21      same information."<br>22      Now, what do you make of that?  Is that true?<br>23 A   That would be true, but there would be inpatient<br>24      responsibilities that would sometimes supersede, just<br>25      like an OB, I have to deliver, you know, a kid.  I have |
| Page 195 | Page 196 |

49 (Pages 193 to 196)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                        FIRM #8093

1    the non-verbal -- There was no verbal way for me to work
2    on stuff.  And Scribe America wasn't in the room when --
3    if I asked, "Can you write something for me?  Can you
4    help me with an order?"  There was nobody there after,
5    you know, obviously Jeff yelling at me.  There was no
6    way that I was going to be asking anybody anything more
7    about what I need for accommodations.
8  Q    So Scribe America --
9  A    It -- A lot --
10 Q    -- you dictate into something, right?  What do you
11   dictate into?
12 A    It -- it was an iPad.
13 Q    Okay.
14 A    Some -- It usually had the name of the patient for the
15   day, you know, the ones that are already registered, but
16   a lot of times it would be blank and you would --
17 Q    Okay.  But I'm just trying to get the system here.
18 A    Yeah.
19 Q    You would dictate into the iPad.  What you're
20   dictating would be taken down by somebody within the
21   company.  They would type it up for you to review,
22   right?
23 A    Yeah.
24 Q    Okay.  That seems very similar to what this --
25 A    No.

Page 205

1  Q    -- MA was that you wanted to have --
2  A    No.  Very not similar.  It was no one that I could talk
3    to, say -- Verbally I can do very much better when
4    talking to someone.  I could not talk to someone with
5    Scribe America, nor could they help me with other
6    functions in the -- in the outpatient setting.  A lot of
7    times --
8  Q    Wait.  Hold on.  What other functions?
9  A    What we talked about.
10 Q    Non-scribe --
11 A    Orders.
12 Q    -- functions.
13 A    Orders.  They're scribe functions, but they are
14   non-dictation.  It wouldn't be -- There would be no
15   scribe -- It's not a scribe when there's nobody there
16   when you come out of the room and say, "Can you write
17   some orders?  I have to get ready for the next patient."
18   Or "The next patient's waiting.  We have to hurry."  You
19   know, there is nobody -- Scribe America was not there
20   for that purpose.
21 Q    But I don't understand.  What's so important --
22 A    I think the --
23 Q    -- about having a person there when you can dictate what
24   you found when you examined the patient and then you can
25   review it, proofread it, be responsible for it being

Page 206

1    accurate, and then sign off on it?
2  A    But that was difficult because --
3  Q    Why?
4  A    Well, sometimes the -- Sometimes the Scribe America
5    would have a name.  Sometimes it would not.  The person
6    that was first presented to me as an interface quit, and
7    then they had other people quit.  I never knew who was
8    the person or the ability to contact them.  Tara
9    Small -- Smalley would be the main person to talk to,
10   but she wasn't -- she had four other clinics to take
11   care of, so she was not necessarily -- had the ability
12   to help me with that.
13 Q    What would she need to help you with?  I mean --
14 A    Okay.  So --
15 Q    -- I thought the responsibility that you had was to
16   dictate information, just like you would when you walked
17   across and told the MA who was doing your scribe work,
18   what happened, what you saw with the patient, they would
19   type it up.  It still came back to you to review and
20   approve as accurate and as medically necessary.
21 A    But if it was --
22 Q    Did it not?
23 A    If it was inaccurate, if was there something that needed
24   to be changed, if something was put in the wrong place,
25   there was no way to -- I could talk to a scribe like a

Page 207

1    real person, but I couldn't talk to an iPad to fix those
2    things.
3  Q    You could make changes on the iPad and you could
4    dictate --
5  A    No.
6  Q    -- and do amendments.
7  A    No.  There's no way that you could make -- It was truly
8    a dictation machine where you dictated a ver -- an
9    audio, the audio would go to someone that would type it
10   in and then put it into the chart.  So at that point you
11   were stuck with that, and the only way to fix that would
12   be Tara Smalley coming to the -- That's why we had so
13   many charts that were waiting.  It wasn't because of me.
14   It was because of not having a scribe.
15 Q    You had charts that were backlogged even before you lost
16   the scribe, didn't you?
17 A    No.  I -- There was --
18 Q    Yes or no?
19 A    -- technical -- Yes, at times, but there was a reason
20   why the scribe had, you know, other commitments or
21   something was needed to be caught up on.
22 Q    And --
23 A    But it was much better and much more medically correct
24   to use somebody right there when it was going on.
25 Q    Well, of course it would be.  Wouldn't that help you out

Page 208

52 (Pages 205 to 208)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                              FIRM #8093

---

Page 209

1    to a bunch of things other than scribing?
2  A   My disability, I've already stated, it's been said --
3      I -- This is -- The reasons are -- already been
4      discussed.
5  Q   You wanted somebody to follow you around and talk to you
6      about what was going on with the patients --
7  A   Not following me around.  Just being available.
8  Q   Well, what they said is you would all only talk to
9      Deziree, and she wasn't a scribe, so that must have
10     been --
11 A   I suffered great trauma, and then right after that I did
12     have difficulties with just -- I wanted someone to
13     trust.  I didn't -- Everything had been destroyed, and
14     you're -- you're faulting me on me wanting just to talk
15     to one or two people all the time?  The rest of the time
16     I would talk to people, because if something needed to
17     be done, I would always talk to anybody that was
18     appropriate.  But I did not feel safe at all.  I did not
19     feel safe in my own clinic.  I did not feel safe with
20     how I was feeling inside, because I had been yelled at
21     and then I had summarily been sent to Flint without an
22     explanation and I was yelled at.  I was -- I mean, I
23     just wanted to survive.  I was in survival mode.
24 Q   Well, maybe you should have looked for another job.  Do
25     you think so?  If this was such a bad experience for

---

Page 210

1      you?
2  A   I needed -- I just wanted to live and let -- At that
3      point I just wanted to survive, okay?
4  Q   And you're saying that being yelled at by Dr. Ropp to
5      shut up and listen and being yelled at by -- Well, I
6      don't know if you're saying that Jeff Whiting was
7      yelling at you.  You said --
8  A   Yes, he was yelling at me.
9  Q   I thought you said what was traumatic is that you
10     were -- somehow felt forced to tell everybody that you
11     had a disability --
12 A   He was --
13 Q   -- in response to him saying --
14 A   He was in my face.
15 Q   -- "What makes you so special?"
16 A   He was in my face pointing his finger yelling at me and
17     saying, "Why are you so special?"  He knew why I was
18     spec -- why this reason for it needed to be."
19 Q   Doctor, all these staff members are going to come to
20     court and testify --
21 A   I would --
22 Q   -- about what happened in that staff meeting.
23 A   Yeah.
24 Q   And there are certain penalties of perjury if you're not
25     testifying truthfully.  The fact that you say he was in

---

Page 211

1      your face when everybody else says you were in Tara's
2      face --
3  A   Tara was --
4  Q   -- is a point of --
5  A   Tara was 15 feet away from me.
6  Q   -- a point of discrepancy, so --
7  A   I'm telling you that I remember that as well as the
8      partition, the --
9          MS. GORDON:  Okay.
10         THE WITNESS:  -- cabinets --
11         MS. GORDON:  All right.  You've already
12     described it.
13         THE WITNESS:  I -- I have tried to give you a
14     very detailed account of my memory.
15         MR. MIGLIO:  Okay.
16         THE WITNESS:  And there is no way on God's
17     green earth that I ever would do something perjurous.
18     Is that understood?
19 BY MR. MIGLIO:
20 Q   So when you were an MA -- Strike that.
21         When you were doing rounds in the hospital --
22 A   Yes.
23 Q   -- did you have an MA there?
24 A   No.
25 Q   Did you have a scribe?

