Exhibit 10

## Page 1

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
                     NORTHERN DIVISION


CHARLES H. CHRISTENSEN, D.O.,

       Plaintiff,

vs.                      Case No. 24-12642
                         Hon. Thomas L. Ludington
                         Magistrate Judge Patricia T. Morris

McLAREN MEDICAL GROUP,

       Defendant.
                              /

Deponent:      BRADLEY ROPP, M.D.

Date:          Wednesday, July 30, 2025

Time:          3:51 p.m.

Location:      FAIRFIELD INN MEETING ROOM
               9044 Holly Road
               Grand Blanc, Michigan 48439




Stenographic Reporter:
Janet M. Seewald, CSR 5079
```

## Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
         TERESA J. GORMAN, P.L.L.C.
 3       (By:  Ms. Teresa J. Gorman, P61001)
         P.O. Box 792
 4       Troy, Michigan 48099
         248.763.6943
 5       terigorman@aol.com
 6   For the Defendant:
         BUTZEL LONG, P.C.
 7       (By:  Mr. Terrence J. Miglio, P30541 and
               Ms. Barbara E. Buchanan, P55084)
 8       101 North Main
         Suite 200
 9       Ann Arbor, Michigan 48104-2283
         734.995.3110
10       Miglio@butzel.com
         Buchanan@butzel.com
11
     Also Present:   Charles H. Christensen, D.O.
12                   Joseph R. Furton, Jr. P45653
                     Carla Henry
```

## Page 3

```
 1              TABLE  OF  CONTENTS
 2   DEPONENT                                    PAGE
 3
     BRADLEY ROPP, M.D.
 4
        Direct Examination by Ms. Gorman          5
 5

            E X H I B I T S
     IDENTIFICATION                              MARKED

     #18:  Email Chain                             25

     #19:  Email Chain                             30

     #20:  Photographs                             49

        (Exhibits attached to transcript.)
```

## Page 4

```
 1                  Grand Blanc, Michigan
 2                  Wednesday, July 30, 2025
 3                  At or about 3:51 p.m.
 4                         - - -
 5           B R A D L E Y   R O P P ,  M. D. ,
 6      a Witness herein, after having first been duly sworn,
 7      testified as follows:
 8                   DIRECT EXAMINATION
 9   BY MS. GORMAN:
10   Q   Would you please state your name for the record?
11   A   Brad Ropp.
12   Q   Is it Brad or Bradley?
13   A   Given name is Bradley, so go by Brad.
14   Q   I understand that.  I go by Teri.  I introduced myself,
15       my name is Teri Gorman.  I'm one of the attorneys
16       representing Doctor Christensen, Charles Christensen, in
17       the lawsuit against McLaren.  You're familiar with that
18       lawsuit?
19   A   I am.
20           MS. GORMAN:  Let the record reflect that this
21       is the deposition of Doctor Brad Ropp taken pursuant to
22       notice and to be used for all purposes under the Federal
23       Rules of Civil Procedure and the Federal Rules of
24       Evidence.
25   Q   (By Ms. Gorman)  Have you ever had your deposition taken
```

Page 17

1  Q   Okay.  Had you -- were you aware that he had been
2      granted a disability accommodation by Huron Medical in
3      the form of a medical assistant scribe due to his
4      dyslexia?
5  A   No.
6  Q   Did you review Doctor Christensen's personnel file with
7      HMC?
8  A   No.
9  Q   Did you review his employment contract with HMC?
10 A   No.
11 Q   Were you aware that the accommodation of the medical
12     assistant scribe to assist Doctor Christensen continued
13     from the time that McLaren took over for close to four
14     years to August of 2022?
15 A   Yeah.  I'm aware of the scribe, yes.
16 Q   During that time before the scribe leaves in August of
17     2022, did you ever have any complaints about Doctor
18     Christensen during those first four years?
19 A   Don't recall.
20 Q   Who is Jeff Whiting?
21 A   He was the manager of several of the practices in the
22     Thumb market.
23 Q   In late 2022, did you become aware of a verbal
24     altercation between Doctor Christensen and Jeff Whiting?
25 A   Yes.

Page 18

1  Q   What were you told and by whom?
2  A   I was told there was a staff meeting, that there was
3      concerns about staff beginning to leave the practice due
4      to conditions onsite, and that there was a meeting
5      around that that got confrontational and he was asking
6      for some help.
7  Q   Who was asking for some help?
8  A   Jeff.
9  Q   What did he want you to do?
10 A   He wanted us to see what we could do to help out with
11     the practice operations.
12 Q   What was the problem that he presented as problems to
13     practice operations?
14 A   No MAs wanted to work at the site.
15 Q   I'm sorry?
16 A   No MAs wanted to work at the site.
17 Q   Anything else?
18 A   Not that I recall, no.
19 Q   What action, if any, did you feel was necessary for you
20     to take with Jeff Whiting's express concerns?
21 A   We wanted to get a little more information in terms of
22     what was going on on the site.
23 Q   Okay.  And did you accomplish that?
24 A   We did.
25 Q   How?

