Exhibit 20

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARLES H. CHRISTENSEN, D.O.,

    Plaintiff,

vs.                     Case No. 24-12642
                      Hon. Thomas L. Ludington
                      Magistrate Judge Patricia T. Morris

McLAREN MEDICAL GROUP,

    Defendant.
                   /

Deponent:    KENNETH RATES

Date:        Friday, July 11, 2025

Time:        1:39 p.m.

Location:    PORT AUSTIN WELCOME CENTER
             33 West Spring Street
             Port Austin, Michigan 48467

Stenographic Reporter:
Janet M. Seewald, CSR 5079

**Page 2**

1  APPEARANCES:
2  For the Plaintiff:
      TERESA J. GORMAN, P.L.L.C.
3     (By:  Ms. Teresa J. Gorman, P61001)
      5700 Crooks Road
4     Suite 200
      Troy, Michigan 48098-2825
5     248.763.6943
      terigorman@aol.com
6
   For the Defendant:
7     BUTZEL LONG, P.C.
      (By:  Mr. Terrence J. Miglio, P30541 and
8         Ms. Barbara E. Buchanan, P55084)
      101 North Main
9     Suite 200
      Ann Arbor, Michigan 48104-2283
10   734.995.3110
     Miglio@butzel.com
11   Buchanan@butzel.com
12 Also Present:   Charles H. Christensen, D.O.
               Carla Henry

**Page 3**

1                 T A B L E   O F   C O N T E N T S
2  DEPONENT                                              PAGE
3
   KENNETH RATES
4
      Direct Examination by Ms. Gorman             4
5
6
7
8
9
10
                     E X H I B I T S
11
      IDENTIFICATION                                     MARKED
12
13 #1:  Email from Kenneth Rates, 12/16/22                32
14 #2:  Email from Jeffrey Whiting, 5/21/24               37
15      (Exhibits attached to transcript.)

**Page 4**

1                          Port Austin, Michigan
2                          Friday, July 11, 2025
3                          At or about 1:39 p.m.
4                                 - - -
5            K E N N E T H    R A T E S,
6       a Witness herein, after having first been duly sworn,
7       testified as follows:
8                  DIRECT EXAMINATION
9  BY MS. GORMAN:
10 Q   Would you please state your name for the record?
11 A   Kenneth Rates.
12         MS. GORMAN:  Let the record reflect this is
13     the deposition of Kenneth Rates taken pursuant to notice
14     and to be used for all purposes under the Federal Rules
15     of Civil Procedure and Federal Rules of Evidence.
16 Q   (By Ms. Gorman)  Mr. Rates, I just introduced myself.
17     My name is Teri Gorman.  I am one of the attorneys
18     representing Doctor Charles Christensen.
19         I believe you know Doctor Christensen,
20     correct?
21 A   Yes.
22 Q   Have you ever had your deposition taken before?
23 A   Never.
24 Q   Just a few quick rules:  I'm going to ask you a series
25     of questions, you're going to give me answers.  With any

Page 29

1  Q  So he helped -- he participated with you and Ms. Windy,
2     correct, in --
3  A  No.
4  Q  -- the pin-up -- selecting the pin-up board that was
5     going from one office to another?
6  A  No.
7  Q  He didn't?  I thought that's what you just said.  Why am
8     I confused?
9  A  His office was already vacated and moved over to the new
10    office at that point in time.  So his old office was
11    just sitting dormant.  Sheila and I were going in there
12    to prepare it for its new tenants that were going to
13    move in there and have a practice.
14 Q  Okay.
15 A  Before we did that, we let Doctor Christensen know we
16    were going to go in there and start clearing stuff out,
17    give him a heads-up, is there anything he wanted before
18    we just started disposing of things.  That was when he
19    made us aware that there was a bulletin board he wanted.
20 Q  Okay.  And did you relocate it for him?
21 A  We had put it into the waiting room area with a Do Not
22    Discard sign.
23 Q  Did you take pictures of anything that you were moving
24    or any -- the pin-up board or any of the other items?
25 A  I don't recall.

