Exhibit 23

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHARLES H. CHRISTENSEN, D.O.,

    Plaintiff,

vs.   Case No. 24-12642
    Hon. Thomas L. Ludington
    Magistrate Judge Patricia T. Morris

McLAREN MEDICAL GROUP,

    Defendant.
_____/

Deponent:   CARLA HENRY

Date:       Wednesday, July 30, 2025

Time:       12:16 p.m.

Location:   FAIRFIELD INN MEETING ROOM
            9044 Holly Road
            Grand Blanc, Michigan 48439

Stenographic Reporter:
Janet M. Seewald, CSR 5079

## Page 2

APPEARANCES:
For the Plaintiff:
    TERESA J. GORMAN, P.L.L.C.
    (By:  Ms. Teresa J. Gorman, P61001)
    P.O. Box 792
    Troy, Michigan 48099
    248.763.6943
    terigorman@aol.com

For the Defendant:
    BUTZEL LONG, P.C.
    (By:  Mr. Terrence J. Miglio, P30541 and
        Ms. Barbara E. Buchanan, P55084)
    101 North Main
    Suite 200
    Ann Arbor, Michigan 48104-2283
    734.995.3110
    Miglio@butzel.com
    Buchanan@butzel.com

Also Present:   Charles H. Christensen, D.O.
              Joseph R. Furton, Jr. P45653

## Page 3

T A B L E   O F   C O N T E N T S

| DEPONENT | PAGE |
|---|---|
| CARLA HENRY | |
|   Direct Examination by Ms. Gorman | 5 |

E X H I B I T S

| IDENTIFICATION | | MARKED |
|---|---|---|
| #1: | Email Chain, McLaren Documents | 31 |
| #2: | Email Chain | 39 |
| #3: | McLaren Document/Securing Personal Property Policy | 42 |
| #4: | McLaren Document/Equal Employment Opportunity Policy | 43 |
| #5: | McLaren Document/Harassment and Discrimination Policy | 43 |
| #6: | Email Chain | 47 |
| #7: | Handwritten Notes/Jeff/Tara | 52 |
| #8: | Email Chain | 53 |
| #9: | Handwritten Note/Elevations of Behaviors | 55 |

Exhibits continue on page four

## Page 4

Exhibits, continued

| IDENTIFICATION | | MARKED |
|---|---|---|
| #10: | Handwritten Note/Retaliation | 55 |
| #11: | Handwritten Note/Meeting 9/3/24 | 55 |
| #12: | McLaren Document/Corrective Action Program Policy | 60 |
| #13: | McLaren Document/Safety Policy | 60 |
| #14: | Defendant's Objections and Answers to Plaintiff's First Interrogatories to Defendant | 81 |
| #15: | Defendant's Objections and First Supplemental and Amended Answers to Plaintiff's First Interrogatories to Defendant | 81 |
| #16: | McLaren Correspondence/Termination of Employment | 86 |
| #17: | Email Chain | 90 |

