Exhibit 30



Neutral
As of: February 16, 2026 5:33 PM Z

# Sanford v. Quicken Loans

United States District Court for the Eastern District of Michigan, Southern Division

February 18, 2015, Decided; February 18, 2015, Filed

Case No. 13-11929

**Reporter**
2015 U.S. Dist. LEXIS 19068 *; 2015 LX 99327; 2015 WL 687235

MARK SANFORD, Plaintiff, v. QUICKEN LOANS, Defendant.

**Prior History:** *Sanford v. Quicken Loans, 2014 U.S. Dist. LEXIS 8782 ( E.D. Mich., Jan. 24, 2014)*

**Counsel:** [*1] For Mark Sanford, Plaintiff: Joseph A. Golden, Megan Bonanni, Pitt, McGehee, Royal Oak, MI.

For Quicken Loans, Defendant: Robert J. Muchnick, Stanley H. Pitts, William D. Sargent, Honigman, Miller, Detroit, MI.

**Judges:** HON. AVERN COHN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** AVERN COHN

## Opinion

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 31)

### I. INTRODUCTION

This is an employment discrimination case. Plaintiff Mark Sanford (Sanford) is suing Defendant Quicken Loans (Quicken), his former employer, for discriminating against him and ultimately terminating him because of his disability (dyslexia) under the Americans With Disabilities Act (ADA), *42 U.S.C. § 12101, et seq.*, and the Persons With Disabilities Civil Rights Act (PWDCRA), *M.C.L. § 37.1101, et seq*. In addition, Sanford alleges discrimination based on his age (47-years-old) under the Age Discrimination in Employment Act (ADEA), *29 U.S.C. § 621, et seq.* and the Elliot-Larsen Civil Rights Act (ELCRA), *M.C.L. § 37.2101, et seq*. Sanford's complaint is in eight counts:

> **Count I**: ADA—Disability Discrimination—Failure to Accommodate
>
> **Count II**: ADA—Disability Discrimination—Termination
>
> **Count III**: ADA—Disability Discrimination—Hostile Work Environment
>
> **Count IV**: PWDCRA—Disability Discrimination—Failure to Accommodate
>
> **Count V**: PWDCRA—Disability [*2] Discrimination—Termination
>
> **Count VI**: PWDCRA—Hostile Work Environment
>
> **Count VII**: ADEA—Age Discrimination
>
> **Count VIII**: ELCRA—Age Discrimination

In November 2013, after Quicken filed a motion for partial summary judgment, the parties stipulated to the dismissal with prejudice of Sanford's state law claims (Counts IV, V, VI, and VIII) (Doc. 19). On September 17, 2014, the parties stipulated to the dismissal with prejudice of Sanford's hostile environment claim and age discrimination claims

(Counts III and VII) (Doc. 41). Thus, the only remaining claims are for failure to accommodate under the ADA (Count I) and for wrongful termination under the ADA (Count II).

Now before the Court is Quicken's Motion for Summary Judgment on the remaining claims (Doc. 31). In addition, Quicken has moved to exclude testimony by Sanford's expert witness, school psychologist Kelly Elliott (Doc. 41). For the reasons that follow, Quicken's Motion for Summary Judgment (Doc. 31) is GRANTED. Because the motion has been granted for reasons unrelated to Sanford's psychological evaluation, the Court need not consider Quicken's Motion to Exclude Testimony of Plaintiff's Expert (Doc. 44).

## II. BACKGROUND

The facts set forth **[*3]** below are taken from the Joint Statement of Facts for Defendant's Motion for Summary Judgment (Doc. 55), as supplemented by references to the record.[1] Because Sanford claims that Quicken wrongfully denied him accommodation and wrongfully terminated him because of his disability, the facts related to each claim are set forth below.

### A. Sanford's Disability

As a crucial element of his case, Sanford says he is dyslexic and therefore "disabled" under the ADA.