---

Page 212

1  A   No.
2  Q   How did you get information entered into the electronic
3      medical record for your visit?
4  A   It took extra time.  And usually yes, it would be
5      between one and five babies or maybe sometimes it would
6      get up to around six or seven, but that was the limit.
7  Q   Six or seven babies rounding in the morning?
8  A   I mean, sometimes we'd have some babies -- I mean, at
9      times we would have a fluctuating census.
10 Q   Okay.  So on those occasions you would enter the
11     information from the patients that you rounded on
12     yourself into the electronic medical record --
13 A   That is --
14 Q   -- correct?
15 A   That is true, but it was a different medical record than
16     the one that we used in the clinic.
17 Q   How was it different?
18 A   There was a web -- They went to a web-based version of
19     CPSI that was for inpatient.  I don't recall -- I don't
20     think it was for outpatient.
21 Q   Doesn't -- Strike that.
22         Were there ever any occasions when you had to
23     correct something in the chart that the scribe had put
24     in there?
25 A   Yeah.  I mean, in the outpatient clinic, yes.

---

53 (Pages 209 to 212)

**Page 221**

```
 1    airgun activity where you're in competition.  And then
 2    following the sports of, like, Olympic double trap or
 3    trench trap, skeet, and then 50-meter airgun would be --
 4    maybe not pistol, but airgun.
 5  Q  What is customer.cleudo.com?
 6  A  I don't know.
 7  Q  Www.browning.com, that's a gun site?
 8  A  Browning would be a manufacturer of shot --
 9  Q  Guns?
10  A  Shotguns and pistols.
11  Q  And then you would go to YouTube?
12  A  Right.  That was mainly just to listen to music and --
13    and I liked a lot of just history.  In the background
14    I'd be listening what was going on.
15  Q  If you needed time to read charts and enter accurate
16    information in a patient's record, wouldn't all this
17    surfing take away from time that could have been used
18    for that?
19  A  I don't agree.
20  Q  Don't agree with what?
21  A  What you said.
22  Q  Why would you have magazines in your office?  I don't
23    mean reading magazines.  I mean magazines for a handgun.
24  A  I was going to give that to a friend or sell them to
25    somebody.  It just -- I was going to give them to a
```

**Page 222**

```
 1    friend, and I put them in my desk and then I forgot
 2    about them, unfortunately.
 3  Q  Why would you bring them to your office in the first
 4    place if you were going to give them to your friend?
 5  A  Well, because I would probably see them at the range, so
 6    I would -- I put them there so hopefully it would remind
 7    me, but I forgot about them.
 8  Q  This was a doctor's office, wasn't it?
 9  A  Yeah.
10  Q  Not a gun shop.
11  A  Well, we're -- No, we're not saying that it was a gun
12    shop, no.  Not at all.  I mean, it was -- These are --
13    These are like little parts that, you know, that are
14    not -- They're not a firearm.  They're just parts to
15    something that would be a firearm.
16  Q  They're part of a firearm that goes into a --
17  A  I'm aware of --
18  Q  -- pistol and you had it in your office where --
19  A  Correct.
20  Q  -- you supposedly are doing medical work and working on
21    patients, right?
22  A  Correct.
23  Q  Did you see anything wrong with that?
24  A  What do you see wrong with that?  I'm --
25       MS. GORMAN:  No.  He's asking you the
```

**Page 223**

```
 1    questions.
 2       THE WITNESS:  I didn't see anything wrong with
 3    it because it wasn't a firearm or a weapon.
 4  BY MR. MIGLIO:
 5  Q  Okay.  What about the gunstock that was there?
 6  A  Same thing.  I was -- I had gotten another gunstock to
 7    replace that one from the manufacturer, and I was going
 8    to give it to someone.  I just forgot about it.  And
 9    that one's been there for at least eight years.
10  Q  You forgot about it for a year.
11  A  Eight years.
12  Q  Okay.
13  A  Yeah.  Like, I really forgot about it.
14  Q  Why would you bring a gunstock to the office?
15  A  It was a piece of plastic.
16       MS. GORMAN:  Asked and answered, but go ahead.
17       THE WITNESS:  It's a piece of plastic.
18  BY MR. MIGLIO:
19  Q  It's not a piece of plastic.  It's part of a weapon.
20  A  It is without anything else a piece of plastic.
21  Q  Couldn't you keep this at home and give it to your
22    friends?
23  A  I forgot about it.  It is a misstep, I understand, but
24    it was something that I was going to get rid of and it
25    just sat there.
```

**Page 224**

```
 1  Q  Well --
 2  A  And -- And it got lost.
 3  Q  So we got magazines, not one, not two, but three of them
 4    that you left there, right?
 5  A  Yes.
 6  Q  We got a gunstock --
 7  A  Yep.
 8  Q  -- that was there.  We had shell casings that you left
 9    in your office.
10  A  Those came out of my pocket and were on the ground.
11    Some of them may have been in a drawer, but like sitting
12    there, and they had something fascinating about them,
13    but I didn't know what it was, but they were spent, so.
14  Q  And you kept them in your pocket and then put them in
15    your doctor's office.
16  A  No, they -- Well, the ones that were in the desk
17    obviously were from me putting them there, but the ones
18    that that -- like, those 22 rounds were -- actually the
19    22 brass was on the floor probably from my pocket when I
20    pulled my keys out or something like that, so.
21  Q  Why were you carrying shells around?
22  A  I recycle the brass.
23  Q  Okay.  And you need to carry them around in your pocket?
24  A  No.  It was just when I was in the -- in -- out in the
25    field at the shooting range I just -- I picked up --
```