Page 19

1  A   We got some additional meetings with the people within
2      the market as well as we had a meeting up in Flint to
3      discuss the office with Doctor Christensen.
4  Q   Who did you speak to before you had the meeting with
5      Doctor Christensen?  What other additional information
6      did you gather?
7  A   The office team and the director on the site and just
8      whoever was at the office, I believe.
9  Q   Did you personally conduct those interviews?
10 A   Some of them, yes.
11 Q   Who did you talk to?
12 A   Jeff Whiting and to Ken Rates.
13 Q   I'm sorry?  Ken Rates?
14 A   Ken Rates, yeah.
15 Q   Okay.  And did Mr. Whiting talk with anybody else and do
16     part of the legwork as far as these interviews?
17 A   No.  I don't believe so.
18 Q   Did Ken Rates?
19 A   I believe yes.
20 Q   You mentioned that you had a meeting with Doctor
21     Christensen, correct?
22 A   Correct.
23 Q   And that's in January of '23, correct?
24 A   Correct.
25 Q   Who was at the meeting in January of '23?

Page 20

1  A   Jeff Whiting, Ken Rates, I believe I had someone from HR
2      in there and also Doctor Christensen.
3  Q   All of those people were at this meeting in your office?
4      Was it in your office?
5  A   No.  It was in our boardroom in Flint.
6  Q   And what was the purpose?  What did you hope to
7      accomplish?
8  A   Hope to come out of there with a little better
9      understanding of what was really going on at the site
10     and try to get it to a better operational place.
11 Q   Who spoke at the meeting?
12 A   Pretty much everybody.
13 Q   Did Doctor Christensen attempt to read a prepared
14     statement at that meeting?
15 A   He did.
16 Q   Was he allowed to?
17 A   He did read part of it, yes.
18 Q   Why only part?
19 A   Because there was other elements that we needed to
20     discuss and we needed to make sure we could cover
21     everything that was supposed to be within the meeting.
22 Q   So what elements were discussed at this meeting?
23 A   Behavior within the -- around the staffing, and we tried
24     to get Doctor Christensen to talk through the elements
25     that he contributed to the behavior parts in the office.

### Page 21

| | | |
|---|---|---|
| 1 | Q | So other than Doctor Christensen reading part of a |
| 2 | | statement, did Ken Rates speak at the meeting? |
| 3 | A | He did. |
| 4 | Q | What did Mr. Rates say? |
| 5 | A | Could not tell you. |
| 6 | Q | Did Mr. Whiting speak at this meeting? |
| 7 | A | Yes. |
| 8 | Q | And what did he say? |
| 9 | A | Same; I don't know off the top of my head. |
| 10 | Q | Was there somebody else present there other than Rates, |
| 11 | | Whiting, Christensen, you? |
| 12 | A | I thought we had someone from HR but I'm not sure. |
| 13 | Q | Was Carla Henry there?  Do you recall her being there? |
| 14 | A | Carla and I are in so many meetings sometimes I can't |
| 15 | | remember which one she's in or not, so.... |
| 16 | Q | If she's testified that she was there -- |
| 17 | A | Then she was there. |
| 18 | Q | -- you'd have no reason -- |
| 19 | A | Yeah. |
| 20 | Q | -- to dispute that, right? |
| 21 | A | I would have no reason to dispute that at all. |
| 22 | Q | Okay.  Isn't it true that at the meeting Mr. Christensen |
| 23 | | complained to you and Carla Henry that he was being |
| 24 | | subjected to discrimination in the workplace and was |
| 25 | | being denied the accommodation of a scribe that he |