Page 30

1  Q  Did you ever take any pictures in Doctor Christensen's
2     office?
3  A  I don't recall.
4  Q  While you were dealing with the pin-up board relocation,
5     did you see anything in Doctor Christensen's office that
6     caused you concern?
7  A  In the old office?
8  Q  Old office, new office.
9  A  ==In the old office we found empty shell casings, a live==
10    ==round, and what appeared to be butts of guns.==
11 Q  Did you ask Doctor Christensen about them?
12 A  I did not.  Sheila Windy had escalated that to our
13    superiors at the time.
14 Q  You had been in Doctor Christensen's office before that,
15    correct?
16 A  Yes.
17 Q  Had you not noticed any of those items before?
18 A  I did not.
19 Q  When you say Sheila Windy escalated, what do you mean?
20 A  To my understanding, she called her superiors to share
21    what we found.
22 Q  Okay.  Did you just leave the items that you had found
23    in their place or did you pick them up?  What did you do
24    with them?
25 A  We waited there until we had further direction.  I do

Page 31

1     not recall at this time if Sheila was directed to remove
2     the items or leave them there.
3  Q  Do you know what day this happened?
4  A  I do not.
5  Q  How quickly did -- well, presuming that she he did --
6     did Ms. Windy get direction as to what to do with it --
7     or with the question?  Did she get an answer?
8  A  That was -- I do recall it was a Thursday.  I don't
9     recall the exact date.  We were advised to go into
10    Doctor Christensen's office the next day and take a look
11    around, see if anything was out of place, anything that
12    looked off, not to touch anything, not to move anything.
13    It was that day that we found what appeared to be bombs.
14 Q  So Thursday was August 29th.  Isn't it true that the day
15    of August 29th you met with Doctor Christensen in his
16    office?
17 A  I don't recall.
18 Q  Do you recall telling him that you wanted to talk to him
19    about -- that you had the new contract for him and you
20    wanted to talk to him about it?
21 A  I don't recall.
22 Q  Do you recall him complaining to you that day about
23    being discriminated against on the basis of his
24    disability?
25 A  I do not recall.

Page 32

1  Q  Isn't it true that he had complained to you prior to
2     that day about being discriminated against?
3  A  I do not recall.
4  Q  Do you recall writing a letter where you told them --
5     told the powers that be -- that Doctor Christensen had
6     complained about being discriminated against?
7         MS. BUCHANAN:  I'm just going to object that
8     it's vague.
9         (Deposition Exhibit One was marked for
10        identification.)
11 Q  (By Ms. Gorman)  Mr. Rates, I'm handing you what's been
12    marked as Exhibit One.  Would you take a look at this,
13    please?
14 A  (Reading.)  I recall this incident as I was driving to
15    Midland in my car --
16        MS. BUCHANAN:  Hold on until she asks you a
17    question.
18        THE DEPONENT:  Sorry.
19 Q  (By Ms. Gorman)  Does this refresh your recollection as
20    to whether you had ever -- whether Doctor Christensen
21    had ever complained to you about discrimination?
22 A  No.
23 Q  Okay.  Do you not write in here "He feels this is
24    discrimination"?
25 A  I don't recall that.  I recall the anti -- I recall him

|   | Page 45 |
|---|---|
| 1 | that she was given. |
| 2 Q | And at that point in time from your testimony today, I |
| 3 | gather that you had no knowledge of anybody in any walk |
| 4 | of life at anytime complaining about anything that they |
| 5 | had seen in Doctor Christensen's office, right? |
| 6 A | Correct. |
| 7 Q | Okay. So your testimony is that Sheila then -- Sheila |
| 8 | Windy then escalates it by calling people, and you don't |
| 9 | know who those people are. |
| 10 A | Yes. |
| 11 Q | What happens next? |
| 12 A | We were in a wait-and-see mode. |
| 13 Q | Okay. |
| 14 A | So we waited, and then Sheila gave us the directive that |
| 15 | we were to go to his current office then. |
| 16 Q | When did you find out? |
| 17 A | That same day. |
| 18 Q | Okay. |
| 19 A | That we were going to go to the next office that same |
| 20 | day. |
| 21 Q | On the 29th? |
| 22 A | That Thursday, yes. |
| 23 Q | So did you go back to the office on that Thursday? |
| 24 A | No. The following day we went. |
| 25 Q | Early in the morning? |