(Exhibits attached to transcript.)

```
                                                Page 65
 1  Q   Other than that?
 2  A   No.
 3  Q   Have you ever participated in any investigation
 4      regarding workplace violence complaints other than what
 5      you testified came from Jeff Whiting?
 6  A   Specifically to pediatrics?
 7  Q   I'm sorry?
 8  A   Specific to the pediatrics clinic?
 9  Q   Yeah, specific.  Yes.
10  A   All right.  No.
11  Q   We're going to shift our focus to August 29th and 30th
12      and then we'll be done.
13          Did you receive a call from Sheila Windy on
14      August 29th, 2024 regarding Doctor Christensen?
15  A   Yes.
16  Q   Tell me everything that you recall, please, about that
17      phone call.
18  A   So I was not available.  She had called and I wasn't
19      available, I was in a meeting.  When I returned her call
20      she was speaking with Doctor Ropp, so I joined the call
21      between Doctor Ropp and Sheila.
22  Q   Sheila Windy was already on the phone with Doctor Ropp?
23  A   As I recall.
24  Q   Okay.  So you joined the call, and what do you recall
25      about that call?
```

```
                                                Page 66
 1  A   Sheila describing the items that she had found in Doctor
 2      Christensen's office -- she and Ken Rates had found in
 3      Doctor Christensen's office, the fact that she was
 4      extremely concerned to find such items, and that her and
 5      Ken had no knowledge of that and that obviously those
 6      items caused concern, and wanted to know kind of --
 7      since they found these what are the next steps.
 8  Q   Okay.  And did either you or Doctor Ropp come up with a
 9      game plan to address those concerns?
10  A   We did.
11  Q   And what was that?
12  A   So after that we -- I consulted with our internal legal
13      in terms of what we should do and what the next steps
14      would be, and from there we determined -- because it was
15      later in the day and he was -- Doctor Christensen was
16      not working the next day -- that because the items that
17      were found were in one office that since there would be
18      nobody in the building the next -- or in his office or
19      his office area the next day that we would go into -- or
20      that Sheila and Ken would go to his office the next
21      morning to see if there were any of the same or similar
22      items in his current office.
23  Q   Did you -- did anybody -- did you, Doctor Ropp, Sheila
24      Windy -- well, Sheila Windy was there, but did you or
25      Doctor Ropp call Doctor Christensen to say "What is this
```

```
                                                Page 67
 1      stuff?"
 2  A   No.
 3  Q   Okay.  Did you personally drive over to the pediatric
 4      clinic to see what she was talking about?
 5  A   No.
 6  Q   Did you have a second call with Ms. Windy that day or
 7      was it just the one?
 8  A   There was a followup call because we had the initial
 9      conversation where she described the items and described
10      the findings.  We said we would look into it, and then
11      there was a followup.  I had a followup call with her.
12  Q   That same day?
13  A   Yes.
14  Q   And that's when you gave her the instruction that you
15      just shared with me about going to his new office the
16      next morning?
17  A   Correct.
18  Q   Okay.  Did you speak with Mr. Rates on August 29th?
19  A   No.  She -- they were together, Sheila and Ken were
20      together at that time.  So I did not personally talk to
21      Ken, no.
22  Q   Was she on speakerphone so Mr. Rates could hear?
23  A   I don't recall that.
24  Q   Did he participate in the conversation with you and
25      Doctor Ropp?
```

```
                                                Page 68
 1  A   No.  It was Sheila.
 2  Q   Ken Rates didn't speak at all that you're aware of?
 3  A   Not that I'm aware of.
 4  Q   You shared with me that you contacted in-house counsel,
 5      and as much as I'd love to I can't ask you questions
 6      about that.
 7              MS. BUCHANAN:  No, but I'd let you answer
 8      them.
 9  Q   (By Ms. Gorman)  Other than calling in-house counsel and
10      the conversation you just told me about, did you have
11      any calls with anybody else on August 29th?
12  A   I just don't recall the exact timing of it, but I did
13      call Carissa Burton, my corporate HR boss.
14  Q   Tell me about that conversation.
15  A   Just giving an update as to what was found and the fact
16      that we were consulting with internal legal and
17      determining next steps and what the next steps were.
18  Q   Anybody else you recall talking to?
19  A   Again, I don't recall the exact day, whether it was that
20      day or the next day, but the other call that I placed
21      was to Chad Grant --
22  Q   Who is that?
23  A   -- who is our corporate executive vice president, chief
24      operating officer.
25  Q   Did you call security at Thumb, McLaren Thumb?
```

Page 77

1  Q   Didn't he say the bike battery had been sitting in a box
2      on a chair for months if not a year?
3  A   He had stated that it was there, but I don't recall him
4      stating it was there for a year.
5  Q   He explained the Bloodstained Men's poster that he had,
6      didn't he?
7  A   Yes.
8  Q   He's a pediatrician, right?
9  A   Yes.
10 Q   Did he explain to you that he had been at a conference
11     in Chicago where there was discussion about the pros and
12     cons of circumcision, correct?
13 A   That's what he stated, yes.
14 Q   On page three he explains that he had gotten a -- you
15     write that he explains he had gotten a call from police
16     that morning.  He voluntarily had driven over to the
17     clinic to reiterate "It's just a bike battery, folks.
18     None of this is stuff is harmless -- or is harmful to
19     anybody."  Didn't he explain that to you?
20 A   That is what he stated.
21 Q   Are you familiar with the Thumb area, the area in which
22     Bad Axe is located?
23 A   At a high level.
24 Q   You've never lived over there, correct?
25 A   No.