### 1.

To establish that he is dyslexic, Sanford provided the Court with a psychological evaluation by Dr. Diane Barnard from February 1975, while Sanford was an elementary student in the Grosse Pointe school district. Dr. Barnard's evaluation states that the school had monitored Sanford since 1971, when it came to the **[*4]** school's attention that Sanford was slow to grasp directions and had difficulty with reversals, or the reversing of a letter's appearance or of the order of letters within a word. After diagnostic testing and examination, Sanford was held back in the second grade. In 1975, while in the fifth grade, Dr. Barnard found that Sanford had a deficiency in reading skills. Dr. Barnard administered a number of diagnostic tests and concluded that Sanford had a disability in learning, and recommended the use of a reading specialist and/or teacher consultant. However, the evaluation did not diagnose Sanford with dyslexia, per se.

### 2.

In July 2014, Sanford met with school psychologist Kelly Elliott, who evaluated Sanford's disability status. In her evaluation, Elliott relied on three sources of data to conclude that Sanford has dyslexia: (1) the Complaint; (2) statements by Sanford during two interviews totaling 2 1/2 hours; and (3) the 1975 psychological evaluation by Dr. Barnard. During the interviews, Elliott asked Sanford how his disability affected him, the ways he accommodated his disability from childhood, and the impact of his disability on his work performance. Elliott admits that during the **[*5]** interviews she accepted Sanford's statements as true because she had no reason to doubt them, and that she had no independent verification of the statements. Elliott conducted no diagnostic tests of her own during the evaluation. Based on the above, Elliott concluded, "It is this examiner's professional opinion that if Sanford were a student in today's schools, his deficits would satisfy special education criteria as a student with a Learning Disability (also commonly called dyslexia) in the area of language arts."

### B. Sanford's Employment History / Request for

---

[1] On November 19, 2014, the Court held a hearing, intending to hear argument on these motions. However, because the parties had failed to submit a joint statement of material facts, and because their separate statements of material facts were argumentative and contained significant distortions of the record, the Court directed the parties to submit an amended statement of facts, a response, and a joint submission. (See Doc. 50).

**Accommodation**

In April 1995, Quicken hired Sanford as a loan officer. During the course of his employment, Sanford was promoted several times, first to Senior Mortgage Banker, then to Executive Mortgage Banker, and finally to the highest level of President's Club Mortgage Banker.

From 1996 through 2008, Quicken provided assistants to its high producing mortgage bankers. As a high-volume producer, Sanford was provided with an assistant during most of that period. However, between 2007 and 2008, Quicken began eliminating assistants to mortgage bankers due to the transition to a web-based mortgage process and the 2008 economic downturn. **[*6]** By June 2008, Quicken had eliminated assistants completely.

In January 2010, Sanford received an "Opportunity Letter," a form of workplace reprimand, regarding his failure to satisfy the loan volume required for his position as President's Club Banker during the prior 60 days. Sanford explains that due to a substantially decreased loan volume during the economic downturn, he was able to perform his job without an assistant; however, after the market started to pick up in 2009 Sanford's work increased and, because of his dyslexia, he had difficulty performing a high volume of clerical work.

Sanford also says that after receiving this Opportunity Letter, another of his supervisors, Andrew Miller, told Sanford that he noticed reversals and clerical errors in Sanford's work, and that he would try to get him an assistant to help increase his production numbers. Miller, however, denies that Sanford ever had problems with transposing numbers or inputting information into a computer; rather, Miller says that Sanford was "resistant" to using computers. (Doc. 38-38, Miller Dep. at 86)

On September 3, 2010, Sanford was given another Opportunity Letter because of his failure to reach volume requirements **[*7]** during May, June and July 2010. He was demoted from the highest level, President's Club Banker, to the second highest level, Executive Mortgage Banker. However, he could regain President's Club Banker status if he met the requisite loan volume during the next several months.

After Quicken advised him of this demotion in September 2010, Sanford told Quicken for the first time that he had dyslexia, and stated that he required an assistant to meet the numbers associated with the President's Club Banker position level. This request was denied. However, during August, September, and October 2010, Sanford's loan volume had again increased, exceeding the level required for President's Club Banker status. Sanford worked without an assistant during these months, until his termination on October 29, 2010.[2] Therefore, the relevant period for Sanford's accommodation claim is roughly two months, September and October 2010.