56 (Pages 221 to 224)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                              FIRM #8093

| | |
|---|---|
| 1    cleaned my spot as, you know, all the members are | 1    housing for the propellent and the primer. |
| 2    required to do, and mistakenly put it in my pocket | 2   Q   Did you -- |
| 3    instead of in a bag or a box that I kept in my car. | 3   A   That it's gone now. |
| 4   Q   Do you wear scrubs in the office? | 4   Q   Was there live ammunition that you kept in the office? |
| 5   A   Not usually. | 5   A   No.  I -- And that one that they found was -- |
| 6   Q   Do you wear a doctor's coat? | 6   Q   Wait a minute. |
| 7   A   No.  Kids get really anxious when you come in with a | 7   A   -- very corroded. |
| 8    white coat. | 8   Q   You said, "No, but the one that they found," so there |
| 9   Q   So you just wear street clothes. | 9    was live ammunition in your office. |
| 10   A   I wear clothes, yes. | 10   A   There was one 22 round that was very corroded that they |
| 11   Q   And you're saying that you would have come from the | 11    found, and it obviously was in my pocket and fell out. |
| 12    shooting range with these items in your pocket, the | 12   Q   How does it fall out of your pocket? |
| 13    shells? | 13   A   Just how I described the brass coming out of my pocket. |
| 14   A   They were spent brass.  Yes. | 14    All of these things just tumble and you don't notice |
| 15   Q   What difference does it make whether it was spent brass? | 15    them? |
| 16    They're -- | 16   A   They were very old.  I stopped shooting 22 -- I stopped |
| 17   A   Shells would be -- | 17    shooting firearms back in . . . before 2020.  I only did |
| 18   Q   -- ammunition that was used. | 18    that on the weekends with my daughter, and everything |
| 19   A   If you say "shells" it means a complete round, where | 19    else was airgun from that point onward.  So I had |
| 20    spent brass is just brass and nothing else now. | 20    airguns just compressed air and lead projectile, so |
| 21   Q   Well, it's brass that came from a bullet that was shot | 21    whatever they found was from at least, you know, |
| 22    by somebody, right?  I mean, it's not just a piece of | 22    probably more so like between 2015 and 2020, because |
| 23    brass.  It's a functional piece of a weapon, a | 23    I -- I focused on airgun bench rest, which is a sport |
| 24    projectile that comes from a weapon. | 24    that is quite popular and, you know, it's -- it's an |
| 25   A   No, it's not a projectile from the weapon.  It's a | 25    activity that -- that I've always enjoyed. |
| Page 225 | Page 226 |

| | |
|---|---|
| 1    MS. GORMAN:  You're on 19, if -- | 1   Q   And is this your description here, "Mother Russia |
| 2    MR. MIGLIO:  Thank you. | 2    bleeding out at the expense of peasant."  Bear with |
| 3    MS. GORDON:  -- that's what you're looking | 3    shoes and broom? |
| 4    for. | 4   A   No.  This is -- someone else wrote this. |
| 5    (Exhibit 19 marked for identification) | 5   Q   Who wrote that? |
| 6   BY MR. MIGLIO: | 6   A   I don't know who wrote that.  That's -- This is a |
| 7   Q   Let me show you was was marked as Exhibit 19. | 7    picture and then someone put something on the picture. |
| 8   A   Okay. | 8   Q   Well, I don't know anybody else who would know what this |
| 9   Q   These are documents we got from your attorney. | 9    is other than the person that was hanging it on the |
| 10   A   Hm-hmm.  This was on my wall of my room.  Everyone came | 10    wall. |
| 11    in, looked at it -- | 11   A   This is my not my writing, sir. |
| 12   Q   I didn't ask you a question yet. | 12   Q   Listen -- |
| 13   A   Okay. | 13   A   This is -- This is not my writing.  The picture was |
| 14    MS. GORMAN:  Just trying to be helpful. | 14    mine, but that was from someone that -- that was |
| 15   BY MR. MIGLIO: | 15    observing what's going on.  It was in social media.  But |
| 16   Q   First of all, let's go through this page by page. | 16    whoever wrote that was their interpretation of it or |
| 17    What's the first one? | 17    they asked me and then wrote that as their |
| 18   A   That is Putin, and there's a wounded bear, and the -- Do | 18    interpretation of what I said.  I don't know who wrote |
| 19    you see that broom right there?  The broom is of a | 19    it. |
| 20    peasant.  And the unfortunate, you know, the grief, the | 20   Q   Is that what your interpretation of the photo is? |
| 21    death is to the -- to the detriment of the peasants of | 21   A   I just told you my interpretation of the photo. |
| 22    Russia. | 22   Q   So look at the second page. |
| 23   Q   Was this in your office? | 23   A   Okay. |
| 24   A   This was on my wall.  It was on my -- on my front door | 24   Q   Whose writing is this on the photo?  Because it sounds a |
| 25    at one time. | 25    lot like what you just said. |
| Page 227 | Page 228 |

57 (Pages 225 to 228)

CHARLES CHRISTENSEN, D.O.
7/10/2025                                                                FIRM #8093

| | Page 245 |
|---|---|
| 1 | **A**  If I knew that they had no business being there, I would |
| 2 | have done something. |
| 3 | MS. GORMAN:  Okay.  You've answered his |
| 4 | question. |
| 5 | THE WITNESS:  Can I go to the restroom real |
| 6 | quick? |
| 7 | MS. GORDON:  Sure. |
| 8 | MR. MIGLIO:  Yeah, we can take a break. |
| 9 | VIDEO TECHNICIAN:  Microphone. |
| 10 | THE WITNESS:  Okay. |
| 11 | VIDEO TECHNICIAN:  Off the record.  5:49. |
| 12 | (Off the record at 5:49 p.m.) |
| 13 | (Deposition adjourned at 6:07 p.m.) |

Page 245

STATE OF MICHIGAN  )
                  )ss.
COUNTY OF MACOMB  )

1   I certify that this transcript is a complete, true
and accurate record of the testimony of CHARLES CHRISTENSEN,
D.O., to the best of my ability.

I also certify that prior to taking this deposition
CHARLES CHRISTENSEN, D.O., was duly sworn by me to tell the
truth.

I also certify that I am not a relative or employee
of a party, or a relative or employee of an attorney for a
party, have a contract with a party, or am financially
interested in the aforementioned action.

Transcript completed on July 19,

_____

Lauri A. Sheldon, RPR, CSR-4045
Notary Public, Macomb County, Michigan
My commission expires: 2-8-2028

Page 246

CHARLES CHRISTENSEN, D.O.
7/11/2025                                                          FIRM #8093

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARLES H. CHRISTENSEN, D.O.,

Plaintiff,

Case No. 24-cv-12642

vs          Hon. Thomas L. Ludington

MCLAREN MEDICAL GROUP, A
SUBSIDIARY OF MCLAREN HEALTH
CARE CORPORATION,

Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CONTINUED VIDEOTAPED DEPOSITION OF CHARLES
CHRISTENSEN, D.O., taken on Friday, July 11, 2025, at 33
W. Spring St. Port Austin, Michigan, at 9:07 a.m.,
pursuant to Notice.