### Page 22

| | | |
|---|---|---|
| 1 | | needed to do his work? |
| 2 | A | He did. |
| 3 | Q | What was the response to that? |
| 4 | A | He needed to just give us the paperwork that would show |
| 5 | | -- fill it out for the appropriate accommodation and |
| 6 | | Carla and the HR department would work with him to get |
| 7 | | that done. |
| 8 | Q | Did he indicate that he had offered to provide exactly |
| 9 | | that? |
| 10 | A | That I don't remember. |
| 11 | Q | Isn't it true that he complained that working without a |
| 12 | | scribe was making his job very difficult? |
| 13 | A | He did. |
| 14 | Q | At that point in time, were you -- weren't you aware |
| 15 | | that he was dyslexic? |
| 16 | A | No.  Again, there was some concerns that had been |
| 17 | | brought up, but we wanted to make sure that we actually |
| 18 | | had the appropriate paperwork that he actually was |
| 19 | | dyslexic.  And Doctor Christensen was given the |
| 20 | | opportunity to present that to us. |
| 21 | Q | I see.  Did you yell at him? |
| 22 | A | I did tell him in a firm voice -- but I did not yell -- |
| 23 | | that I needed him to "Listen to us." |
| 24 | Q | Did you tell him to "Shut up"? |
| 25 | A | No.  I didn't tell him to "Shut up."  I did tell him to |

### Page 23

| | | |
|---|---|---|
| 1 | | "Stop talking."  I think that was the exact term. |
| 2 | Q | Those were your exact words? |
| 3 | A | Yeah. |
| 4 | Q | Okay.  Did you threaten to place Doctor Christensen on |
| 5 | | administrative leave? |
| 6 | A | I did if we were not able to get through the meeting |
| 7 | | without getting to some kind of conclusion. |
| 8 | Q | Did you get to a conclusion? |
| 9 | A | We did. |
| 10 | Q | And what was the conclusion? |
| 11 | A | We were going to work through with the operations team |
| 12 | | to try and get the staffing numbers back up to where |
| 13 | | they were, and then Doctor Christensen was going to |
| 14 | | provide us with any kind of documentation around the |
| 15 | | dyslexia piece. |
| 16 | Q | Was this considered in your mind some sort of |
| 17 | | disciplinary meeting? |
| 18 | A | Not initially, no.  We really were trying to find out |
| 19 | | more as to what was going on up there. |
| 20 | | And we did, however, want to make sure we |
| 21 | | addressed the behaviors that came out of the staff |
| 22 | | meeting because we had quite a bit of feedback from |
| 23 | | staff about -- I would say inappropriate verbalizations |
| 24 | | in the behavior of Doctor Christensen. |
| 25 | Q | But he wasn't put on any kind of Performance Improvement |

### Page 24

| | | |
|---|---|---|
| 1 | | Plan like that or anything like that, correct? |
| 2 | A | He was told just not to do that again and there was |
| 3 | | agreement not to.  I won't put someone on a PIP after |
| 4 | | one incident like that.  That virtually in our world is |
| 5 | | not uncommon to see physicians get feisty. |
| 6 | Q | Did you get feedback after the meeting as to whether the |
| 7 | | plan of attack was working? |
| 8 | A | The operations team was working through that, and I |
| 9 | | believe that there was some feedback that things were |
| 10 | | moving -- slowly -- but moving.  But I did hear that we |
| 11 | | did not have anything on the paperwork business for |
| 12 | | dyslexia. |
| 13 | Q | I'm sorry? |
| 14 | A | There was nothing on dyslexia though, no. |
| 15 | Q | Were you unwilling to accept Huron Medical's findings |
| 16 | | that the accommodation of a scribe was appropriate? |
| 17 | A | Wasn't really my decision to make on that, but I do |
| 18 | | think that we needed to go through the right channels |
| 19 | | and process. |
| 20 | Q | If he went through the right channels with Huron Medical |
| 21 | | years before and everybody concurred that a scribe was |
| 22 | | an appropriate accommodation, why would that be |
| 23 | | insufficient for McLaren? |
| 24 | A | Because Huron Valley [sic] is not McLaren and we want to |
| 25 | | make sure we go through with our process. |

### Page 41

```
 1  A   I've got it.
 2  Q   -- there was one bullet that was corroded, and short of
 3      throwing it at somebody, there was no way of that
 4      becoming a problem, correct?
 5          MS. BUCHANAN:  Objection, foundation.
 6          THE DEPONENT:  Yeah.  I think that's -- I
 7      wouldn't say that.
 8  Q   (By Ms. Gorman)  Why?
 9  A   It's a live round.  I mean I wouldn't throw that at
10      anybody or do anything else with it, be careful with it.
11  Q   Well, of course.  But I mean I said "Short of."  But
12      there was no weapon, there was no gun to fire, correct?
13  A   That's true.  There was no gun there.  That is correct.
14  Q   And there was no bomb?
15  A   No bomb.
16  Q   And there was nothing in the office that was going to
17      blow up, explode, shoot or hurt anybody.  Isn't that
18      correct?
19  A   That is correct.
20  Q   Thank you.  After law enforcement says it's a bike
21      battery, were you advised that they just started
22      leaving?  Law enforcement said "Nothing for us to do
23      here and we're departing"?
24  A   We -- well, the bomb squad obviously left after that.
25      The authorities spoke -- I think still had some concerns
```