|   | Page 46 |
|---|---|
| 1 A | Yes. |
| 2 Q | Did you call Doctor Christensen and tell him that you |
| 3 | had some concerns about things in his office and he -- |
| 4 A | I did not. |
| 5 Q | You didn't think it was important to get his input on |
| 6 | what you were going to look for or what you found? |
| 7 A | I was following directives that I was given. |
| 8 Q | By whom? |
| 9 A | Came from Sheila Windy. Who gave it to her, I don't |
| 10 | know. |
| 11 Q | Okay. Had you been instructed not to talk to Doctor |
| 12 | Christensen? |
| 13 A | I don't recall. |
| 14 Q | Did you have a phone conversation or any kind of |
| 15 | communication with Doctor Ropp at that point? |
| 16 A | I don't recall. I don't believe so. That was -- Sheila |
| 17 | was handling those conversations. |
| 18 Q | The next morning, the 30th, is Friday and the clinic is |
| 19 | closed, correct? |
| 20 A | Yes. |
| 21 Q | Did you call Doctor Christensen that morning and tell |
| 22 | him, you know, "We've got some concerns about things in |
| 23 | your office and we've been instructed to check it out"? |
| 24 A | I did not. |
| 25 Q | Did you have a search warrant? |

|   | Page 47 |
|---|---|
| 1 A | I did not. |
| 2 Q | What practices were -- the Peds practice was closed that |
| 3 | day, right? |
| 4 A | Yes. |
| 5 Q | Do you know what practices were open that Friday morning |
| 6 | in the same building? |
| 7 A | General Surgery had staff in there. That was it to my |
| 8 | knowledge. |
| 9 Q | How did the meeting get scheduled for eight a.m.? |
| 10 A | The Friday morning? |
| 11 Q | Yeah. |
| 12 A | I was just told to show up there at that office. |
| 13 Q | Told by whom? |
| 14 A | Sheila. |
| 15 Q | And what happens when you got to the office? |
| 16 A | We entered the space, started looking around for |
| 17 | anything that was alarming. That's when we found the -- |
| 18 | what appeared to be a bomb. |
| 19 Q | And what about it appeared to be a bomb? |
| 20 A | There were rectangular things, devices wrapped in bubble |
| 21 | wrap with wires connecting to each other. |
| 22 Q | Do you have bomb experience? |
| 23 A | I do not. |
| 24 Q | To your knowledge, does Ms. Windy? |
| 25 A | To my knowledge, no. |

|   | Page 48 |
|---|---|
| 1 Q | Well, how did you conclude that it appeared to be a |
| 2 | bomb? |
| 3 A | My first reaction when I saw it "This looks like a |
| 4 | bomb." |
| 5 Q | Can you think of a reason why Doctor Christensen, a |
| 6 | renowned pediatrician, would have a bomb in his office? |
| 7 |             MS. BUCHANAN:  Objection.  Calls for |
| 8 | speculation. |
| 9 Q | (By Ms. Gorman)  You can still answer the question. |
| 10 A | Can you repeat the question? |
| 11 Q | Was there anything that you had -- in getting to know |
| 12 | Doctor Christensen as well as you did -- I don't know |
| 13 | how well that is -- during the prior two years, was |
| 14 | there anything that you knew about him that would make |
| 15 | you think that he would have a bomb in his pediatric |
| 16 | office? |
| 17 A | No. |
| 18 Q | But that's what you thought it was? |
| 19 A | Yes. |
| 20 Q | Or could be? |
| 21 A | Yes. |
| 22 Q | Did you and/or Ms. Windy contact anybody at McLaren |
| 23 | before calling law enforcement? |
| 24 A | Sheila Windy made those calls. I don't know who she |
| 25 | called in what order. |