Page 78

1  Q   Do you vacation over there?
2  A   No.
3  Q   Do you have an understanding of what that -- did he
4      explain to you the interest in gun ownership and target
5      shooting and gun clubs in the Thumb area?
6  A   Not in detail.  He stated that he -- this is a rural
7      area.
8  Q   Your paragraph on page three, "He states he felt it was
9      retaliation for the contract issues."  You asked -- you
10     say "Asked what he meant."  He stated "Waiting for
11     agreement, receive previous draft contract Thursday
12     evening and didn't address what was discussed."
13         Doctor Christensen has testified that he met
14     with Ken Rates the night of August 29th and that Ken
15     Rates had presented him with a contract that was not
16     reflective of what he believed it was supposed to be,
17     correct?  You sat through Mr. Rates' testimony who says
18     he doesn't remember meeting with Doctor Christensen the
19     night of the 29th.
20         When you spoke with Mr. Rates on the 29th, did
21     he share with you that he was meeting with Doctor
22     Christensen that evening?
23 A   No.
24 Q   Do you have any reason to believe that the meeting with
25     Mr. Rates didn't happen on the 29th?

Page 79

1  A   I wouldn't have that information.
2  Q   When Doctor Christensen told you that he believed he was
3      being retaliated against on this contract issue and the
4      need for a scribe, what was your response?  Or did you
5      respond?
6  A   I stated that I didn't understand how he was putting the
7      -- those pieces together, and I didn't understand how
8      all of the items that we found that he could connect
9      that to the contract issues.
10        So I stated "I don't understand why -- how
11     you're coming to that conclusion or how you're coming to
12     that connection and that it's not accurate."
13 Q   So did you just dismiss his claim of retaliation
14     outright?
15 A   I disagreed with it.
16 Q   I know you disagreed with it.  Did you just dismiss it?
17 A   Define "Dismiss."
18 Q   Well, did you do what your policy mandates that you do
19     and have an investigation?
20 A   We were actively investigating their findings.
21 Q   No.  I'm talking investigating his claim of retaliation.
22 A   No.
23 Q   Okay.  Fair to say -- and you indicate here
24     "Significance of concern.  'I understand.  Won't do it
25     again.'"

Page 80

1           Is it fair to say Doctor Christensen was
2      fighting for his job at that point?
3  A   No.
4  Q   Is it fair to say that he was promising "Even though I
5      don't agree with you, that, hey, this was harmful, I'll
6      make sure that it doesn't happen again."  Did he give
7      you that assurance?
8  A   He stated it, but his actions during the entire
9      investigation definitely didn't lead one to believe that
10     he fully understood the significance of the issue.
11 Q   What investigation are you talking about?
12 A   Our meeting, our discussion about why the items were
13     there, the environment that it creates, that it's not
14     just one of these items, it's every one of these items
15     and trying to get him to see the larger picture.  It was
16     clear he did not see the larger picture.
17 Q   You have the quote:  "I understand.  Won't do it again."
18 A   Because that's what he stated.
19 Q   Okay.
20 A   But his actions and his responses up to that time --
21     including with even how he described getting a call from
22     the police -- it all came across as very dismissive.
23     Like it's not a big deal.
24 Q   It was interpreted that way by you?
25 A   Yeah.

### Page 81

| | | |
|---|---|---|
| 1 | Q | Okay. Anything else you recall about that meeting? |
| 2 | A | No. |
| 3 | Q | Isn't it true that are Doctor Ropp gives him assurance |
| 4 | | at that meeting that no decision will be made unless and |
| 5 | | until we finish an investigation? |
| 6 | A | Correct. |
| 7 | Q | Did an investigation -- any further investigation ensue? |
| 8 | A | There was additional conversations before a final |
| 9 | | decision was made. |
| 10 | Q | Additional conversations between whom? |
| 11 | A | We spoke with legal, our internal counsel. |
| 12 | Q | Well, obviously can't ask about that. Anybody else you |
| 13 | | talked to other than legal? |
| 14 | A | And then it gets presented to Doctor Binesh Patel who |
| 15 | | makes the final decision. |
| 16 | Q | Well, let's talk about that. |
| 17 | | (Deposition Exhibits 14-15 were marked for |
| 18 | | identification.) |
| 19 | Q | (By Ms. Gorman) I'm handing you what's been marked as |
| 20 | | 14 and 15. Fourteen is Defendant's Objections and |
| 21 | | Answers to Plaintiff's First Interrogatories to |
| 22 | | Defendant. I'd like you to turn to page three, if you |
| 23 | | would. |
| 24 | | The first interrogatory was "With regard to |
| 25 | | each interrogatory below, please state the name, address |