**C. Sanford's Employment History / [*8] Termination**

As part of its quality control and customer service functions, Quicken has an internal process to identify mortgage bankers' inappropriate behavior on loans. When such behavior is identified, it may result in coaching sessions and/or corrective actions. In April 2009, Sanford received an Opportunity Letter regarding three discrete incidents of inappropriate behavior. In August 2010, Sanford received two additional Opportunity Letters regarding a client's claim that he had misrepresented Quicken's deposit policy, and another client's claim that he lied to the client about closing costs.

In 2010, Sanford began working with clients Kelly and Jody Sizemore. On October 26, 2010, Mrs. Sizemore complained to Quicken that Sanford had

---

[2] Sanford claims that his increased volume during these months was due to "co-workers and certain managers" acting as his assistant. However, there is no support for the contention that he received assistance during, but not prior to, this period.

Case 1:24-cv-12642-TLL-PTM   ECF No. 23-31, PageID.415   Filed 03/02/26   Page 5 of 8

Page 4 of 7
2015 U.S. Dist. LEXIS 19068, *8

not returned her calls and voicemails. The complaint was referred to Laura Kreder of the Quicken's Client Relations team. Her investigation revealed that despite three voice messages left by Mrs. Sizemore, Sanford failed to return the call from his Quicken telephone or from his personal telephone.[3] Kreder also reviewed the recorded calls between Sanford and the Sizemores, and noted that on October 27, Sanford spoke to Sizemore's realtor, saying that he **[*9]** could not complete the loan because the Sizemores "got him in hot water with [human resources] because he didn't return their call in 3-seconds, and now he has to deal with that." Kreder reported that Sanford later spoke with Mr. Sizemore and "berated" him for the no-call complaint, and implied that he could not work on the loan because of it. Kreder noted that Sanford's tone was "inappropriate" and was acting like it was Mr. Sizemore's fault that the loan was not going to close. Kreder summarized, "I can honestly say I am sick to my stomach after reviewing everything. This is one of those situations where I am not sure a [second] chance is in order." (Doc. 32, Ex. 15)

On October 28, Sanford again called Mr. Sizemore. Sanford asked Mr. Sizemore to call Thomas Dempsey, Sanford's supervisor at the time, withdrawing the no-call complaint and explaining that Sanford had returned all of his calls and answered all **[*10]** of his questions. When Mr. Sizemore refused, Sanford got upset, called him an "a--hole," and threatened to walk away from the loan unless Mr. Sizemore "got him off the hook." (Doc. 32, Ex. 16). Mr. Sizemore immediately called Dempsey. Dempsey asked Mr. Sizemore to submit a written complaint, which he promptly did.

The complaint was then forwarded to Daniel Majewski, Quicken's Vice President of Human Resources, who called Mr. Sizemore to confirm his account of Sanford's conduct. Majewski reported Sizemore's complaint to William Emerson, Quicken's Chief Executive Officer, who made the decision to terminate Sanford. Emerson explained in his deposition, "Mr. Sanford had basically coerced his client into trying to get them to rescind this call complaint . . . . Profanity used towards this client. All unprofessional things . . . that we will not tolerate in an organization on how we communicate with the client." Justifying his decision to terminate Sanford, Emerson also noted Sanford's propensity and reputation for "bullying people." (Doc. 32, Ex. 3) Emerson did not know at the time that Sanford claimed to have dyslexia.

### III. LEGAL STANDARD

The summary judgment standard of review under *Fed. R. Civ. P. 56* is **[*11]** well known and not repeated here. Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. of Ed., 286 F.3d 366, 370 (6th Cir. 2002)*.

### IV. ANALYSIS

#### A. Count I: Failure to Accommodate

Quicken argues that Sanford cannot establish a failure to accommodate claim. To constitute a prima facie case for "failure to accommodate," Sanford must demonstrate: (1) he has a disability under the ADA; (2) he was "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; (3) he proposed a specific, objectively reasonable accommodation; and (4) Quicken Loans failed to make reasonable accommodation for his disability. *Smith v. Ameritech, 129 F.3d 857, 866-68 (6th Cir. 1997)*.

1.

---

[3] Sanford says that he returned the Sizemore's phone calls on October 19, 2010 and October 21, 2010 from his home number, but that he was terminated before he could provide these records to the Client Relations team. However, the phone records he cites do not support this statement.