REPORTED BY:  LAURI A. SHELDON, RPR, CSR 4045

Page 247

---

1
2    A P P E A R A N C E S
     TERESA J. GORMAN P61001
     TERESA J. GORMAN PLLC
3    5700 Crooks Road, Suite 200
     Troy, Michigan  48098
4    (248)763-6943
     terigorman@aol.com
5    Appearing for Plaintiff.
6    TERRENCE J. MIGLIO P30541
     BARBARA BUCHANAN P55084.
7    BUTZEL LONG
     201 W. Big Beaver Road, Suite 1200
8    Troy, Michigan  48084
     (248)258-1616
9    miglio butzel.com
     Appearing for Defendants.
10
     VIDEO TECHNICIAN:  LAUREN LUZOD
11
12   ALSO PRESENT:  CARLA HENRY
                    JOSEPH FURTON
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 248

---

1    T A B L E  O F  C O N T E N T S
2    Witness                          Page
3    CHARLES CHRISTENSEN, D.O. (CONTINUED)
4    Examination by MR. MIGLIO .....................251
5    Examination by MS. GORMAN .....................346
6    Examination by MR. MIGLIO .....................355
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 249

---

1    E X H I B I T  I N D E X
2    (Exhibits attached)
3    Exhibit   Description                      Page
4    Exhibit 21 Email ..............................267
     Exhibit 22 Prepared Statement ..................252
5    Exhibit 23 Email ..............................270
     Exhibit 24 Email ..............................271
6    Exhibit 25 Email with Physician Employment .....274
        Agreement
7    Exhibit 26 Protest of a Determination ...........285
     Exhibit 27 Emails ..............................286
8    Exhibit 28 Physician Employment Agreement .......290
     Exhibit 29 Emails ..............................294
9    Exhibit 30 Email ..............................295
     Exhibit 31 Emails ..............................300
10   Exhibit 32 Emails ..............................306
     Exhibit 33 Emails ..............................311
11   Exhibit 34 Termination Letter ..................343
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 250

---

1 (Pages 247 to 250)

CHARLES CHRISTENSEN, D.O.
7/11/2025                                                          FIRM #8093

| | |
|---|---|
| 1   A   And then sometimes -- sometimes we had some difficulties | 1   was calling Tara -- |
| 2       with that.  There had been times where I would try and | 2   Q   I just want to know what you meant, "edit stonewall |
| 3       log in and it would have a lot of difficulties and I | 3       barriers."  I never heard that term and I want to know |
| 4       would have to ask Tara to come over and maybe help me | 4       what you meant by it -- |
| 5       out to get that working again. | 5   A   So when we had -- |
| 6   Q   And she would help you, wouldn't she? | 6   Q   -- "edit stonewall barriers." |
| 7   A   When she had time.  I mean, she had four other clinics | 7   A   So when I had a real scribe, a person, I could ask them |
| 8       to take care of. | 8       to change something in real time, like right then, or |
| 9   Q   And you had how many MAs in your office? | 9       soon afterwards so it was fresh in our memory.  With |
| 10  A   Well, they didn't have anything to do with Scribe | 10      Scribe America it would sometimes take weeks, sometimes |
| 11      America. | 11      even months to really get back to that chart that there |
| 12  Q   They couldn't help you log in like other physicians log | 12      was deficiencies in. |
| 13      in? | 13  Q   It would take you weeks to get back to the chart? |
| 14  A   I don't know if other physicians log in. | 14  A   No, it -- Tara would be the only interface I would have |
| 15  Q   You -- Did you ask anybody to help you log in to Scribe | 15      to interface and edit. |
| 16      America other than Tara? | 16  Q   Okay. |
| 17  A   Just Tara. | 17  A   So I considered that a major barrier to getting the work |
| 18  Q   Okay.  What is "edit stonewall barriers"?  What does | 18      done on documentation. |
| 19      that refer to? | 19  Q   "Edit stonewall," I'm just trying to figure out what's |
| 20  A   I think we described that earlier, that you can't | 20      that descriptive of. |
| 21      communicate with someone at Scribe America.  The only | 21  A   It's a descriptive of a barrier.  A difficulty.  A |
| 22      way, you can kind of text them, but that doesn't really | 22      unneeded increase to work and then decrease in quality. |
| 23      solve a lot of problems and it's -- it's something where | 23  Q   All of the information that goes into a patient's chart |
| 24      they never gave me a way to talk to someone at Scribe | 24      or the patient's electronic medical record is ultimately |
| 25      America, so the only way I -- the only recourse I had | 25      the responsibility of you, the physician, correct? |
| Page 303 | Page 304 |

| | |
|---|---|
| 1   A   In the final product, yes. | 1   Q   And are you saying that support staff wasn't responsive? |
| 2   Q   And a medical assistant who's performing scribe | 2   A   I -- No.  I'm just saying that they tried to address |
| 3       functions or a scribe application can't independently | 3       issues, but the difficulties kept on coming back and |
| 4       put in information about your patient into the medical | 4       coming back.  They didn't resolve.  And IT is not Scribe |
| 5       record, correct? | 5       America.  Scribe America is a cloud-based dictation |
| 6   A   Could you rephrase that, please? | 6       program. |
| 7   Q   Yeah.  A scribe, an MA who's acting as a scribe, or a | 7       (Exhibit 32 marked for identification) |
| 8       scribe function, cannot independently put information in | 8   BY MR. MIGLIO: |
| 9       the patient's chart about patient care that you | 9   Q   Let me show you what's been marked as Exhibit 32. |
| 10      provided, correct? | 10  A   Okay. |
| 11  A   I don't understand what you're saying, sir. | 11  Q   So this is July 19th of 2023, an email from Ken Rates to |
| 12  Q   They need you to tell them what to put in the chart. | 12      Sarah Frye.  And he says, "Good morning, Sarah.  I'm |
| 13  A   They need me to tell them what to put in the chart, yes. | 13      meeting with Jeff at the moment and Dr. Christensen came |
| 14  Q   Okay.  And then ultimately once they type that out you | 14      over to discuss his contract.  I informed him of the |
| 15      ultimately are responsible to make sure that what goes | 15      meeting we have coming up on the 2nd to discuss his comp |
| 16      into the chart is accurate, correct? | 16      model review and transition to the Evergreen contract." |
| 17  A   Correct.  I would sign off after I reviewed it. | 17      So were you aware that you had a meeting with |
| 18  Q   Okay.  Did you ever ask to meet -- Strike that. | 18      Jeff and Chris -- and Ken Rates to discuss the contract? |
| 19      Did you ever contact IT or anybody else to set | 19  A   I don't know.  I don't recall.  It was . . . |
| 20      up a meeting with Scribe America? | 20  Q   Okay.  Did you ever go over, like it says here, to meet |
| 21  A   I talked to immediate supervisors Tara and Jeff.  They | 21      with Ken Rates to discuss your contract? |
| 22      were -- I don't know -- That decision would have been | 22  A   Again, the only thing they did was give me the contract, |
| 23      made by one of them.  Because we've had problems with | 23      and we had -- I would try and provide some input to |
| 24      other computers and -- and the first thing I would | 24      address, you know, what I needed to succeed. |
| 25      would be to notify the support staff. | 25  Q   So you never went over to Ken Rates and asked him to |
| Page 305 | Page 306 |