### Page 42

```
 1      about what they found.
 2  Q   What makes you say that?  What do you base that on?
 3  A   Well, the sheriff I know told us that there was some
 4      concerns that -- about Doctor Christensen and his just
 5      overall manner while this was going on and material that
 6      was found just made him worried.
 7  Q   What medical qualifications or psychological training
 8      qualifications are you aware of Sheriff Kelly Hanson
 9      having?
10  A   Zero, but as a law enforcement officer, I think he's
11      seen his fair share of people that can come unhinged and
12      cause problems.
13  Q   So was his opinion influential in the eventual decision
14      to terminate Doctor Christensen?
15  A   No.  I wouldn't say it was that.  But it definitely --
16      when law enforcement says something to you it does leave
17      an impression.  But that was not in any way, shape or
18      form a decisionmaker for what we were doing.
19  Q   Doctor Christensen that day was put on administrative
20      leave, right?
21  A   Correct.
22  Q   Why?
23  A   Because we needed more investigation done and we needed
24      to talk through how we were going to handle this.
25  Q   Who made the decision to suspend him?
```

### Page 43

```
 1  A   Me and our CEO, Doctor Patel, was also involved in the
 2      decision and senior leadership as a whole.
 3  Q   So when does Doctor Patel become involved in the
 4      communications?
 5  A   I don't know off the top of my head.
 6  Q   Well, was it the 30th when the decision to suspend him
 7      was made by early afternoon of the 30th?
 8  A   I believe we did have contact with him on the 30th, yes.
 9  Q   Do you remember the content of that contact?
10  A   No.
11  Q   Was that you and Ms. Henry?
12  A   I can't remember.
13  Q   Okay.
14  A   Yeah, I can't remember.
15  Q   Do you remember talking to anybody else?
16  A   We do follow a process around this stuff.  We notify our
17      one-ups and others within leadership and also make sure
18      Connie, who is the CEO of the hospital, was aware of it.
19  Q   Even with the protection of law enforcement in the area,
20      do you call Doctor Christensen?
21  A   No.
22  Q   Why?
23  A   Didn't feel that was necessary at this point.
24  Q   You don't want to hear his explanation right there at
25      the time that all of this is happening?
```