Page 53

1  Q   Did you have the authority to do that?
2  A   I did not.
3  Q   Did Sheila Windy have the authority to do that?
4  A   Not to my knowledge.
5  Q   Did you have -- after law enforcement left or while law
6      enforcement was there, did you have another opportunity
7      or need to go back into the offices?
8  A   No.
9  Q   Did you ever go back into the offices?
10 A   Yes.
11 Q   When?
12 A   Well, the office that -- after it was determined that
13     Doctor Christensen was not going to return, we had a
14     requirement from Rural Health to get rid of all the
15     supplies, empty -- clean out any empty supplies.  So we
16     would have been removing medical supplies from the
17     office.
18 Q   Did you participate in taking any of the pictures of the
19     items including some of the items that you mentioned in
20     Doctor Christensen's office or offices?
21 A   I don't recall taking any pictures.
22 Q   Did you have any responsibility of removing the shells
23     or the gun parts or anything else that were found in
24     Doctor Christensen's office?
25 A   I don't recall how they got removed.  When we were

Page 54

1      cleaning out some of his old office that was his there
2      was a box of stuff that he didn't direct us to keep but
3      it looked like it was personal -- a credit card
4      statement comes to mind -- and so we removed that and
5      put that into the Practice Management building.  But I
6      don't recall how we got the items of question.
7  Q   Did you participate in picking them up or putting them
8      in a box or how did they end up out of the office?
9  A   I don't recall if Security removed them or if it was
10     Sheila Windy.  I don't --
11 Q   I'm not asking you to guess who.  I'm just asking if you
12     did.
13 A   I don't recall removing them from the office.
14 Q   Okay.  Did you -- to your knowledge, did you or anyone
15     else ask Doctor Christensen's permission to go through
16     his desk and all the items in his office?
17 A   In the old office?
18 Q   The old office or the new office.
19 A   In the old office that would be McLaren property, so
20     once it's vacated we were given the heads up we were
21     gonna --
22 Q   What about the new office?
23 A   We were advised to look but don't move anything, don't
24     touch anything.
25 Q   Have you ever -- before this or since -- entered another

Page 55

1      doctor's office and gone through their desk or taken
2      inventory of the items in their office?
3  A   No.
4  Q   You testified you didn't find a weapon in Doctor
5      Christensen's office, right?
6  A   The old office?
7  Q   Old or new.
8  A   No.  We didn't find any weapons that you could classify
9      the -- what looked like to be a bomb we thought it was a
10     weapon at the time.
11 Q   But once you found out it wasn't a bomb, did you find
12     anything in Doctor Christensen's office that could hurt
13     anybody?
14 A   No.
15 Q   Did anybody from upper management or corporate ever
16     question you about the days' events?
17 A   No.
18 Q   Doctor Christensen was ultimately terminated, correct?
19 A   As I understand it.
20 Q   Did you participate in the decision to terminate?
21 A   I did not.
22 Q   Were you consulted by anyone regarding his potential
23     termination?
24 A   I was not.
25 Q   Did you personally receive any letters, phone calls,

Page 56

1      emails, any kind of communications from parents of
2      patients regarding Doctor Christensen's separation from
3      employment?
4  A   They would have called the office looking either to
5      schedule an appointment or wanting to transfer their
6      records elsewhere.  So not personally, no, but they
7      would have made contact with the office.
8  Q   Did you ever become aware that patients and their
9      parents were unhappy with the decision to terminate
10     Doctor Christensen?
11 A   I don't recall if they were unhappy.
12 Q   You indicated that the Peds office that closed, what, a
13     month later?
14 A   I don't recall the exact timeframe.  After those days of
15     events, there was an investigation going on that took --
16 Q   What kind of investigation?
17 A   I wasn't privy to it, but it was HR and IT all doing the
18     investigation on whatever they were investigating.  I
19     don't know what they were investigating, but I was
20     advised that Doctor Christensen was out of the office
21     for an undetermined amount of time.
22 Q   Were you questioned or did you provide a statement
23     regarding this alleged investigation?
24 A   No.
25 Q   How did you learn that there was an investigation?