### Page 82

| | | |
|---|---|---|
| 1 | | and job title of the position of each individual |
| 2 | | providing information to respond." After the objection |
| 3 | | the answer is "Defendant states that Carla Henry, vice |
| 4 | | president human resources and provider services, McLaren |
| 5 | | Medical Group, at the direction of defendant's counsel, |
| 6 | | assisted with the completion of these interrogatories." |
| 7 | | Do you remember, Ms. Henry, assisting with the |
| 8 | | completion of these interrogatories? |
| 9 | A | Yes. |
| 10 | Q | Would you turn to page eight, please? Interrogatory |
| 11 | | Eight says "Identify all persons who participated in the |
| 12 | | decision to terminate plaintiff from his employment with |
| 13 | | defendant." After the objection, the answer is "Bradley |
| 14 | | Ropp and Jeff Young." |
| 15 | | Did you provide that information to counsel -- |
| 16 | A | No. |
| 17 | Q | -- or the answer to the interrogatory? |
| 18 | A | No. |
| 19 | Q | Okay. Do you know who did? |
| 20 | A | No. |
| 21 | Q | The next paragraph or next interrogatory is "Identify |
| 22 | | the person(s) who made the final decision to terminate |
| 23 | | plaintiff from his employment with defendant." And the |
| 24 | | answer was "Bradley Ropp." |
| 25 | | Did you believe or did you provide the |

### Page 83

| | | |
|---|---|---|
| 1 | | information for the answer to interrogatory nine to |
| 2 | | counsel? |
| 3 | A | No. |
| 4 | Q | If you look at -- which one was it -- |
| 5 | | MS. BUCHANAN: Fifteen is the amended. |
| 6 | Q | (By Ms. Gorman) Okay. Fifteen, and if you go to page |
| 7 | | five on paragraph or interrogatory -- page four |
| 8 | | interrogatory eight which asked "Identify all persons |
| 9 | | who participated in the decision to terminate plaintiff |
| 10 | | from his employment with defendant." |
| 11 | | The original answer was "Bradley Ropp and Jeff |
| 12 | | Young." The amended answer is "Bradley Ropp and Binesh |
| 13 | | Patel the chief executive officer." |
| 14 | | Did you provide this information to defense |
| 15 | | counsel? |
| 16 | A | Yes. |
| 17 | Q | Paragraph nine, "Identify the person(s) who made the |
| 18 | | final decision to terminate plaintiff from his |
| 19 | | employment with defendant." The original answer is |
| 20 | | "Bradley Ropp." The amended answer is "Doctor Patel." |
| 21 | | Did you provide that information to defense |
| 22 | | counsel? |
| 23 | A | Yes. |
| 24 | Q | The original interrogatories were answered and not |
| 25 | | signed by anybody from McLaren on December 26th, 2024. |

### Page 84

| | | |
|---|---|---|
| 1 | | The amended answers were just provided to me yesterday. |
| 2 | | When did you discover -- or was there a time |
| 3 | | that you discovered the answer to the interrogatory was |
| 4 | | incorrect? |
| 5 | A | It was maybe a week ago. |
| 6 | Q | Okay. Did you have discussions or did you participate |
| 7 | | in discussions with Doctor Patel -- |
| 8 | A | Yes. |
| 9 | Q | -- regarding Doctor Christensen? |
| 10 | A | Yes. |
| 11 | Q | When? |
| 12 | A | I don't recall a specific date. |
| 13 | Q | Did you -- was it sometime prior to Doctor Christensen's |
| 14 | | termination? |
| 15 | A | Yes. |
| 16 | Q | Was this an in-person meeting? |
| 17 | A | Yes. |
| 18 | Q | Who attended? |
| 19 | A | Doctor Ropp and myself. |
| 20 | Q | And Doctor Patel? |
| 21 | A | Correct. |
| 22 | Q | Did you provide documentation to Doctor Patel? By |
| 23 | | "Documentation," I mean emails, pictures, anything? |
| 24 | A | We would have went over the pictures and discussions |
| 25 | | about the meeting, the investigatory meeting. |