Quicken challenges Sanford's claim on two grounds, arguing (1) that Sanford is not disabled under the ADA, and (2) that Sanford cannot show that he requested, but was not provided, a reasonable accommodation. Assuming, arguendo, that Sanford is disabled under the ADA, his claim nevertheless fails because he cannot demonstrate that he requested a reasonable accommodation. Because Quicken's second argument is dispositive, the Court will not address **[*12]** whether Sanford is disabled under the ADA.

**2.**

To begin, a plaintiff claiming a failure to accommodate "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Cassidy v. Detroit Edison Co., 138 F.3d 629, 633 (6th Cir. 1998)* (quoting *Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1183 (6th Cir. 1996))*. "In order for an accommodation to be reasonable, it should be necessary in light of the plaintiff's known physical limitations." *Johnson v. Cleveland City Sch. Dist., 344 F. App'x 104, 111 (6th Cir. 2009)*. A court may grant summary judgment where a plaintiff fails to demonstrate that a requested accommodation is reasonable. *Cassidy, 138 F.3d at 635*.

Further, courts in this circuit have denied reasonable accommodation claims where a plaintiff is able to perform the essential functions of the job without any accommodation. *See Black v. Wayne Center, 225 F.3d 658*, [published in full-text format at *2000 U.S. App. LEXIS 17567*], 2000 WL 1033026, *3 (6th Cir. Jul.17, 2000) ("[W]here Plaintiff is able to perform the job without accommodation, plaintiff cannot demonstrate the objective reasonableness of any desired accommodation."); *Obnamia v. Shinseki, 569 F. App'x 443, 445 (6th Cir. 2014)* (affirming summary judgment where the plaintiff was able to successfully perform her job without accommodation, and suggesting that this was a relevant factor weighing against the reasonableness of an accommodation).

**3.**

Here, the record demonstrates that Sanford was able to perform his job without an assistant, both before and after he advised Quicken that he had dyslexia. Between **[*13]** the time Sanford's assistant was eliminated in 2008 and when his numbers fell in 2010, Sanford performed his job duties and maintained his President's Club Banker position without an assistant. Sanford explains that due to a decreased loan volume during the economic downturn, he was able to perform his job without an assistant, and that, after the market started to pick up in 2009 his work increased and, he had difficulty performing the high volume of clerical work because of his dyslexia. However, this claim is undermined by the fact that, after Sanford was demoted and he advised Quicken of his dyslexia, his numbers again increased to the level required for his prior President's Club Banker, without the benefit of an assistant.[4] Aside from several months of low production in 2010, the record shows that Sanford reached and was able to maintain the highest level among mortgage bankers for nearly two years without the benefit of an assistant.

**4.**

Finally, Quicken argues that Sanford's request for an assistant to help with clerical work is not a reasonable accommodation. Indeed, courts in this circuit have held that the duty to accommodate does

---

[4] Sanford's now admits that his numbers were sufficient for the President's Club Bankers position during these months, but claims that he was assisted by co-workers and managers during this period. As noted previously, this statement lacks support in **[*14]** the record. *See infra* note 2. In addition, Sanford's previous counter statement of material facts denies this, and states that Sanford's numbers during this period were half of what was required. (Doc. 38 at 9) Such inconsistencies in Sanford's admissions severely undermine the substantiality of his claims.

not require employers to provide full-time assistants. *Steward v. Chrysler, 415 F. App'x 632, 642 (6th Cir. 2011)*; *Bratten v. SSI Servs., Inc., 185 F.3d 625, 632 (6th Cir. 1999)* ("Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform function or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.") In response, Sanford states that he is not requesting a full-time assistant, but rather an assistant to help with the "marginal duty" of preparing and reviewing paperwork. However, this argument is unavailing. Especially as here, where Quicken eliminated the use of personal assistants in 2008 and transitioned to a web-based mortgage process, requiring Quicken to assign an existing employee **[*15]** to help with Sanford's essential job functions does not constitute a reasonable accommodation.

### B. Count II: Termination

Next, Quicken argues that Sanford cannot establish a wrongful termination claim. To prove a prima facie case of discrimination, Sanford must establish: (1) his membership in a protected group; (2) his qualification for the job in question; (3) that he suffered an adverse employment action; and (4) that he was replaced by someone outside his protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; *Johnson v. University of Cincinnati, 215 F.3d 561, 572-73 (6th Cir. 2000)*.