15 (Pages 303 to 306)

Tri-County Court Reporters
248-608-9250

CHARLES CHRISTENSEN, D.O.
7/11/2025                                              FIRM #8093

| | |
|---|---|
| 1  Q   Okay. | 1   wanted to keep this confidential. |
| 2  A   You know what happened -- | 2   Q   Doctor, you wanted an accommodation, correct? |
| 3  Q   Didn't -- | 3   A   Yes. |
| 4  A   -- just before that? | 4   Q   For a learning disability, a medical condition, correct? |
| 5  Q   -- you tell -- didn't you tell people that you weren't | 5   A   Neurodevelopmental condition, yes. |
| 6   giving them the medical documentation because you felt | 6   Q   So in order for you to get a request for an |
| 7   that violated your rights under HIPAA? | 7   accommodation approved did you understand that you |
| 8  A   No, I did not say that, but what I told them was that | 8   needed to submit medical documentation so that McLaren |
| 9   I'd just been outed by Jeff Whiting, I didn't feel | 9   could figure out what to do? |
| 10   secure -- Let me finish, please.  I was -- I did not | 10   A   I -- |
| 11   feel -- Yeah, I feel violated and traumatized by what | 11   Q   Did you understand that? |
| 12   happened with Jeff and Dr. Ropp.  I told them I have a | 12   A   No.  What I -- What I offered was the ability for me and |
| 13   whole thick envelope of documentation from -- most of it | 13   HR to go through the denial, find out what they needed |
| 14   that you received -- that I had to verify my disability | 14   specifically and confidentially, and then -- and then no |
| 15   and that we could review those files together.  So I | 15   one ever said anything else to me. |
| 16   had -- I'm not just giving someone that they'll just | 16   Q   Didn't you fill out a form and submit it without the |
| 17   give it to everybody.  I didn't want that to happen.  I | 17   medical documentation? |
| 18   wanted to have control over something that was so | 18   A   I told you exactly what I did. |
| 19   private. | 19   Q   No.  I'm asking you a different question.  Did you not |
| 20       And Dr. Babiker, my physician, would not know | 20   fill out the medical -- the request for an accommodation |
| 21   anything.  I mean, he would know about the learning | 21   under the ADA, but didn't provide the medical |
| 22   disabilities, but he would not be able to comment about, | 22   information that the form required? |
| 23   you know, what things I would need for that disability. | 23   A   I provided an avenue for that to be reviewed, yes. |
| 24   And he was also a colleague.  I didn't -- I didn't want | 24   Q   I'm not asking you whether you provided an avenue.  The |
| 25   to out myself to another colleague or another person.  I | 25   form called for you to submit from your doctor |
| **Page 315** | **Page 316** |

| | |
|---|---|
| 1   information regarding your medical condition, did it | 1   BY MR. MIGLIO: |
| 2   not? | 2   Q   Now, how many times were you asked to fill out the |
| 3  A   It didn't seem appropriate for -- | 3   request or -- the request form for an ADA accommodation? |
| 4  Q   Did the form ask for you to provide medical information | 4   A   Once. |
| 5   regarding your disability? | 5   Q   And you filled it out and didn't supply the information |
| 6  A   It decide -- It wanted me to go to a doctor to have me | 6   for the doctor to fill out, right?  Supply. |
| 7   physically looked at and provided with restrictions, and | 7   A   I filled it out as best I could and provided it. |
| 8   in the context it was a physical disability, not a | 8   Q   Okay.  Well -- And it is true, is it not, that one of |
| 9   neurodevelopmental, and I asked for instructions how to | 9   the reasons, or the reason, why you didn't provide the |
| 10   answer that best. | 10   doctor information was because you didn't want people to |
| 11  Q   Didn't you fill out -- | 11   know about your disability? |
| 12  A   And no one talked to me. | 12   A   Yes. |
| 13  Q   Didn't you fill out the form and not provide the medical | 13   Q   Okay. |
| 14   information?  That's all I'm asking you right now. | 14   A   It was private. |
| 15  A   Because of the trauma of -- | 15   Q   There's privacy. |
| 16  Q   Did you not -- | 16   A   It's need to know.  I mean, so -- and if I was in high |
| 17  A   -- Jeff Whiting -- No. | 17   school I wouldn't just talk to my teacher.  I wouldn't |
| 18       MR. MIGLIO:  We're going to take a break.  I | 18   broadcast it to my whole class. |
| 19   suggest you talk to your client. | 19   Q   Well, were you aware that McLaren, like other employers, |
| 20       MS. GORMAN:  I'll talk to him right now and | 20   had a policy for accommodating people, but part of that |
| 21   we'll get this done.  Answer him yes or no. | 21   policy included a process whereby you -- an employee |
| 22       THE WITNESS:  Yes, I did not provide medical | 22   submits information indicating documenting that they |
| 23   documentation. | 23   need an accommodation because of a medical condition? |
| 24       MS. GORDON:  There you go. | 24   A   So when I first -- |
| 25       MR. MIGLIO:  Okay. | 25   Q   Were you ever -- Did you ever know that? |
| **Page 317** | **Page 318** |

18 (Pages 315 to 318)