### Page 44

```
 1  A   No.
 2  Q   Did you or anyone else ask Doctor Christensen's
 3      permission to go through his desk and all of his
 4      personal items in his office?
 5  A   That's McLaren property.  It's not Christensen's office.
 6  Q   How many times in your role as chief medical officer
 7      have you authorized or requested that a physician's
 8      office be searched?
 9  A   This isn't the first, but I don't know the number off
10      the top of my head.
11  Q   Can you ballpark it for me?
12  A   Oh, boy.  Most recent one I can tell you is over sample
13      drugs that were found at one site that we had to -- we
14      searched, and that's happened a couple times.  I'd say
15      probably three or four.  It could be more.
16          We'll search something if we feel like there's
17      anything that's illicit or anything that's a danger to
18      patients or a danger to staff.  That's right where I'll
19      leave that.
20  Q   Did you or anyone else ask law enforcement -- for to get
21      a search warrant so they could do the search?
22  A   No.
23  Q   Did you or anyone else take pictures of the items in
24      Doctor Christensen's office?
25  A   We have pictures.
```

```
                              Page 45                                                    Page 47
 1   Q   Who took the pictures?                          1   A   Yeah.
 2   A   I don't remember if it was Jeff or others that were   2   Q   For example, didn't he tell you that all of the shells
 3       there, but it would be one of the three people that were   3       were spent from target practice, that that was one of
 4       there onsite.                                    4       his hobbies?
 5   Q   So on the 30th you suspend Doctor Christensen.  Then   5   A   Yeah.
 6       what happens?                                    6   Q   Do you have a hobby of target practice?  Do you know
 7   A   There's more investigation, more discussion just to see   7       anything about it?
 8       what --                                          8   A   I do.  I don't have a handgun but I do have guns.
 9   Q   What kind of investigation?  Define "Investigation" for   9   Q   Did he explain why he had the bike battery in his
10       me.                                             10       office?
11   A   So make sure we followup with law enforcement people,   11   A   He did.
12       make sure that we've got everything out of the office   12   Q   Did he explain why he had the magazines in his office?
13       that we truly found, everything is -- there's no more   13   A   Yes.
14       hazardous related pieces, and then get a chance to talk   14   Q   Did he explain why he had the -- you're nodding.  Is
15       with our teams here.                            15       that a "Yes"?
16   Q   Did you say HazMat related pieces?              16   A   Yes.
17   A   Hazardous.                                      17           MS. GORMAN:  Got it?
18   Q   Oh, hazardous.                                  18           THE COURT REPORTER:  Yes.
19   A   Yeah.                                           19   Q   (By Ms. Gorman)  Did he explain why he had the various
20   Q   What did you personally believe to be hazardous that was   20       gun portions or parts in his office?
21       in the office?                                  21   A   Yes.  He gave his description.
22   A   After finding all those other pieces in there, I didn't   22   Q   Did he also tell you -- isn't it true that he told you
23       know quite what they were going to find, so --   23       that that stuff had been there for quite a while?
24   Q   So you wanted a more thorough search?  Is that it?   24   A   He did.
25   A   Correct.                                        25   Q   Bike battery had been sitting in a box for months after

                              Page 46                                                    Page 48
 1   Q   I see, okay.  Was anything else found?           1       he didn't sell it to somebody?
 2   A   No.  Well, more shells.  But no -- nothing.  Yeah.   2   A   He gave us his side of how long everything had been in
 3   Q   So you have this additional investigation and you said   3       there, yes.
 4       more discussions.  Who is discussing?            4   Q   You agree with me that there is no policy from McLaren
 5   A   So that would be hospital leadership, our overall   5       that forbids employees to have personal items in their
 6       leadership are the main people making those decisions.   6       office, correct?
 7   Q   Okay.  September 3rd you have a meeting, correct, with   7   A   Personal items, yes.  Correct.
 8       Doctor Christensen and --                        8   Q   ==Isn't it true that at the meeting Doctor Christensen==
 9   A   Is that the one with Michele Nichols --          9       ==showed remorse for this becoming an issue?==
10   Q   Carla Henry was there.                          10   A   ==Actually, no.==
11   A   -- or is this --                                11   Q   ==No?==
12   Q   Who is Jeff Young?                              12   A   ==I don't -- I don't think he really understood how big of==
13   A   Oh, okay.  So this is the one where we had everybody   13       ==a deal this was.==
14       here in Flint.  Yes.                            14   Q   Is it fair to say that Doctor Christensen made it known
15   Q   Anybody else at that meeting?                   15       that he really wanted to keep his job and would not have
16   A   No.  Just the three of us.                      16       such items in his office again?
17   Q   What was the purpose of the meeting?            17   A   No, not really.
18   A   To discuss over what we had found thus far.     18   Q   Carla Henry took notes -- and it's an exhibit in her
19   Q   Okay.  Isn't it true at that meeting that Doctor   19       deposition -- and at one point it says "Significance of
20       Christensen methodically explained each and every item   20       concern" and quote marks of him talking "I understand,
21       that had been found?                            21       won't do it again."  Do you recall him saying that?
22   A   He did describe them, yes.                      22   A   No.  But if it's in there from Carla then I will agree.
23   Q   And explained why they were there and --        23   Q   How did the meeting end?
24   A   He gave his description.                        24   A   This particular meeting ended just with continuation of
25   Q   -- what their purpose was?                      25       suspension.
```

12 (Pages 45 to 48)

Page 57

 1   A   No.
 2           MS. GORMAN:  Step out with Doctor Christensen
 3       and be right back.
 4               (Off the record from 5:16 p.m. to 5:20
 5               p.m.)
 6           MS. GORMAN:  I have no further questions for
 7       you, Doctor Ropp.  Thank you for your time.
 8           THE DEPONENT:  Thank you, ma'am.
 9           MS. BUCHANAN:  No questions.
10               (Whereupon the deposition was
11               concluded at or about 5:20 p.m.)

Page 58

 1       STATE OF MICHIGAN         )
 2                                 )  SS
 3       COUNTY OF OAKLAND         )
 4
 5           I certify that this transcript consisting of 58
 6       pages is a complete, true and correct record of the
 7       testimony of BRADLEY ROPP, M.D., held in this case on
 8       July 30, 2025.
 9           I also certify that prior to taking this
10       deposition, BRADLEY ROPP, M.D. was duly sworn to tell
11       the truth.
12           I also certify that I am not a relative or employee
13       of or an attorney for a party; or a relative or employee
14       of an attorney for a party; or financially interested in
15       the action.
16
17
18
19
20
21       August 5, 2025       Janet M. Seewald _____
                              JANET M. SEEWALD, CSR-5079
22                            Certified Shorthand Reporter