## Page 57

1  A   I was told he was placed on administrative leave while
2      they investigate what happened and what transpired.
3  Q   Did you agree with the decision to put him on
4      administrative leave once it was determined it was a
5      bike battery?
6  A   It wasn't my call to make.
7  Q   I know, but I'm asking your opinion.  I know it wasn't
8      your call to make, but what was your -- what was your
9      feeling?
10 A   My feeling was that I would follow the advice and
11     guidance of HR and others involved until they came to a
12     -- whatever conclusion they were -- till they --
13     conclusion to the events.  So I supported the decision
14     if that's what they decided was best for the
15     organization and for the patients and for everyone
16     involved.
17 Q   Was another doctor hired to care for the patients in the
18     interim before the Peds practice closed?
19 A   No.
20 Q   Is there any plans to reopen Thumb Peds, Thumb
21     Pediatrics?
22 A   They are -- there was some recruitment efforts on
23     Advanced Practice Providers to care for pediatric
24     patients in that sole capacity, but I don't know where
25     we're at in those recruitment efforts right now.

## Page 58

1  Q   I'm sorry.  I can't hear you.
2  A   I don't know where those recruitment efforts landed.
3  Q   Okay.  The Huron County Sheriff's Department report from
4      that day, Deputy Dufty writes "I arrived on scene and
5      made contact with Kenneth Rates and Sheila Windy.  They
6      told me they were in Doctor Christensen's old office
7      yesterday.  While in the office, they found some shell
8      casings on a black gun stock.
9          "They also found some drawings that appeared
10     to have tanks on fire and another drawing with a person
11     holding a panda bear.  There was a paper titled
12     'Legitimate Targets for Russian Bombs, Bomb Moscow.'
13     They took those items."
14         Did you take those items from the office?
15 A   I don't recall if it was me specifically or if it was
16     Sheila.
17 Q   But you were present when they were taken out of the
18     office, correct?
19 A   I don't recall specifically taking those out of the
20     office.
21 Q   Is Deputy Dufty wrong when he says that you took them?
22 A   I don't know.
23 Q   "On today's date," that would be the 30th, "they went
24     into Doctor Christensen's new office and found a box
25     with two rectangular objects with bubble wrap on them

## Page 59

1      connected to a gray object.
2          "Officer McGrath and Trooper Hawkins evacuated
3      the building and Mee-dee's (ph) building also.  MSP Bomb
4      Squad was called to see what the suspicious items were."
5          So the bike battery, according to Deputy
6      Dufty, you found in the new office?
7  A   Yes.
8  Q   Does that refresh your recollection at all about having
9      met with Doctor Christensen the day before in his new
10     office regarding the contract?
11 A   I don't recall meeting the day before on the contract.
12         MS. GORMAN:  Let me meet with Doctor
13     Christensen.  I'll be right back.
14         (Off the record from 3:00 p.m. to 3:14
15         p.m.)
16         MS. GORMAN:  Mr. Rates, I have no further
17     questions for you and I yield the floor to Ms. Buchanan.
18         MS. BUCHANAN:  And I have no questions.
19         MS. GORMAN:  Thank you, sir, for your time.
20     Appreciate it.
21         THE DEPONENT:  Thank you.
22         (Whereupon the deposition was
23         concluded at or about 3:14 p.m.)

## Page 60

1   STATE OF MICHIGAN       )
2                           ) SS
3   COUNTY OF OAKLAND       )
4
5       I certify that this transcript consisting of 60
6   pages is a complete, true and correct record of the
7   testimony of KENNETH RATES, held in this case on
8   July 11, 2025.
9       I also certify that prior to taking this
10  deposition, KENNETH RATES was duly sworn to tell the
11  truth.
12      I also certify that I am not a relative or employee
13  of or an attorney for a party; or a relative or employee
14  of an attorney for a party; or financially interested in
15  the action.
16
17
18
19
20
21  July 13, 2025         Janet M. Seewald _____
                          JANET M. SEEWALD, CSR-5079
22                        Certified Shorthand Reporter