Page 85

1  Q  Any other documents other than the pictures?  Any
2     emails?
3  A  Not that I recall.
4  Q  Did you or Doctor Ropp share the prior two years of
5     emails or communications regarding the request for a
6     scribe and the complaints of discrimination, complaints
7     of retaliation with Doctor Patel?
8  A  Did bring him up to date in terms of to let him know
9     what the status of his employment agreement because that
10    obviously makes a difference in terms of what language
11    you're using and term notice and those pieces of it.  So
12    we did have a discussion regarding it and the status and
13    why there wasn't a current -- what I'll call a current
14    employment agreement.
15 Q  Thank you for that, but let's go back to my question.
16    Did you share with Doctor Patel Doctor Christensen's
17    complaints of discrimination and retaliation over the
18    last two years?
19 A  Yes.  He was aware.
20 Q  He was aware of that?
21 A  Yes.
22 Q  You made him aware?
23 A  Yes.
24 Q  Did you show him emails or documentation or anything
25    like that?

Page 86

1  A  No.
2  Q  Anything else you recall you and Doctor Ropp sharing
3     with Doctor Patel?
4  A  Not that I recall.
5  Q  Other than talking with Doctor Patel and in-house
6     counsel, did you or Doctor Ropp talk to anybody else as
7     the decision of what to do about Doctor Christensen was
8     being made?
9  A  No.
10 Q  Did you see the letter to Doctor Ropp -- or Doctor
11    Christensen from Doctor Ropp of September 18th before it
12    was sent terminating Doctor Christensen's employment?
13 A  Yes.
14 Q  Did you write it?
15 A  No.
16 Q  Did Doctor Ropp write it?
17 A  No.
18 Q  Who wrote it?
19 A  Internal counsel.
20           (Deposition Exhibit 16 was marked for
21            identification.)
22 Q  (By Ms. Gorman)  Handing you what's been marked as
23    Exhibit 16 which represents as the Termination Letter
24    that was sent to Doctor Christensen dated September
25    18th.  You testified that you saw this before it was

Page 87

1     mailed?
2  A  Yes.
3  Q  Did you agree with everything that was in it?
4  A  In this, yes.
5  Q  Did you express an opinion that you thought Doctor
6     Christensen should be terminated?
7           MS. BUCHANAN:  To who?  Or at anytime?
8     Objection, vague.
9           MS. GORMAN:  Anybody.  To Doctor Ropp, to
10    Doctor Patel.
11 Q  (By Ms. Gorman)  Strike that.  In your meetings with
12    Doctor Ropp and Doctor Patel before Doctor Christensen
13    is terminated, did you express an opinion "I think he
14    needs to be terminated"?
15 A  Yes.
16 Q  Did Doctor Ropp express the same opinion?
17 A  Yes.
18 Q  And we know Doctor Patel -- at least from the revised
19    Answers to Interrogatories -- Doctor Patel is the one
20    who made the final decision, correct?
21 A  Correct.
22 Q  Did the three of you consult -- other than with in-house
23    counsel -- with anybody else before making that
24    decision?
25 A  Not that I'm aware of.