If Sanford can establish a prima facie case, Quicken Loans has the opportunity to offer a legitimate, nondiscriminatory reason for his termination. *Johnson, 215 F.3d at 573* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))*. Sanford then must prove Quicken Loans' reason was a pretext for discrimination. *Id.* To demonstrate that a nondiscriminatory reason for his termination is pretextual, Sanford must show "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his [discharge], or (3) that they were insufficient to motivate discharge.'" *Chattman v. Toho Tenax America, Inc., 686 F.3d 339, 349 (6th Cir. 2012)* (emphasis in original) (quoting *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994))*.

**1**.

First, Quicken argues that Sanford cannot establish that **[*16]** he was treated less favorably than non-disabled individuals. To sustain this burden, Sanford must "demonstrate[] that a comparable non-protected person was treated better." *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998)*. "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the relevant aspects.'" *Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008)* (quoting *Ercegovich, 154 F.3d at 352*).

Sanford notes several other non-disabled employees who had been investigated for customer service violations and unprofessional conduct but were not terminated. Indeed, Quicken concedes that several of these employees had been the subject of repeated no-call complaints, misrepresentations and miscommunications regarding credit reports and appraisal issues (Doc. 38, Ex. 27), failure to ask the correct application questions (Doc. 38, Ex. 28, Doc. 38, Ex. 29), becoming defensive with a client and threatening to "blacklist" the client (Doc. 38, Ex. 14). However, Quicken is correct that these incidents are relatively "benign" compared to Sanford's conduct. Unlike these other employees, Sanford had received several prior complaints and had a bully's reputation; he "berated" Mr. Sizemore and cursed at him; he asked Mr. Sizemore to retract the no-call complaint **[*17]** in order to impede the internal Quicken investigation; and he threatened

that he would walk away from the loan if Mr. Sizemore did not call Dempsey to "get him off the hook."

Sanford's conduct is substantially more egregious than that of the other, non-disabled employees who were not terminated. For this reason, the other employees are not similarly situated to Sanford "in all of the relevant aspects." Sanford cannot demonstrate that he was treated less favorably than any similarly situated comparator without a disability. In addition, there is no evidence, and Sanford does not argue, that someone without a disability replaced him. Thus, Sanford fails to establish a prima facie case of wrongful termination.

**2.**

In addition, Quicken argues that it had a legitimate nondiscriminatory reason for Sanford's termination—specifically, his treatment of the Sizemores. Quicken notes that Sanford (1) failed to return the Sizemores' calls; (2) "berated" Mr. Sizemore for the no-call complaint; (3) threatened not to work on the Sizemore's loan unless they withdrew their complaint; and (4) cursed at Mr. Sizemore.

Sanford argues that these reasons are pretextual. First, he suggests that the Sizemores are **[*18]** lying about his threats, and notes that there is no *recorded* evidence that he actually threatened Mr. Sizemore, other than Mr. Sizemore's written complaint and his statements to Dempsey and Majewski. This argument is without merit.

Next, Sanford says that Quicken did not interview him as part of their investigation before terminating him; therefore, Quicken failed to make a reasonably informed decision and could not have honestly believed that Sanford actually threatened the Sizemores. However, all that is required is that Quicken reasonably believed that Mr. Sizemore's complaint was credible. *Chen v. Dow Chem. Co., 580 F.3d 394, 401 (6th Cir. 2009)*. "For an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer 'must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Brooks v. Davey Tree Expert Company, 478 Fed. Appx. 934, 942 (6th Cir 2012)* (quoting *Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006))*.

Here, between the telephone logs, recorded phone calls, Sizemore's statements to Dempsey, and Sizemore's written complaint, Quicken has demonstrated that it reasonably relied on the Sizemore's claims. Sanford cannot establish that these reasons are merely pretextual, and his wrongful termination claim therefore fails to state a genuine issue **[*19]** of material fact.

## V. CONCLUSION

For the reasons stated above, Quicken's Motion for Summary Judgment has been granted. The case is DISMISSED.

SO ORDERED.

/s/ Avern Cohn

AVERN COHN

UNITED STATES DISTRICT JUDGE

Dated: February 18, 2015