Tri-County Court Reporters
248-608-9250

CHARLES CHRISTENSEN, D.O.
7/11/2025                                                    FIRM #8093

| | |
|---|---|
| 1  A   Sir, let me ask -- answer your question.  So when I | 1  Q   Didn't the form -- |
| 2      started with HMC I provided documentation and they said, | 2  A   -- what doctor do you want me to have. |
| 3      "Fine."  I continued having a scribe long into my | 3         MS. GORMAN:  Okay.  Answer -- |
| 4      employment with McLaren and -- | 4         THE WITNESS:  I mean, you keep on asking me |
| 5  Q   Doctor. | 5      questions like, "Is there a doctor?"  I didn't know if a |
| 6  A   And I took -- At the -- At the time for several years I | 6      doctor or what doctor would be able to do that. |
| 7      gave -- I mean, that's the only thing I gave was | 7  BY MR. MIGLIO: |
| 8      basically I needed a scribe, and I had a scribe, and it | 8  Q   Didn't the form have a section on it for your doctor or |
| 9      was provided, but then all the sudden it wasn't provided | 9      a doctor to fill out medical information regarding your |
| 10     and -- | 10     disability and what accommodations -- |
| 11  Q  The CEO of hospital and others told you you needed to | 11  A  It wasn't a medical disability. |
| 12     submit the paperwork in order to have an ADA request for | 12  Q  Listen to me. |
| 13     an accommodation for your disability under the ADA and | 13  A  It was a neurodevelopmental disability, and I don't -- I |
| 14     other laws in order for that to go through, did they | 14     didn't know -- I asked for instruction, and no one gave |
| 15     not? | 15     it to me. |
| 16  A  Um . . . I got a form from HR.  They told me to fill it | 16  Q  Wait. |
| 17     out.  I filled it out to my best ability. | 17        MS. GORMAN:  End of story. |
| 18  Q  All right. | 18  BY MR. MIGLIO: |
| 19  A  And, I mean, that was all that I heard.  There wasn't | 19  Q  You're a physician and you're saying that your condition |
| 20     anything extending like, "Do you -- We need to get more | 20     as a learning disability isn't medical?  Is that what |
| 21     information.  Can we review your file?  Could" -- There | 21     you're saying? |
| 22     was no conversation beyond that. | 22  A  I'm saying it's neurodevelopmental. |
| 23  Q  Doesn't the form have a section on it for your doctor | 23  Q  Are you saying it's not medical? |
| 24     to fill out? | 24  A  More -- I -- I can characterize it as something that a |
| 25  A  I didn't know.  I tried to ask -- | 25     regular general practitioner wouldn't be able to |
| Page 319 | Page 320 |

| | |
|---|---|
| 1      address. | 1      able to discuss with him yet about it and -- but then I |
| 2  Q   Well, didn't you tell them that you weren't giving them | 2      thought about, well, he's a medical doctor, not a |
| 3      the medical documentation because you thought it was a | 3      neurodevelopmental psychologist, psychiatrist, |
| 4      matter of your privacy? | 4      someone -- someone authoritative that could give |
| 5  A   No, I -- I offered for fully -- | 5      instruction, so I offered my past documentation from |
| 6  Q   No, you did not tell them that? | 6      when I was a kid, when I was med school, American Board |
| 7  A   I fully was aware and I wanted to sit down and go | 7      of Pediatrics.  Mainly American Board of Pediatrics and |
| 8      over -- | 8      when I was a kid. |
| 9  Q   Did you tell them that you weren't giving them | 9  Q   Did you offer doctors' documentation in any way, shape, |
| 10     information because of your privacy? | 10     or form on the form or otherwise? |
| 11  A  No.  I said I would give them information. | 11  A  Yes.  I mean, I offered them to come and look at my |
| 12        MS. GORMAN:  He's answered that three times | 12     file. |
| 13     now. | 13  Q  Did you provide it to them is my question. |
| 14        THE WITNESS:  What are you -- What are you -- | 14  A  I had provided a way to for them to do that.  Yes. |
| 15     I was trying to provide as much avenue for them to look, | 15  Q  Okay.  But the form asked you to submit it so that they |
| 16     see, copy, whatever they needed, but it would be with me | 16     could consider it. |
| 17     sitting with them and talking to them about what it was. | 17  A  I -- I gave them the avenue to review it, and they did |
| 18  BY MR. MIGLIO: | 18     not take it, so -- |
| 19  Q  Didn't you also tell them that you couldn't provide | 19        MS. GORMAN:  Okay. |
| 20     medical information because your doctor was no longer | 20  BY MR. MIGLIO: |
| 21     there or the doctor that assessed you was no longer | 21  Q  When's the last time you saw your therapist? |
| 22     available? | 22  A  I'd have to review my phone, but approximately two weeks |
| 23  A  Yeah.  Dr. Babiker was fired. | 23     ago, because today -- or yester -- yesterday was |
| 24  Q  Okay. | 24     supposed to be my next appointment, so they're every two |
| 25  A  And I hadn't set up -- He went to Caro and I hadn't been | 25     weeks. |
| Page 321 | Page 322 |

19 (Pages 319 to 322)

CHARLES CHRISTENSEN, D.O.
7/11/2025                                           FIRM #8093

| | |
|---|---|
| 1  Q  Do you take any responsibility for your termination? | 1  A  Yes. |

**Page 327**

1  Q  Do you take any responsibility for your termination?
2  A  No.
3  Q  Do you take any responsibility for having those items in
4     your office -- or strike that.
5        I mean, do you think it was a mistake or was
6     improper for you to keep those items in your office?
7  A  The items that people had seen for years --
8  Q  Yes or no?
9  A  Yes or no know what?
10     MS. GORMAN:  Do not yell at my client.
11     MR. MIGLIO:  Well, I -- We're trying to get --
12  I'm trying to --
13     MR. GORMAN:  That's fine --
14     MR. MIGLIO:  -- accommodate your schedule.
15     MS. GORMAN:  -- but you don't have to yell.
16  BY MR. MIGLIO:
17  Q  Do you think that you were wrong in keeping those items
18     in your office?
19  A  If I knew I would, yes, agree with you.
20  Q  What time does the gun range open?
21  A  Its' open 24/7.  All the time.
22  Q  Okay.  So that would allow you to go to the gun range in
23     the morning, I think you said.
24  A  Hm-hmm.
25  Q  Correct?

**Page 327**

1  A  Yes.
2  Q  What time would you go to the gun range in the morning
3     if you had to work?
4  A  Usually a good hour, so I have enough time to clean up
5     and get back.
6  Q  So what time would that be?
7  A  So I would have to get there by at least seven, but
8     usually I would get there at six.  Now, the only thing
9     with that is that you would have to only be able to go
10     in the summertime because it would be dark and you
11     wouldn't be able to utilize the gun range in the morning.
12     Um . . . And it would depend also, like, what I was
13     going to be doing.  Sometimes I would be doing --
14     MS. GORMAN:  You answered his question.
15     THE WITNESS:  -- many different things.
16  BY MR. MIGLIO:
17  Q  Do you have to put in a key code or swipe a badge in
18     order to get into the labor and delivery unit at the
19     hospital in the morning when you did rounds?
20  A  Not at first, but later on.
21  Q  Beginning when?
22  A  I don't know when they installed the card.
23  Q  What year would that be?
24  A  I don't recall, but it was --
25     MS. GORMAN:  If you don't recall, you don't

**Page 328**

1  recall.
2     THE WITNESS:  Yeah.  Sometimes I would just --
3     MS. GORMAN:  Enough.
4     THE WITNESS:  Sometimes I wouldn't do that.
5  BY MR. MIGLIO:
6  Q  What do you mean sometimes you wouldn't do that?  Do
7     what?
8  A  I would just call on the phone and ask them to open the
9     door.
10  Q  Open the door to labor and delivery.
11  A  Hm-hmm.
12  Q  Why wouldn't you be able to go in with your keypad?
13  A  I might not have -- I might not have my -- my pocket or
14     it's in my wallet or I misplaced it, so I just would
15     pick up the phone right by the -- the door.
16  Q  Okay.  Do you remember Michele Nichols?  Do you know who
17     she is?
18  A  She's in HR.
19  Q  If you want to take a break to eat, we can do that.
20  A  No.  Go ahead.
21  Q  Didn't Michele Nichols ask you to fill out the ADA
22     disability accommodation request form?
23  A  Yes.
24  Q  Okay.
25  A  That's a direct {ph} question, yeah.