Page 88

1  Q  Who made the decision that he needed to be terminated
2     for cause?
3  A  Doctor Patel.
4  Q  Did you make him aware -- did anybody make him aware
5     that his original contract -- even though there wasn't a
6     current one -- his original contract would have included
7     -- or did include a 60-day notice provision to terminate
8     him just because?
9  A  Can you restate the question?
10 Q  Sure.  If he made the decision he had to be terminated
11    for cause, was he aware that there was the possibility
12    from the previous contract and the one that was in the
13    process of being negotiated that he could have been
14    terminated just with appropriate notice or without
15    cause?
16 A  Yes.
17 Q  Did you think he needed to be terminated for -- Doctor
18    Christensen needed to be terminated for cause?
19 A  Yes.
20 Q  Did Doctor Ropp express that as well?
21 A  Yes.
22 Q  And the cause that you selected -- who selected the
23    Workplace Threats and Violence Policy?
24 A  We worked with internal counsel.
25 Q  You've been in HR for a long time.  You've indicated

Page 89

```
 1       that you do the hiring of physicians.  Was it your
 2       intent to completely derail Doctor Christensen's career
 3       as a hospitalist?
 4              MS. BUCHANAN:  Objection to form.
 5              THE DEPONENT:  No.  Our intent was to address
 6       the issue at hand.
 7    Q  (By Ms. Gorman)  Did you give it thought before saying
 8       "Yes" to the "For cause workplace violence" as to what
 9       that would do to his trying to get another job?
10    A  Very aware, and we take very seriously a for cause
11       termination.  It was not taken lightly.  But because of
12       the significance of the findings, it was determined that
13       for cause was needed.
14    Q  I'm asking you if that's what you determined.  I
15       understand you got direction from in-house counsel or
16       Doctor Patel had an opinion.  I'm asking you, Ms. Henry,
17       with your experience did you think a for cause
18       termination was necessary?
19    A  Yes.
20    Q  Did you take into consideration with your experience in
21       HR of hiring physicians what it would do to his career?
22    A  I was aware, yes.
23    Q  Isn't it true that there had been a plan in place to get
24       rid of Doctor Christensen long before the issue with the
25       bike battery and the stuff in his office?
```

Page 90

```
 1    A  I don't know that I would call it a plan to replace, but
 2       there was definitely concerns about his productivity.
 3              (Deposition Exhibit 17 was marked for
 4              identification.)
 5    Q  (By Ms. Gorman)  Handing you what's been marked Exhibit
 6       17.
 7    A  (Reading.)  Okay.
 8    Q  Exhibit 17 is series of emails involving Sarah Frye from
 9       to -- you're copied on all of this, correct?
10    A  Correct.
11    Q  And you can see I've highlighted the two -- three lines
12       that I find significant.  Who is Joel Keiper?
13    A  He was at the time the vice president of operations.
14    Q  Sarah Frye's boss?
15    A  Yes.
16    Q  He writes on October 4th that there was a -- "Would this
17       be to augment/transition from Christensen as current Bad
18       Axe peds?"  Sarah Frye then replies "The goal is to move
19       away from Christensen."  Down another line I have
20       highlighted "The full-time physician position is to
21       replace Christensen."
22              So isn't it true that almost a year before he
23       was terminated for cause there is a movement, a plan, to
24       remove him from his job?
25    A  Based upon that email, yes.
```

Page 91

```
 1    Q  Do you know why that wasn't effectuated then if there
 2       was disappointment or unhappiness with Doctor
 3       Christensen for whatever reason why it wasn't
 4       effectuated back then?
 5    A  I don't.
 6              MS. GORMAN:  I'm going to step out with my
 7       client.
 8              (Off the record momentarily at 2:57 p.m.)
 9              MS. GORMAN:  I have no further questions for
10       the witness.  Thank you.
11              MS. BUCHANAN:  No questions.
12              (Whereupon the deposition was
13              concluded at or about 2:59 p.m.)
```

Page 92

```
 1       STATE OF MICHIGAN        )
 2                                ) SS
 3       COUNTY OF OAKLAND        )
 4
 5           I certify that this transcript consisting of 92
 6       pages is a complete, true and correct record of the
 7       testimony of CARLA HENRY, held in this case on
 8       July 30, 2025.
 9           I also certify that prior to taking this
10       deposition, CARLA HENRY was duly sworn to tell the
11       truth.
12           I also certify that I am not a relative or employee
13       of or an attorney for a party; or a relative or employee
14       of an attorney for a party; or financially interested in
15       the action.
16
17
18
19
20
21       August 3, 2025        Janet M. Seewald _____
                               JANET M. SEEWALD, CSR-5079
22                             Certified Shorthand Reporter
23
24
25
```