**Page 329**

1  Q  And I think I asked you this, and I apologize:  Do you
2     remember when you filled out that form?
3  A  No, I don't.  It was after Dr. Ropp and Jeff Whiting,
4     but that's all I can recall.
5  Q  "It was after Dr. Ropp and Jeff Whiting."  What does
6     that mean?
7  A  The incident in -- with Jeff Whiting yelling at me and
8     Dr. Ropp yelling at me, so that would be January --
9     sometime after January of '23.
10  Q  Wasn't your meeting with Dr. Ropp in '24?
11  A  We did have a meeting in '24, it was in September, but
12     the first meeting that I had with Dr. Ropp was in '23.
13     MS. GORMAN:  January '23.
14     THE WITNESS:  January of '23.
15  BY MR. MIGLIO:
16  Q  As a pediatrician -- pediatrician were you ever -- did
17     you ever fill out a form for a pediatric patient with a
18     learning disability so that the patient could get some
19     sort of an educational accommodation or an IEP?
20  A  Yeah.
21  Q  Filled it out regularly?
22  A  Filled out regu -- if the child was determined that they
23     did --
24  Q  Do you know what an IEP is?
25  A  Yes.  Individualized educational program.  So what I --

**Page 330**

21 (Pages 327 to 330)

CHARLES CHRISTENSEN, D.O.
7/11/2025                                                    FIRM #8093

| | |
|---|---|
| 1 Q And were you refusing to take this iPad that had | 1 said, "Why are you so special?" -- |
| 2 the iScribe -- the Scribe America platform on it into | 2 A Right. And that -- |
| 3 the office? | 3 Q I just -- |
| 4 A What -- What part of the offi -- It was in the office, | 4 A -- that private information was -- |
| 5 but what part of the office? | 5 MS. GORMAN: You've answered the question. |
| 6 Q The office where you worked. | 6 BY MR. MIGLIO: |
| 7 A Yeah, it was there the whole time. I didn't -- I mean, | 7 Q And the yelling at you you claim occurred by Dr. Ropp |
| 8 it sat on a -- it sat on a desk in the office that I | 8 was him telling you to shut up or stop reading the |
| 9 worked at. At -- I didn't try it for about a week in | 9 statement, correct? |
| 10 the patient's room, but a lot of stuff was being missed | 10 A As I recall, he said "shut up," yes. |
| 11 because it, you know, it just has a -- a little | 11 Q Okay. And then the other aspect you're saying that when |
| 12 microphone and it would be -- It wasn't working very | 12 Nicole Murawski left -- |
| 13 well if you took it into the room, but then I -- I | 13 A Yes. |
| 14 couldn't use it for anything but dictation. | 14 Q -- they didn't provide you with an in-person MA to do |
| 15 Q Tell me how McLaren created a hostile work environment | 15 what Nicole was doing for you, correct? |
| 16 for you. | 16 A They didn't provide me with a scribe, yes. |
| 17 A Not recognizing my disability, not recognizing the | 17 Q All right. They didn't provide you with an MA, which is |
| 18 accommodations I need. When the accommodation was then | 18 what Nicole was doing, to also do scribe duties, |
| 19 severed because of Nicole Murawski leaving, I provided | 19 correct? |
| 20 ample evidence of what was not being provided, and it | 20 A I still -- I answered your question. |
| 21 made me feel less than human. It made me -- And then | 21 Q Okay. But they are did provide you with Scribe America, |
| 22 the yelling matches of -- of Jeff yelling at me, | 22 correct? |
| 23 Dr. Ropp yelling at me. It was incredibly | 23 A Which is a dictation, but not a scribe. |
| 24 discriminatory. | 24 Q Doctor, please. These are simple questions. |
| 25 Q Okay. The yelling at you by Jeff was the statement he | 25 A Yes. And I'm giving you a simple answer. |
| Page 335 | Page 336 |

| | |
|---|---|
| 1 Q And they had supply you with the help from Tara to help | 1 A I . . . I don't -- No, I don't. |
| 2 you do these charts, and actually she acted as a scribe | 2 Q All right. So my question is, and maybe I shouldn't |
| 3 in many instances -- | 3 have used "discrimination," how were you treated |
| 4 A No, she did not. | 4 differently than other physicians? |
| 5 Q Did she help you complete -- | 5 A I had a -- I've already probably described this many |
| 6 A She helped complete the charts that were missed or not | 6 times before, too. |
| 7 done right by Scribe America, yes. | 7 Q How you were treated differently from other physicians? |
| 8 Q Okay. So even when Scribe America wasn't working Tara | 8 A I don't know what's applicable here. |
| 9 got you caught up on these charts, right? | 9 Q Well, I'm asking you the question. What other |
| 10 A She would clean them up, yes, and fix them. | 10 physicians were treated more favorably than you? Let's |
| 11 Q How do you -- Why do you think you were discriminated | 11 try that. |
| 12 against? | 12 A I don't know if -- of what other physicians were treated |
| 13 A I already answered that question, I think. | 13 or how they were treated or if they had a disability or |
| 14 Q You said you had a hostile work environment. I'm asking | 14 not, because it's not my business. I wouldn't want to |
| 15 you how you were discriminated against. How were you | 15 know. I just know that they're great doctors, and I |
| 16 treated differently than other physicians? | 16 wanted to be just that, just a great doctor and not have |
| 17 MS. GORMAN: He's answered that so many times | 17 to private information provided to everybody or being |
| 18 in the last two days -- | 18 yelled at or being listened to. I tried my best to try |
| 19 BY MR. MIGLIO: | 19 everything I could for -- but I don't know about other |
| 20 Q Well, what other physicians were -- | 20 doctors. |
| 21 A I don't know about physicians that have dyslexia and -- | 21 Do you want me to give you a suggestion of -- |
| 22 And there's probably many, many physicians out there | 22 MS. GORMAN: No. I want you to just . . . |
| 23 that don't want to tell anybody about their disability. | 23 There's no question pending. |
| 24 Q Do you know of any other physicians that kept live | 24 BY MR. MIGLIO: |
| 25 ammunition, magazines, gunstocks in their office? | 25 Q Are you familiar with the Facebook post, "You must be |
| Page 337 | Page 338 |

23 (Pages 335 to 338)

Tri-County Court Reporters
248-608-9250

CHARLES CHRISTENSEN, D.O.
7/11/2025                                                    FIRM #8093

| | |
|---|---|
| 1    from Port Austin, Michigan"? | 1    posted came from you? |
| 2    A    You asked this yesterday. | 2    A    I don't -- We're in a relationship with being married |
| 3    Q    Yeah, are you -- I didn't -- I didn't know the name of | 3    for 23 years.  I -- I think it's just like any other |
| 4    it then. | 4    relationship with your wife or your loved one or . . . |
| 5    A    Yeah, I think you did say that, actually. | 5    Q    She wrote, "My husband, Charlie Christensen, was fired |
| 6    Q    And . . . I think you said you were aware that your wife | 6    from his job yesterday."  Did you authorize her to write |
| 7    posted stuff on that -- Facebook  about your | 7    that on the post? |
| 8    termination. | 8    A    I didn't auth -- I -- She did this on her own volition, |
| 9    A    You would have to read it to me and I could comment on | 9    not mine. |
| 10    it. | 10    Q    Well, did you tell her not to? |
| 11    Q    All right.  Let me share my laptop with you, because I | 11    A    I -- This is her -- |
| 12    don't have a copy of this. | 12    Q    Did you tell her not to? |
| 13    A    Okay.  And what's your question? | 13    A    No.  I didn't say anything to her. |
| 14    Q    First of all, read it and I'll ask you the question. | 14    Q    She said, "I want the community to know that McLaren |
| 15    A    "I want locals to know McLaren" -- | 15    fired him for," quote, "threats and violence," close |
| 16          MS. GORMAN:  You don't have to read it out | 16    quote.  She must have got that information from you, |
| 17    loud. | 17    right? |
| 18          THE WITNESS:  Oh, okay. | 18    A    She was -- I was sitting on -- the day before listening |
| 19          Okay. | 19    to Dr. Ropp and asking him questions why I was |
| 20    BY MR. MIGLIO: | 20    terminated -- |
| 21    Q    You see that? | 21          MS. GORMAN:  Just yes or no.  It's just a yes |
| 22    A    I see that. | 22    or no question. |
| 23    Q    The date of that post is September 14. | 23          THE WITNESS:  So she heard what Dr. Ropp said |
| 24    A    Yeah. | 24    on the speakerphone. |
| 25    Q    Okay.  Would you say that the information that your wife | 25    BY MR. MIGLIO: |
| Page 339 | Page 340 |

| | |
|---|---|
| 1    Q    She wrote, "He kept our daughter's electric bike | 1    Sheila Windy was there, Ken Rates, |
| 2    batteries in his office, but the batteries were in that | 2    Q    No, I just -- |
| 3    office in the same place for months."  You gave her that | 3    A    And the security person -- |
| 4    information, right? | 4    Q    -- want to know whether you told your wife that there |
| 5    A    Yes. | 5    were other items, such as the magazines, the gunstock, |
| 6    Q    And then she wrote, "Nursing staff, cleaning personnel, | 6    the live ammunition, the shells, targets, the pictures |
| 7    and management were in and out all the time for months." | 7    depicting bombing Russia, those kinds of things.  Did |
| 8    Did you provide that information to her?  Did you tell | 8    tell her that those items were in your office? |
| 9    her nursing staff, cleaning personnel, and management | 9    A    It was not bombing Russia.  I already told you what that |
| 10    were in and out all the time for months? | 10    was referred to. |
| 11    A    Yes. | 11    Q    All right.  Well, whatever the case, did you tell her |
| 12    Q    Okay.  What nursing staff were in there? | 12    there were other items that the police found in your |
| 13    A    The MAs. | 13    office for which you were terminated other than just |
| 14    Q    In your office. | 14    these batteries? |
| 15    A    Or CENAs. | 15    A    I was told the reason why I was terminated for threats |
| 16    Q    In your office, not -- | 16    and violence was that -- |
| 17    A    Yes. | 17    Q    I'm not asking you why you told -- I just -- It's a very |
| 18    Q    -- in the examination room. | 18    simple question.  Did you tell your wife that there were |
| 19    A    No, yeah.  They were -- Ken Rates.  Um . . . Yeah. | 19    other items in the office that you were being terminated |
| 20    Q    Cleaning personnel, who would that be? | 20    for in addition to this batteries that looked like |
| 21    A    Cleaning personnel?  People that clean the offices. | 21    whatever? |
| 22    Q    All right.  Did you tell her, your wife, before she | 22    A    I'm trying to say this to you that -- |
| 23    posted this that there were other items other than the | 23          MS. GORMAN:  Just answer yes or no.  Please. |
| 24    batteries that were found for which you were terminated? | 24          THE WITNESS:  No. |
| 25    A    So when I was put on administrative leave I asked -- | 25    BY MR. MIGLIO: |
| Page 341 | Page 342 |

24 (Pages 339 to 342)

CHARLES CHRISTENSEN, D.O.
7/11/2025                                                        FIRM #8093

| | |
|---|---|
| 1 "when would this patient come back to see us?" or I knew | 1 STATE OF MICHIGAN  ) |
| 2 what -- what time that patient -- because she was doing | 2                 )ss. |
| 3 the scheduling, I would tell her.  I mean, I wouldn't | 3 COUNTY OF MACOMB   ) |
| 4 be, um . . . I guess I wouldn't be evasive.  If it | 4 |
| 5 needed -- If it needed to be done, I would take care of | 5 |
| 6 it. | 6     I certify that this transcript is a complete, true |
| 7 Q   And Tammie and Stacie resigned from their employment at | 7 and accurate record of the testimony of CHARLES CHRISTENSEN, |
| 8 about the same time? | 8 D.O., to the best of my ability. |
| 9 A   As I recall, yeah, they all kind of left around the same | 9 |
| 10 time. | 10     I also certify that prior to taking this deposition |
| 11 Q   I don't have anything else. | 11 CHARLES CHRISTENSEN, D.O., was duly sworn by me to tell the |
| 12     MS. GORMAN:  We're done. | 12 truth. |
| 13     VIDEO DEPOSITION:  That concludes the | 13 |
| 14 deposition.  Off the record.  It's 12:16:30 seconds. | 14     I also certify that I am not a relative or employee |
| 15     (Deposition concluded at 12:16 p.m.) | 15 of a party, or a relative or employee of an attorney for a |
| 16 | 16 party, have a contract with a party, or am financially |
| 17 | 17 interested in the aforementioned action. |
| 18 | 18 |
| 19 | 19     Transcript completed on July 19, |
| 20 | 20 |
| 21 | 21     _____ |
| 22 | 22 Lauri A. Sheldon, RPR, CSR-4045 |
| 23 | 23 Notary Public, Macomb County, Michigan |
| 24 | 24 My commission expires: 2-8-2028 |
| 25 | 25 |
| Page  359 | Page  360 |

Tri-County Court Reporters
248-608-9250